**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MISTY BLU STEWART, on behalf of herself and all others similarly situated,** | ) ) | |
| | ) | **Case No. 3:11-cv-0342** |
| **Plaintiff,** | ) | **JUDGE TRAUGER** |
| | ) | **MAGISTRATE JUDGE BRYANT** |
| **vs.** | ) | |
| | ) | |
| **CUS NASHVILLE, LLC, COYOTE UGLY SALOON DEVELOPMENT CORP., COYOTE UGLY ENTERTAINMENT, INC., and LILIANA LOVELL,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND FOR DECERTIFICATION OF
THE NASHVILLE CLASS**

_____

Defendants CUS Nashville, LLC, Coyote Ugly Saloon Development Corp., Coyote Ugly Entertainment, Inc. and Liliana Lovell ("CUS Nashville", "CUS Development" and "CUS Entertainment" or "Lovell" or collectively the "Defendants"), through counsel, pursuant to Federal Rule of Civil Procedure 56 and the Court's Order in this matter (D.E. No. 107), file this Memorandum of Law in Support of Their Motion for Summary Judgment and for Decertification of the Nashville Class.

## I. INTRODUCTION

This case involves two Fair Labor Standards Act ("FLSA") classes and three individual claims of retaliation. The Defendants move for summary judgment on one class, decertification of the other, summary judgment as to CUS Entertainment, and summary judgment on the

retaliation claims. In the alternative to decertification, the Defendants move for summary judgment as to one member of the smaller class.

The first class is comprised of forty-six (46) current and former bartenders and waitresses who worked at one of eight stores of which the majority owner is CUS Development and who participated in a tip pool with security guards (the "Nationwide Class"). The other class is comprised of ten (10) of the Nationwide Class members who worked in Nashville and who have additional claims that they did work off-the-clock for which they were not compensated (the "Nashville Class"). However, in her discovery responses, one of the Nashville Class members denies having any off-the-clock claims. The three individuals with retaliation claims are Misty Blu Stewart, Samantha Thomas and Sarah Stone. With its motion, the Defendants move: i) for summary judgment as to the Nationwide Class; ii) for summary judgment as to the retaliation claims; iii) for summary judgment as to CUS Entertainment; and iv) for decertification of the Nashville class or, in the alternative, for summary judgment as to plaintiff Katherine J. Sharbar-Timberlake's claim (D.E. No. 58).

## II.    UNDISPUTED MATERIAL FACTS

### 1.    <u>Coyote Ugly Saloons</u>.

The Coyote Ugly Saloon concept was developed and founded by Defendant Lovell twenty years ago while she was living in New York. She had an extensive background bartending and waitressing and created a concept for a bar to employ attractive female bartenders who are also entertainers, dancing on the bar from time to time and serving drinks in between. The Coyote Ugly Saloon bartenders and waitresses are known as "Coyotes" and, in addition to mixing and selling drinks, they dance on the bar in choreographed numbers and do "body shots" of alcohol off their stomachs. They are to be flirty and "sassy" with customers. Female customers are also allowed and invited to dance on the bar and "let loose." Some, but not all,

Coyote Ugly Saloons serve limited food depending upon legal requirements. (Exh. 1 at 63-64, 104-05, 137-44; MS 2, pg. 11; Exh. 2). The bar chain was featured in a movie called *Coyote Ugly* that was released in 2000, grossed over $100 million, and led to significant publicity and attention to the business. (Exh. 3). Coyote Ugly Saloon has become a brand and each of the stores sells Coyote Ugly merchandise. (Exh. 1 at 55-57). As stated in an employee handbook:

> The Coyotes are expected to use their own personalities to promote their shifts. . .Being a Coyote is about being a confident woman who feels sexy and tough. She is a go getter who knows how to read people and can adapt to different circumstances. . .Service is the most important part of the bar business and I expect my girls to be great bartenders. People go to Coyote to have fun. Men want to see sexy bartenders. Women want a chance to dance on the bar and feel sexy and free. It's a place to let your hair down, have some fun, and spend money."

(Exh. 3).

CUS Development is the majority owner of several limited liability companies that own individual Coyote Ugly Saloons ("Company Owned Stores"). The Company Owned Stores are located in Denver, Colorado; Oklahoma City, Oklahoma; Memphis, Tennessee; Nashville, Tennessee; Austin, Texas; San Antonio, Texas; and Milwaukee, Wisconsin. (Exh. 1 at 35, 47-38). CUS Development was majority owner in another Coyote Ugly Saloon, in Ft. Lauderdale, Florida, that closed. (*Id.* at 36). Defendant Lovell is the President and Founder of CUS Development. Each Company Owned Store has a general manager and assistant manager employed by that individual entity. CUS Development has regional managers and an operations manager who oversee the Company Owned Stores, visiting them periodically to ensure compliance with company standards, appropriate operating procedures and the like. (Exh. 1 at 26-28). There are non-company owned stores through the United States and Europe that operate independently. (Exh. 1 at 38-39). CUS Nashville is the owner of the Nashville store. (D.E. Nos. 1, 11).

CUS Entertainment is a separate entity that was formed for the limited purpose of promoting a singing group of Coyotes to be paid as 1099 independent contractors. The venture was limitedly active and is now defunct. Neither Ms. Stewart, the original plaintiff, or <u>any</u> of the remaining plaintiffs were involved with CUS Entertainment. (Exh. 4 at ¶ 3; Exh. 5). In response to discovery request about why CUS Entertainment was included as a defendant, all responding plaintiffs stated as follows:

> Plaintiff objects on the grounds that this Interrogatory calls for a legal conclusion, and that Plaintiff is not competent to determine what entity(ies) was/were his employer(s) under the Fair Labor Standards Act. Subject to and without waiving that objection, Plaintiff worked at a Coyote Ugly saloon and took directions from managers who were employed by Coyote Ugly. Her work attire, pay information, and the signage at the store all indicated that she worked for Coyote Ugly.

(*See, e.g.,* Exh. 6). The response does not mention anything specific about CUS *Entertainment* or the activities of that separate entity.

### 2. <u>Employees at Coyote Ugly Saloons</u>.

As discussed above, each Company Owned Store has a management team that includes a general and assistant manager. All of the Company Owned Stores employ bartenders, barbacks and security guards, and some have employees who only work selling Coyote Ugly merchandise, or who only waitress. In many of the Company Owned Stores the security guards double as barbacks when business is slow. Some of the bars have head bartenders and head security guards as well. How many employees work and what roles they fulfill varies from store to store, day to day and shift to shift depending on customer volume. (Exh. 1 at 55-57, 67, 74-76, 170).

The Company Owned Stores have a point of sale system called Aloha that employees use to clock in and out of for their shifts. This system allows them to clock in according to the particular job they are performing, whether as a tipped bartender, tipped cocktail waitress, attendance at a meeting or practice, barback or security guard. (Exh. 1 at 159, 171). Employees

are responsible for clocking themselves in and out when they start and finish work, which can be overridden or corrected by management if a clocking error occurs. (Exh. 1 at 159-60).

Bartenders perform the functions discussed above in relation to the Coyote Ugly Saloon concept, and also sometimes work a waitress shift serving drinks on the floor. (Exh. 1 at 63-64, 104-05). If business is slow, they periodically go out on the street with a security guard escort and hand out flyers encouraging passersby to come in the bar and see them. They are still part of the tip pool while doing this and this practice is designed to increase business for the shift and thus improve tips. (Exh. 1 at 212-13). While bartending or waitressing Coyotes earn the tip wage applicable to the state in which they work, and participate in a tip pool with the other bartenders on their shift. (Exh. 1 at 68). Most of them average between $150 and $250 *in tips alone* in an eight hour shift, or from $19 to $30 an hour even after tip sharing with barbacks and security guards. (Exh. 7 at ¶6; Exh. 8-15 at ¶4; Exh. 16 at 108; Exh. 17 at 44).

In addition to their tipped shifts, bartenders are required to attend periodic dance practices and meetings, or to work special events, for which they are paid a regular, straight wage of at least minimum wage. (Exh. 1 at 188-92; Exh. 7 at ¶7; Exh. 8-15 at ¶7).

Barbacks are paid at a rate higher than a tipped rate, and are responsible for stocking the bar with liquor, mixers and ice, washing and collecting glassware, and picking up trash. They generally are supposed to do whatever is necessary to assist the bartenders to have a successful shift. (Exh. 1 at 64-65, 69, 106).

Security guards have a complex and sometimes difficult job. As their job description states, their duties include "sell[ing] the bar," "talking to everyone that walks by the door," "[m]ak[ing] the customers feel comfortable on their way in," "pick[ing] up empty glassware" and "throw[ing] away empty beers. . ." (Exh. 18). The security guards at Coyote Ugly Saloons

are very visible and spend all of their time in the front of the bar where the customers are located. They wear shirts with BMF on the front – initials subject to different interpretations -- and their role is to be visible and meet and greet and mix with customers. (Exh. 1 at 78, 112-14; Exh. 17 at 38). Further:

> They're required to be in good spirits. We don't like the whole, standing in the background with your shoulders held high, trying to look tough. We are completely against that. While that works in some nightclubs, I'm sure, it's contradictory to what kind of operation we're trying to do. So they're required to be in good spirits, talking to people.

(Exh. 1 at 107-08). They check the identification for legal drinking age of every customer who comes into the store. (Exh. 19 at 8; Exh. 16 at 37; Exh. 17 at 37; Exh. 1 at 107). They stand at the top of the stairs [leading to the bar] to "encourage people to come in by yelling – they call it `hollering' – at the street." (Exh. 1 at 76-77, 106-07; Exh. 19 at 9; Exh. 16 at 37; Exh. 17 at 38-39). Further, they help the female patrons who dance on the bar get on and off the bar to ensure their safety. (Exh. 19 at 8-11; Exh. 16 at 36; Exh. 17 at 37; Exh. 1 at 108-09). During body shots and choreographed dances by the bartenders they are required to get close to the bartenders on heightened alert to ensure no touching by customers. (Exh. 16 at 37-38; Exh. 1 at 108, 138-42). They escort the bartenders to their cars after their shifts. (Exh. 16 at 37; Exh. 17 at 38; Exh. 1 at 107, 137-40, 180, 252). They pick up glassware and trash, helping the bartenders do their jobs and keeping the store an appealing place for customers to enjoy. (Exh. 1 at 78, 107-08; Exh. 16 at 37; Exh. 17 at 37-38). In the declarations filed with the Motion, all of the managers and bartenders discuss the importance of the security guards keeping them safe, the bars' operations and the customer experience at Company Owned Stores. (Exh. 7 at ¶ 5; Exh. 8-15 at ¶ 3). Daniel Huckaby, the CUS Development Director of Operations, summarized their duties as follows: "Their job is – as complicated as the girls' is, we run security a little bit different than, I

think, most places do.  We let them know they're the first thing that people see when they walk in and the last thing they see when they leave, so we consider them to be integral to our operation."  (Exh. 1 at 106).  Security guards start making $9-10 an hour.  (*Id.* at 83-84).

### 3.    The Tip Pool.

Every non-management employee at a Company Owned Store can receive tips. Although security guards occasionally receive tips, the vast majority of tips are paid to the bartenders.  The bartenders pool their tips and then split them at the end of their shift depending upon the number of hours they worked.  Security guards are required to, likewise, tip share with bartenders.  (Exh. 1 at 86, 91).  There are different pools for waitresses or those working at multiple bars in stores with more than one bar if there is a division of labor because of the job or layout of the store.  Generally, however, barbacks are tipped out 10% and security guards 5% from the bartender tip pool.  If there is no barback on a shift and the security guards are doubling as barbacks, the security guards are tipped 10%.  Security guards are required to share 5% of their pool of tips with the bartenders as well.  In no case does a bartender retain less than 85% of her tips.  (Exh. 1 at 86-92; Exh. 17 at 36; Exh. 7 at ¶ 6; Exh. 8-15 at ¶ 4).  New employees are informed of the tip pool when they are hired at or before their first training shift.  (Exh. 1 at 100-02).  Mr. Huckaby has been with the Defendants since 2005 and has never received a complaint from a bartender about participating in a tip pool with security guards.  (*Id.* at 102-03).

The bartenders fill out forms for each shift, indicating what they received in tips, the hours worked and what the "tip out" is to barbacks and security guards.  (Exh. 20; Exh. 19 at 94-95).  They split the tips equitably, according to how many hours they worked.  (Exh. 9 at 91-92). A review of the tip sheet for August 1, 2009, for instance, shows that the bartenders who worked that day made an average of $34 in tips per hour worked, and the security guards made an

average of $3 in tips per hour worked. (Exh. 20). The next day, August 2, fewer were working and it was apparently slower, but bartenders still received approximately $20 per hour in tips and the three security guards split $28 in tips for all hours worked. (*Id.*). The Plaintiff testified in her deposition that she was making approximately $800 - $1000 a week *in tips* working at Coyote Ugly. (Exh. 19 at 30-31).

The Department of Labor investigated the CUS Ft. Lauderdale tip pool practices in 2007 based apparently upon a complaint or random audit of same. The agency elected *not* to take any action against the Defendants at that time, concluding its investigation without finding the tip pool to be contrary to the company's FLSA obligations. (Exh. 21 at ¶ 3).

4.    **Industry Standard**.

As has been discussed in this case, the issue of whether or not security guards are "regularly tipped employees" who "enhance the customer experience" is one of first impression. While there are cases involving employees the Defendants believe are comparable to its security guards, none involve security guards per se. Mr. Huckaby testified that in the three years working in bars in Austin, Texas before coming to work for the Defendants, his experience was that security guards were commonly included in the bartender tip pool. (Exh. 1 at 22-24, 122-25, 128-31). He identified bars in Austin, as well as some in Denver, San Antonio and Ft. Lauderdale of which he was personally knowledgeable that the same practice occurred. (*Id.* at 132-34). The Defendants have also provided the Court with four affidavits from individuals who have worked in and/or owned bars in Milwaukee, San Antonio and Austin who verify this as a common practice in those communities. (Exh. 22-25).

For instance, Mathias Simonis testified in his declaration that he has been in the bar and restaurant industry in Milwaukee for twenty years, having worked at approximately thirty

different establishments. (Exh. 22 at ¶ 2). He testified that in Milwaukee bars he compared to Coyote Ugly Saloon, where security guards interact with customers as a "friendly but official presence" and help bartenders, it is common practice that they participate in the bartender tip pool. If all they do is security and do not have that interaction or that helpful role, they do not get tipped out. (*Id.* at ¶¶3-4). Shawn Cochrell, a former San Antonio bar owner and worker, testified that all establishments he owned or at which he worked included security guards in tip pools because those employees enhanced the customer experience. Like those at Coyote Ugly Saloons, they checked customer identification, greeted customers, picked up glassware, and monitored customer decorum and behavior. He compared their roles to hosts and hostesses at restaurants. (Exh. 23 at ¶¶ 2-3). The places that did not include security guards were like the places in Milwaukee Mr. Simonis described, where the security guards stood on the side and only interacted with customers to kick them out if necessary. (*Id.* at ¶ 4). Chris Weinheimer and Issam Chahine, two bar industry veterans in Austin, make similar statements regarding their experience with security guards participating in tip pools. (Exh. 24 -25 at ¶ 3).

The Defendants have demonstrated that tipping out security guards who participate in "selling" the bar to customers, assisting the bartenders and mixing with the customers is the industry practice in six of the eight locations where there are Company-Owned Stores.

5.     **Retaliation Claims.**

        a.     Misty Blu Stewart.

Ms. Stewart left her employment at CUS Nashville in December of 2009. (Exh. 19 at exh. 2). She was terminated for what the Defendants considered to be theft, which was pouring drinks that she did not ring up in the point of sale system. Mr. Huckaby observed her doing this and confronted her at that time. She admitted doing so and he thus recommended that the CUS

Nashville general manager terminate her. (Exh. 1 at 240-41). Ms. Stewart initiated this litigation on April 7, 2011, well over one year later. (D.E. No. 1). The sole basis of Ms. Stewart's retaliation claim is a blog that Defendant Lovell put on the Coyote Ugly website in her "Lil Spills" column, on May 11, 2011, as follows:

> "By the way Lil, you should be getting served with a lawsuit. No worries just sign for it." This particular case will end up pissing me off cause it is coming from someone we terminated for theft. I have to believe in my heart that somewhere down the road, bad people end up facing bad circumstances!
>
> I have been reading the basics of Buddhism and am going to a class on Monday. The Buddhist way would be to find beauty in the situation and release anger knowing that peace will come. Obviously, I am still a very new Buddhist cause my thoughts are "fuck that bitch". Let me do my breathing exercises and see if any of my thoughts change. Lol

(Exh. 19 at 7-9 and exh. 1). Ms. Stewart's belief is that the posting made an untrue statement about her by stating she was terminated for theft and referencing her as a "bitch." (*Id.*). Ms. Stewart admits that CUS Nashville considered her to have committed theft, and has no reason to doubt that Defendant Lovell is angry about the lawsuit and would refer to her in that manner. (*Id.* at 16-17, 19). Moreover, she had been gone from her employment for over a year, the blog does *not* mention her by name and she has not discussed the blog posting with anyone but her boyfriend and her lawyer. (*Id.* at 10, 17-18, 26-27). Thus, her impression that the blog was about her and that others would view it as such is complete and extreme speculation. She acknowledges not suffering any economic damages or having sought any medical or psychological treatment as a result. (*Id.* at 10, 17). She was already reemployed at the time of the blog posting and has not been terminated as a result. (Exh. 26 at 21).

        b.     <u>Samantha Thomas</u>.

Samantha Thomas was terminated by the general manager at CUS San Antonio on March 4, 2012 for violating a well-established policy, of which Ms. Thomas was aware, against

employees dating each other. The general manager had no knowledge of Ms. Thomas' interest or involvement in this litigation at the time. (Exh. 17 at 9, 50, Exh. 3; Exh. 27 at ¶¶ 4-6). Ms. Thomas claims her sole basis for her claim is that, at the time, she mentioned her receipt of the notice of this litigation to a co-worker, Lauren Gawlik, and asked Ms. Gawlik if she knew anything about it. Ms. Thomas did not tell this co-worker she was going to participate, and had not even decided if she was going to participate. She also did not have a conversation about the notice with the managers, nor did Ms. Gawlik. (Exh. 17 at 88-90; Exh. 27 at ¶ 7; Exh. 28 at ¶ 6). In fact, Ms. Thomas did not even opt in to this litigation until March 19, 2012, two weeks after she was terminated. (D.E. No. 69). Further, Ms. Gawlik confirms that she knows Ms. Thomas was in violation of company policy by dating a co-worker while they both worked at CUS San Antonio. (Exh. 28 at ¶ 5).

    c. <u>Sarah Stone</u>.

   Sarah Stone resigned her employment from CUS Oklahoma City on July 1, 2012 after what she perceived to be retaliatory comments about her made by Mr. Huckaby. (Exh. 16 at 73-74). In fact, Mr. Huckaby did not say anything to Ms. Stone about the lawsuit or anything else, but rather made a Facebook post that said "Dear God, please don't let me kill the girl that is suing me…….that is all….." (*Id.* at 88-90 and exh. 3). Ms. Stone admits that unless someone was sitting with her when she saw the post on her phone after Mr. Huckaby left the bar the particular evening he posted it, or she showed it to them, no one could have associated the post to her, which was removed approximately twelve hours later. (*Id.* at 92-95). The next evening Ms. Stone overheard Mr. Huckaby and the manager discussing a customer who had fallen on some stairs at the bar and threatened to sue, and Mr. Huckaby say "I'm tired of all of these bitches taking their issues out on our company. They're fucking idiots." (*Id.* at 99-100). Ms. Stone felt

the comments were directed at her, but admits they were in the context of the customer complaint issue, were not made to her or around her and she was not referenced. Further, Mr. Huckaby did not approach her or talk to her in any way after that. (*Id.* at 100-03). Mr. Huckaby denies that he was speaking about Ms. Stone at the time. (Exh. 1 at 232-36). Ms. Stone resigned the next day. (Exh. 16 at 103-04).

### 6. Nashville Plaintiff Katherine J. Sharbar-Timberlake.

The plaintiffs were all asked to respond to written discovery, including Nashville plaintiff Katherine J. Sharbar-Timberlake. One request was "Specifically identify all meetings, practices or other events that you claim you were required to provide services for CUS for which you were not properly paid. As to each such event, state the date and hours for which pay is due, and the amount you claim is owed." In her sworn response, Ms. Sharbar-Timberlake stated "Plaintiff is not making any applicable claims." (Exh. 6).

### III. LEGAL ANALYSIS

### 1. Summary Judgment Standard

A party may be awarded summary judgment if the evidence establishes there are no genuine issues of material fact for trial and it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Covington v. Knox County School Sys.,* 205 F.3d 912, 914 (6th Cir.2000). The moving party bears the initial burden of satisfying the Court that the summary judgment standards set forth in Rule 56 have been met. *See Martin v. Kelley,* 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question is whether there exists any genuine issue of disputed material fact. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986); *Covington,* 205 F.3d at 914 (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). The purpose of summary judgment is to isolate, and then terminate, factually unsupported claims and defenses. *See Celotex,* 477 U.S. at 323-24. By moving for summary judgment, a party forces its opponent to come forward

with at least one sworn averment of fact essential to that opponent's claims before the time-consuming process of litigation will continue. *See Lujon v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In ruling on a motion for summary judgment, the Court is to construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

    B.    **The Defendants Are Entitled To Summary Judgment As To The Nationwide Class Because The Tip Pool Arrangement At Company Owned Stores Does Not Violate The FLSA.**

The Defendants filed a prior motion asking the Court to dismiss the Plaintiff's claim that the Company Owned Store tip pool arrangement is illegal because security guards are allowed to participate. (D.E. Nos. 12-13). In ruling on the Defendants' motion to dismiss, after reviewing the most recent Sixth Circuit caselaw on this issue set out in *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294 (6th Cir. 1998), the Court held that it would not find, as a matter of law, that security guards at Company Owned Stores are eligible to participate in the tip pool because of the need to develop discovery to identify their role in the business. "In the absence of a factual record, it is entirely unclear how and to what extent these security personnel interact with customers, which is the touchstone issue under *Kilgore*." (D.E. No. 19 at 6).

Since the Court's consideration of the Defendants' motion to dismiss, the parties have engaged in extensive discovery relative to the job duties of security guards in the operation of Company Owned Stores and, specifically, their interaction with customers. As discussed above, the security guard job description evidences they are involved in "selling" the bar and talking to every patron. They are the first and last impression of the bar. They pick up glassware and beer

bottles, and assist female patrons climbing on the bar to dance.  They are visible and interact with the customers, intimately involved in the customer experience.  (Exh. 18; Exh. 1 at 76-78, 106-08, 112-14; Exh. 17 at 37-38; Exh. 16 at 37; Exh. 19 at 9; (Exh. 7 at ¶ 5; Exh. 8-15 at ¶ 3).  This is precisely the type of information the Defendants perceive the Court felt was necessary to make a determination regarding the appropriateness of Company Owned Store security guards participating in a tip pool with bartenders.  The Defendants have demonstrated that Company Owned Store security guards are employees who "customarily and regularly receive tips", analogous to the groups of employees found in *Kilgore* and similar cases to be appropriate for inclusion in tip pools.

In *Kilgore*, the waiters at Outback restaurants were required to participate in a tip pool with hosts, even though hosts were forbidden from receiving tips[1], which practice was challenged based upon the theory hosts were not employees who customarily and regularly receive tips.  The Sixth Circuit found that hosts at Outback are part of an occupation that customarily and regularly receives tips basing its analysis on the fact that hosts "sufficiently interact with customers in an industry (restaurant) where undesignated tips are common."  160 F.3d at 301.  It then reviewed what hosts typically do, including greeting customers, supplying customers with menus and seating them, and occasionally "enhance[ing] the wait."  *Id.*  Further, even though hosts are not the "primary customer contact" they have more than a "de minimis interaction" with customers.  They are distinguishable from employees who do not mix with customers, such as dishwashers, cooks and off-hour employee such as janitors.  *Id.*

The Sixth Circuit in *Kilgore* also relied upon analogous caselaw developed in other jurisdictions, such as a case involving a maître d' from a district court in Arkansas.  *Dole v. Continental Cuisine, Inc.*, 751 F.Supp. 799 (E.D.Ark. 1990).  In a more recent maître d' case,

---

[1] Security guards at Company Owned Stores are allowed to, and do, receive tips.  (Huckaby Depo., pg. 91).

*Rudy v. Consolidated Restaurant Companies, Inc.*, 2010 WL 356418 (N.D.Tex.) (attached), a Texas district court agreed with the *Dole* and *Kilgore* analysis, again looking at the employee's role in enhancing the customer experience. *Id.* at *6. Several recent courts have relied on *Kilgore*, and have simplified this analysis to find that "front-of-the-house" employees are those who customarily and regularly receive tips because of their necessary customer interaction, whereas back-of-the-house employees who do not mix with customers. Front-of-the-house qualify as tipped employees, while back-of-the-house employees do not. *See*, *e.g.*, *Roussell v. Brinker Int'l, Inc.*, 2008 WL 2714079 (S.D.Tex.) (quality assurance employees have a level of customer service that is highly relevant to the restaurant) (attached); *Pedigo v. Austin Rumba, Inc.*, 722 F.Supp.2d 714 (W.D.Tex. 2010) (dishwashers and preparation cooks back-of-the-house and not qualified to participate in tip pool); *Turner v. Millennium Park Joint Venture, LLC*, 767 F.Supp.2d 951 (N.D.Ill. 2011) (silverware rollers performed functions waiters would otherwise have to do are tipped employees, even though there is no industry standard) (attached). The U.S. Department of Labor has even issued an opinion letter that sushi chefs and teppanyaki chefs (i.e. who cook at tables in front of customers) are tipped employees because, despite falling in the category of cooks, they are an exception because of the special nature of their cooking duties that involve contact with the public. (DOL 2008-18) (attached). This is consistent with the Department of Labor's lack of negative finding or punitive action against CUS Ft. Lauderdale in 2007 when it last reviewed a Company Owned Store's tip pool practice. (Exh. 21 at ¶ 3).

With this motion, the Defendants have not only provided a detailed description of what Coyote Ugly Saloon security guards do, plainly establishing their active role in enhancing the customer experience, but also information regarding the industry standard in cities where Company Owned Stores are located. Mr. Huckaby knows from personal experience tipping out

security guards is a well-established industry practice in Austin, San Antonio, Denver and Ft. Lauderdale. (Exh. 1 at 132-34). Four others with significant experience in the bar and restaurant industry in Austin, San Antonio and Milwaukee concur, explaining that establishments in those cities that use security guards the way Company Owned Stores do include security guards in the tip pools. (Exh. 22-25).

Given this additional information regarding the actual duties of the Company Owned Store security guards, and prevailing industry practices, the Defendants have more than met their burden at summary judgment that this class of employees, while not the "primary customer contact", have more than a "de minimis interaction" with customers. *Kilgore*, 160 F.3d at 301. The evidence is that security guards are important to the experience of patrons at Coyote Ugly Saloons. They are the classic example of "front of the house" employees and thus, pursuant to *Kilgore*, are employees to be classified as those who customarily and regularly receive tips for the purposes of tip pool participation. Based on the foregoing, the Defendants request that the Court grant them summary judgment as to the Nationwide Class claims.

### C. CUS Entertainment Should Be Dismissed As A Defendant

CUS Entertainment has not been an "employer" to any of the plaintiffs, as defined in the FLSA at Section 203(d), and thus should be dismissed as a defendant in this action. It has no employees and has never had any employees; it is a Delaware corporation that was established to be an "entertainment division" of Coyote Ugly that, at one time, had a band and singers associated with it as independent contractors; and regardless, none of the plaintiffs participated in this activity. (Exh. 4 at ¶ 3; Exh. 19 at 61, 120). This is the *only* evidence in the record before the Court regarding CUS Entertainment, other than documents showing to whom payments have been made and all plaintiffs' discovery responses, discussed above, in which they deny

knowledge of or information specific to CUS Entertainment. (Exh. 5-6). In the depositions of the individual retaliation plaintiffs in this case, all three indicated no knowledge of CUS Entertainment of its activities. (Exh. 19 at 61, 120; Exh. 17 at 101-02; Exh. 16 at 72-73).

The Plaintiff has not asked to take the deposition of any corporate representative of CUS Entertainment. The Plaintiff has not inquired further regarding the status of CUS Entertainment as an "employer". The only evidence regarding CUS Entertainment has been provided by the Defendants and does not support the proposition that it was the employer of any of the plaintiffs. (Exh. 4 at ¶ 3; Exh. 5; Exh. 19 at 61, 120).

In ruling on the Defendants' motion to dismiss CUS Entertainment, the Court cited *United States Dept. of Labor v. Cole Enters., Inc.*, 62 F.3d 775 (1995) as setting the test of "economic realities" for use in the Sixth Circuit to determine who is an "employer" for FLSA purposes. (D. E. No. 19 at 17). Specifically, that a court must consider "which entities or individuals have 'operational control' over the relevant aspects of the business enterprise at issue and which entities make key decisions including firing, hiring and salary determinations for the enterprise." *Id.* at 778. In *Cole*, for instance, as in many cases in which courts struggle to determine who is an "employer" for FLSA purposes, the inquiry involved an individual who was a 50% owner of the business at issue. The Court considered factors such as the individual's actual involvement in the business in activities like issuing checks, having custody and control of employment records, and making hiring and firing and pay decision. *Id.* While is it undisputed that CUS Entertainment is owned and operated by persons who are involved with CUS Development, and that the class members are individuals currently or formerly employed by different Company Owned Stores, the plaintiffs have absolutely *no* involvement in CUS Entertainment's activities. (Docket Entry No. 12-1 at ¶ 3l; Exh. 1; Exh. 5 at 61, 120). CUS

Entertainment is not a parent company or owner of CUS Nashville or any of the limited liability companies that own the stores, or CUS Development. CUS Entertainment is a separate entity with separate operations and functionalities. The Plaintiff has had the opportunity to develop proof otherwise and has failed to do so. Thus CUS Entertainment should not have been included as a defendant and should be dismissed.

### D.  The Three Retaliation Claims Should Be Dismissed

The FLSA protects employees from discharge or discrimination because of the filing of a complaint or institution or causing the institution of a claim under the act. 29 U.S.C. § 215(a)(3). In this case, the retaliation claims were brought by three plaintiffs, one of whom no longer worked for the Defendants and two of whom did, when this lawsuit was filed. Of the two who were still employed, one was terminated and the other resigned. The facts associated with their claims are, for the most part, not disputed. These plaintiffs have not alleged legally supportable retaliation claims, and thus the Defendants request that the claims be dismissed.

### 1.  Misty Blu Stewart

Ms. Stewart bases her claim on a single blog entry that does not identify her, and she does not know of anyone who has connected her to the blog other than her boyfriend and lawyers, to whom she showed the blog. She also cannot identify any true damages as a result. She had not worked at CUS Nashville for many months, was reemployed elsewhere and simply cannot show any consequences as a result of the blog. While the issue of former employees fitting the definition of "employee" in the retaliation provision of the FLSA was addressed by the Court when the Plaintiffs amended to add the claim (D.E. No. 110), the Court has not made any finding about the underlying substantive basis of Ms. Stewart's retaliation claim. The Defendants submit that it is without merit.

In *Kasten v. Saint-Gobain Performance Plastics Corp.,* 131 S.Ct. 1325 (2011), the Supreme Court analyzed the purpose of the FLSA's anti-retaliation provision. It found the FLSA seeks to prohibit labor conditions detrimental to the maintenance of a minimum standard of living and to prevent the fear of economic retaliation. *Id.* at 1333. In *Kasten*, the legal question at issue was what action by an employee is sufficient to constitute the "filing of a complaint" for the purposes of bringing an FLSA retaliation claim. While that is not the issue in relation to Ms. Stewart's claim, the analysis regarding what the FLSA anti-retaliation provision was designed to do is relevant. Ms. Stewart was not in a position to be effected economically or otherwise by the Defendants when the subject blog was posted. In fact, it did not even identify her by name. Only if she were to tell people she thought it referred to her could it have an effect on her, and that is entirely speculative since she has been reemployed elsewhere for some time. She simply cannot show that the blog was retaliatory in nature or can form the basis of her claim, especially given the fact that the Defendants believed her to have actually been fired for theft.[2]

Despite the Court's ruling that *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977), allows a cause of action by former employees under the FLSA's anti-retaliation provision, Ms. Stewart still must demonstrate a prima facie case of retaliation, including a showing of an employment action adverse to her. *Pettit v. Steppingstone, Center for the Potentially Gifted*, 429 Fed.Appx. 524, **5 (6th Cir. 2011) (*citing Adair v. Charter Cnty. of Wayne,* 452 F.3d 482, 489 (6th Cir.2006)) (attached). Defendant Lovell's statement in her blog was not an adverse employment action. It did not even mention Ms. Stewart by name if she were to somehow claim that it was *intended* to limit her future employment opportunities. In *Dunlop*, the allegation was that the plaintiff was prevented from obtaining new employment because her

---

[2] Respectfully, whether or not someone considers another person to be a "bitch" is subjective and cannot possibly be shown as true or not true for the purposes of this action. It was an opinion statement that did not have any retaliatory impact on Ms. Stewart.

former employer, against whom she had filed a wage and hour claim, notified her potential employer in an attempt to interfere with that opportunity. The Court in *Dunlop* stated "We hold that where an employer refuses to rehire a former employee because the employee has filed unfair labor practice charges against the employer" it is a violation of the FLSA's anti-retaliation provision. *Id.* at 146. In this case, Ms. Stewart was not mentioned by name, a potential employer was not involved, and there was no attempt to interfere with an employment opportunity. Thus, while the Defendants understand the Court's prior ruling in relation to a Rule 12 motion to dismiss, Ms. Stewart has not demonstrated a retaliation claim that would survive a Rule 56 motion for summary judgment as she cannot show there was an adverse employment action. In fact, she had been in another job for some time, which job she retains to date. Her retaliation claim should therefore be dismissed.

     2.   <u>Samantha Thomas</u>

Ms. Thomas cannot demonstrate that she "filed a claim" sufficient to constitute protected activity and trigger the FLSA anti-retaliation protection. Thus the Defendants move for summary judgment on her retaliation claim as well.

As discussed above, the Supreme Court recently addressed the issue of the sufficiency of filing a claim in the *Kasten* case. The Court in *Kasten* specifically considered the issue of whether or not an oral FLSA claim constituted the "filing" of a claim. The plaintiff in *Kasten* questioned the company's clocking in process, and repeatedly brought it to the attention of management through the company's grievance procedure. 131 S.Ct. 1325, 1329. There was no dispute that an oral complaint had been made, and it regarded FLSA protection, but rather the issue was whether that was enough to constitute protected activity. *Id.* at 1330. The Court discussed at length the breadth of the FLSA's anti-retaliation protections and the need for

flexibility in interpreting them.  *Id.* at 1332-34.  As part of that discussion, however, the Court found that an employer is entitled to "fair notice" that the employee is actually making a wage and hour complaint.  It held, however, that fair does not equate to written.  *Id.* at 1334-35.

In this case, Ms. Thomas cannot possible demonstrate that she "filed a complaint" of any type with CUS San Antonio when she made an inquiry, to a co-worker, about the lawsuit notice. Ms. Thomas' exact quote about what she said to her co-worker was "Hey, I got this letter in the mail talking about some lawsuit for Coyote Ugly.  Did you get one?"  (Exh. 17 at 89).  She was terminated by Ms. Terrazas, the general manager, who was unaware of that conversation.  (Exh. 27 at ¶¶ 4-6 ; Exh. 28 at ¶ 6).  Ms. Thomas' opt in to the lawsuit was well after her termination, and thus the termination could not possibly have been proximately caused by that action.  (D.E. No. 69).  In fact, Ms. Thomas was terminated for violating company policy about dating co-workers.  (Exh. 27 at ¶¶ 4-6 ; Exh. 28 at ¶¶ 4-8).  Simply put, Ms. Thomas did not take any action that could constitute the filing of a complaint pursuant to the FLSA prior to her termination and thus her retaliation claim should be dismissed.

3.  <u>Sarah Stone</u>

This is yet another situation in which a plaintiff assumed she was the subject of a post or statement, but her name was not mentioned and she has no knowledge of anyone being aware of the association unless she told them.  Ms. Stone decided to resign because she assumed Mr. Huckaby was talking about her, but she has no proof of that and certainly no damages.  When he was around her in person, he did not treat her badly or mention the lawsuit or act any differently than he would otherwise.  (Exh. 16 at 87-88, 100-03).  Ms. Stone cannot demonstrate that she was constructively discharged in retaliation for filing a claim regarding the FLSA.

To demonstrate constructive discharge, one must show an adverse action by the employer that constitutes "[a] significant change in the terms of employment imposed by an employer." *Pettit*, 429 Fed.Appx. at **7. The plaintiff must show that that "the employer deliberately created intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit" by considering "both the employer's intent and the employee's objective feelings." *Brock v. Positive Changes Hypnosis, LLC,* 589 F.Supp.2d 974 (W.D.Tenn. 2008) (*quoting Logan v. Denny's, Inc.,* 259 F.3d 558, 568-69 (6th Cir.2001); *Moore v. KUKA Welding Sys.,* 171 F.3d 1073, 1080 (6th Cir.1999)). Further, the FLSA anti-retaliation protections do "`not set forth a general civility code for the American workplace' [and] "`[N]ormally petty slights, minor annoyances, and simple lack of good manners will not' deter a reasonable worker from asserting their statutory rights." *Brock*, 589 F.Supp.2d at 982-83 (*citing Burlington,* 548 U.S. at 68, (*quoting Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

If Mr. Huckaby were referring to Ms. Stone either in his Facebook post or his comments at the bar, those statements could be considered rude and offensive. However, not only was she not mentioned by name, the comments themselves could not be construed as creating intolerable working conditions. Certainly Mr. Huckaby did not intend them as such, and his intentions must be considered as well as Ms. Stone's subjective perceptions. Given these facts, Ms. Stone has not made a supportable case of retaliation, and the Defendants request that it be dismissed.

E. **The Nashville Class Is Not Similarly Situated Sufficiently To Support Continuation As A Class**

As this Court is aware, at conditional certification, "courts apply a 'fairly lenient' standard to determine whether plaintiffs are similarly situated. *White v. Baptist Mem'l Health Care Corp.*, 08-2478, 2011 WL 1883959 1, *3 (W.D. Tenn. 2011) (attached) (*see also Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006)). The court applies a lenient standard because the first stage takes place at the beginning of discovery and the court can only rely on the pleadings and any filed affidavits. *Id.* According to *White*, "named plaintiffs need only make a 'modest factual showing' of class-wide discrimination." *Id.* at 3.

Courts apply a stricter standard at the second stage of the collective action certification process because it follows discovery and allows much more information upon which to determine similarly situated. *White*, 2011 WL 1883959 at *4. At the second stage, to avoid decertification, the named plaintiffs have the burden of proof and must introduce "substantial evidence" that the opt-in plaintiffs are similarly situated. *Id.* at 4. The lead plaintiffs must show that the opt-in plaintiffs are similarly situated to the lead plaintiffs. *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009). The FLSA does not define "similarly situated" and neither has the Sixth Circuit, thus district courts have based their final-certification decisions on a variety of factors, including the 'factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action'." *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009). The *O'Brien* court notes that, "a district court should examine whether partial decertification is possible, when faced with the situation where a subset of the plaintiffs fail to allege violations of the FLSA." *Id.* at 586.

The Plaintiff generally alleges that the Nashville Class members were not paid for all hours worked, including meetings, dance practices and special events. Further, that they were not paid properly for "flyering" when they were working a tipped shift. (D.E. No. 111). One of the Nashville Class members, Katherine J. Sharbar-Timberlake, denies not being paid for all "meetings, practices and other events" in her sworn discovery responses. (Exh. 6). Central to the Nashville Class claims are that CUS Nashville, as a company practice, does not pay bartenders for all meetings, dance practices and special events. (D.E. No. 111). Ms. Sharbar-Timberlake denies that to be the case, thus demonstrating that the ten Nashville Class members are not sufficiently similarly situated to support a class. The lead Plaintiff is obligated, at this stage of proceedings, to introduce "substantial evidence" that she is similarly situated to the Nashville Class members. In fact, the Defendants have demonstrated substantial evidence that Ms. Sharbar-Timberlake is *not* similarly situated to the lead Plaintiff, or to the other class members. Thus the class must fail. In the alternative, the Defendants request that plaintiff Sharbar-Timberlake be dismissed from the Nashville Class.

## IV.   CONCLUSION

The Defendants deny any company practices that violate the FLSA, not only as to their tip pool practices, but also in the payment of wages, recordation of employee hours worked and the treatment of employees and former employees who opted in to this litigation. Further, the Defendants assert that CUS Entertainment is not a statutory employee and should not be included as a defendant in this action.

The Defendants respectfully request that the Court GRANT them summary judgment and DISMISS the Nationwide Class claims, the individual retaliation claims and CUS Entertainment

as a defendant, and DECERTIFY the Nashville Class. In the alternative to decertifying the

Nashville Class, that the Court DISMISS Katherine J. Sharbar-Timberlake as a plaintiff.

Respectfully Submitted:

BONE MCALLESTER NORTON PLLC

By: /s/ Anne C. Martin
Anne C. Martin
Marshall T. Cook
511 Union Street, Suite 1600
Nashville, Tennessee 37219
(615) 238-6300 phone
(615) 238-6301 fax
amartin@bonelaw.com
mcook@bonelaw.com
*Attorneys for Defendants CUS Nashville, LLC, Coyote Ugly Saloon Development Corp., Coyote Ugly Entertainment, Inc. and Liliana Lovell*

### Certificate of Service

I hereby certify that on December 6, 2012, a true and exact copy of the foregoing has been served electronically by the Court's ECF system to:

Randall W. Burton
144 Second Avenue, North
Suite 212
Nashville, TN 37201
randallwburton@gmail.com

Stephen W. Grace
Jordan Sluder
1019 16th Avenue South
Nashville, Tennessee 37212
sgrace@sgracelaw.com

*Attorneys for Plaintiff*

/s/ Anne C. Martin