# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MISTY BLU STEWART, on behalf      )
of herself and all others similarly situated,      )
     )
     **Plaintiff,**      )
     )
v.      )      **Case No. 3:11-cv-0342**
     )      **Judge Trauger**
CUS NASHVILLE, LLC, COYOTE UGLY      )
SALOON DEVELOPMENT CORP.,      )
COYOTE UGLY ENTERTAINMENT, INC.,      )
and LILIANA LOVELL,      )
     )
     **Defendants.**      )

## MEMORANDUM

Pending before the court is the Defendants' Motion for Summary Judgment and for Decertification of the Nashville Class (Docket No. 119), to which the plaintiffs have filed a response (Docket No. 135), and the defendant has filed a reply (Docket No. 143). Also before the court is the Plaintiffs' Motion for Summary Judgment (Docket No. 123), to which the defendants have filed a response (Docket No. 132), and the plaintiffs have filed a reply (Docket No. 142). For the reasons discussed herein, both motions will be denied.

## FACTUAL BACKGROUND

This federal wage and hour collective action asserts claims under the Fair Labor Standards Act ("FLSA") arising out of the defendants' alleged operation of an illegal tip pool and its failure to compensate employees for work performed off-the-clock and during overtime hours. The plaintiffs belong to two separate classes. The first includes those current and former

Case 3:11-cv-00342   Document 147   Filed 02/06/13   Page 1 of 24 PageID #: 2989

employees who worked as bartenders, barbacks, or waitresses at any company-owned Coyote
Ugly Saloon and were required to contribute their tips to a tip pool in which security guards also
shared. The second class includes those current and former employees who worked as
bartenders at the company-owned saloon in Nashville, Tennessee and performed uncompensated
off-the-clock and overtime work. In addition to the aforementioned claims, two individual class
members allege that the defendants retaliated against them for engaging in activities protected
under the FLSA.

The defendants in this case are all affiliated in some manner with the Coyote Ugly Saloon
concept, which was developed by defendant Liliana Lovell twenty years ago while she was
living in New York City.[1] The saloon employs bartenders and waitresses known as "Coyotes"
who, in addition to mixing and selling drinks, entertain customers by performing choreographed
dances on the bar and "body shots" of alcohol off their stomachs. While working, "Coyotes" are
expected to flirt and be "sassy" with the bar's customers. To add to the atmosphere, female
customers are also permitted and encouraged to dance on the bar.

Defendant Lovell is currently the President and Founder of defendant Coyote Ugly
Saloon Development Corp. ("CUSDC"), which in turn is a majority owner of several limited
liability companies that own seven Coyote Ugly Saloons nationwide ("company-owned

---

[1] Unless otherwise noted, the facts are drawn from the defendants' statement of
undisputed facts (Docket No. 122), the plaintiffs' responses thereto (Docket No. 136), the
plaintiffs' statement of undisputed facts (Docket No. 125), the defendants' responses thereto
(Docket No. 134), and related exhibits. The court draws all reasonable inferences in favor of the
non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);
*Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

saloons"). The company-owned saloons are currently located in the following cities: Denver, Colorado; Oklahoma City, Oklahoma; Memphis, Tennessee; Nashville, Tennessee; Austin, Texas; San Antonio, Texas; and Milwaukee, Wisconsin.[2] Defendant CUS Nashville, LLC is the limited liability company that owns the Nashville saloon. The defendant Coyote Ugly Entertainment, Inc. ("CUEI") is a defunct entity that was previously formed to promote a singing group of "Coyotes" that were paid as independent contractors. It is undisputed that none of the plaintiffs in this action were involved with the limited activities of CUEI.

CUSDC employs regional managers and an operations manager who are tasked with oversight of the seven company-owned saloons. These managers periodically visit the company-owned saloons to ensure that they are complying with applicable company standards and employing the appropriate operating procedures. Working under the operations manager and regional managers, are separate management teams at each company-owned saloon. This local management team includes a general and assistant manager who supervise the work of a particular saloon's bartenders, barbacks, security guards and, depending on the particular saloon, waitresses and employees who sell Coyote Ugly merchandise.

As the preceding paragraph suggests, employee staffing varies among each company-owned saloon. In many of the saloons, security guards also perform barback duties when business is slow. Other saloons employ, in addition to the cast of employees recounted above, head bartenders and head security guards. Outside of this corporate framework and structure,

_____

[2] CUSDC previously held a majority stake in another saloon in Ft. Lauderdale, Florida that is no longer in business.

3

there are several saloons throughout the United States and Europe that operate independently under the Coyote Ugly name. Those saloons are not at issue in this action.

In addition to performing the aforementioned functions, bartenders at company-owned saloons sometimes work a waitress shift. Moreover, when business is slow, bartenders venture into the street escorted by a security guard to pass out flyers and encourage passersby to come inside the bar. In performing their duties, bartenders at company-owned saloons earn the minimum wage tip rate applicable to the particular state in which they work.

Barbacks generally do what is necessary to support bartenders during a given shift. For instance, they (1) stock the bar with liquor, mixers, and ice, (2) wash and collect glassware, and (3) pick up trash. In performing these functions, barbacks are compensated at a rate higher than the tipped rate earned by bartenders.

As their job title implies, security guards at company-owned saloons ensure the safety and security of the Coyotes and customers and check the identification of persons seeking entry to the bar. However, they also perform other duties which include: (1) encouraging passersby to come inside the bar; (2) helping female patrons who dance on the bar to get onto and off of the bar; and (3) picking up glassware and garbage. In performing their duties, security guards are visible and wear t-shirts with the "Coyote Ugly Saloon" logo on the front and the letters "BMF" on the back. "BMF" is an acronym that has been ascribed different meanings, including "big mother f***er" or "bad mother f***er." Security guards at company-owned saloons earn an hourly wage. (Docket No. 127, Ex. 1 at 21.)

4

According to the defendants, security guards are an integral aspect of the Coyote Ugly experience and engage in a high level of customer interaction. Daniel Huckaby, CUSDC's Director of Operations, testified that security guards encourage would-be customers passing by the bar to come inside, are required to be in good spirits while speaking with customers, and often are out on the floor dancing with them. In addition, nine current or former bartenders employed at company-owned saloons submitted declarations stating that security guards: (1) attempt to "sell" the bar to customers; (2) frequently interact with patrons; (3) are part of the Coyote Ugly experience; (4) encourage female patrons to dance on the bar; (5) encourage all customers to buy drinks and merchandise; and (6) are otherwise supposed to be friendly to customers while interacting with them. Finally, Mathias Simonis, a bar manager in Milwaukee, submitted a declaration stating that he had been to the local Coyote Ugly Saloon a number of times and observed that security guards there promote the bar to passersby and customers inside, welcome patrons, and mix with the crowd.

The plaintiffs, on the other hand, assert that security guards primarily perform safety and security functions and rarely interact with customers. For instance, two individual plaintiffs, Misty Blu Stewart and Samantha Thomas, who formerly worked as bartenders at company-owned saloons in Nashville and San Antonio respectively, state in declarations that the primary duty of security guards is to ensure a safe environment at the bar. Based on their experience, security guards inside the bar spent 90-95% of their time watching customers or providing heightened security while bartenders were performing a body shot, and rarely picked up trash or

5

empty beer bottles. Ms. Stewart and Ms. Thomas also stated that security guards only "sell" the bar by encouraging passersby on the street to come inside.

The plaintiffs also submit a declaration from David Griner, an individual who has patronized company-owned saloons in Nashville, Austin, and San Antonio dozens of times over the past ten years. Mr. Griner states that, aside from having his identification checked and being involved in an incident that led to his improper removal from the Austin saloon, he never had a discussion or interaction with a security guard. He adds that he has: (1) never seen a security guard engage in a friendly conversation with a patron; (2) never observed any interaction between security guards and customers, unless it involved them removing customers from the bar or cautioning customers about touching or getting too close to the Coyotes; (3) witnessed security guards assist female customers in getting onto and off of the bar, but has never seen them interact with those customers outside of offering them a hand to steady themselves; and (4) otherwise observed that security guards stand around with their arms folded and stare at the customers inside the bar.

Bartenders at company-owned Coyote Ugly saloons are required to contribute all of the tips they receive during a particular shift to a tip pool. The money in this pool is then distributed among bartenders, barbacks, and security guards who worked during that shift. As a general matter, barbacks receive 10% of the tips in the pool and security guards receive 5%. During shifts where there is no barback, security guards receive 10% when they perform barback duties. It is undisputed that bartenders never retain less than 85% of their tips. While security guards occasionally receive tips, the overwhelming majority are received by Coyote Ugly bartenders.

6

The plaintiffs allege that this tip pooling arrangement, requiring bartenders to share their tips with security guards, violates the FLSA's minimum wage provisions.

As previously noted, in addition to the tip pool claim asserted by members of the nationwide class,[3] two of the plaintiffs, Ms. Stewart and Sarah Stone, have asserted individual retaliation claims against the defendants.[4] Ms. Stewart left her employment from the company-owned Coyote Ugly saloon in Nashville in December of 2009. While the defendants state that Ms. Stewart was terminated for engaging in theft - namely, pouring drinks that she failed to ring up in the bar's point of sale system, Ms. Stewart denies that she ever engaged in theft while working at the Nashville saloon.

Ms. Stewart's retaliation claim is primarily predicated on an entry posted by defendant Lovell in her "Lil Spills" blog, which appears on Coyote Ugly's Website. The "Lil" in "Lil Spills" is a shorthand of defendant Lovell's first name: Liliana. (*See* Docket No. 121, Ex. 3 at 2.) The blog entry in question was posted on May 11, 2011, which was just over one month after Ms. Stewart initiated the instant action on April 7, 2011, and stated the following:

> "By the way Lil, you should be getting served with a lawsuit. No worries[,] just sign for it." This particular case will end up pissing me off[,] cause it is coming from someone we terminated for theft. I have to believe in my heart that[,] somewhere down the road, bad people end up facing bad circumstances!

---

[3] The off-the-clock claims are no longer at issue in this motion. (*See infra* p. 11, n.7)

[4] A third plaintiff, Samantha Thomas, also asserted a retaliation claim against the defendants. However, after the defendants sought summary judgment as to this claim, the plaintiffs conceded that summary judgment should be granted. (Docket No. 135 at 14, n.4.) Accordingly, the court will dismiss Ms. Thomas' retaliation claim.

7

> I have been reading the basics of Buddhism[,] and am going to a class on Monday. The Buddhist way would be to find beauty in the situation and release anger knowing that peace will come. Obviously, I am still a very new Buddhist[,] cause my thoughts are "[f***k] that [b**ch.]" Let me do my breathing exercises and see if any of my thoughts change. Lol . . . [.]

Ms. Stewart was already re-employed at the time defendant Lovell posted this blog entry. While Ms. Stewart concedes that she has not suffered any economic damages nor sought any medical or psychological treatment as a result of defendant Lovell's actions, she testified that she was humiliated and embarrassed by the blog entry.

Sarah Stone resigned from her employment at the company-owned saloon in Oklahoma City on July 1, 2012, after what she perceived were retaliatory comments made to her by Mr. Huckaby, CUSDC's Director of Operations. Mr. Huckaby, who supervised the regional managers and reported directly to defendant Lovell, was in town to attend an anniversary party at the saloon. On the night of the party, Mr. Huckaby made the following post to his Facebook page: "Dear God, please don't let me kill the girl that is suing me . . . . that is all . . . ." While Mr. Huckaby was intoxicated at the time he made this post, he was also aware that Ms. Stone had joined this lawsuit. According to Ms. Stone, Mr. Huckaby was sitting across the bar from her when he made this post to his Facebook page. Ms. Stone, who at the time was Facebook friends with Mr. Huckaby, saw this post on her cell phone almost one hour later. However, when she woke up the next day, the post was removed. Mr. Huckaby has no recollection of making or removing this Facebook post.

Mr. Huckaby is alleged to have made another retaliatory comment the following night. Specifically, Ms. Stone testified at her deposition that Mr. Huckaby learned that night from

Amber Almond, a manager at the Oklahoma City saloon, that a customer had fallen down some stairs and had threatened to sue. After receiving this information, Ms. Stone testified that Mr. Huckaby yelled out: "Why does everyone sue? I'm tired of all these bi***es taking their issues out on our company. They're f***ing idiots." While yelling, Mr. Huckaby was looking at Ms. Almond, although his body was facing Ms. Stone, who was approximately two feet away. Ms. Stone added that Mr. Huckaby occasionally glanced outward while yelling at Ms. Almond. The next day, Ms. Stone resigned from her employment. As is the case with the Facebook post, Mr. Huckaby does not recall making this statement.

On April 7, 2011, Ms. Stewart initiated this action on behalf of herself and other similarly situated current and former employees. (Docket No. 1.) Shortly thereafter, the defendants moved for dismissal of the tip pool claim and CUEI as a defendant in this action. (Docket No. 12.) That motion was denied by the court on June 29, 2011. (Docket No. 19.) On February 13, 2012, the court issued a Memorandum Opinion, in which it conditionally certified a collective action consisting of the aforementioned nationwide and Nashville classes. (Docket No. 55 at 14.) On September 13, 2012, the court granted Ms. Stewart leave to, among other things, amend her Complaint to add the retaliation claim asserted by Ms. Stone. (Docket No. 103 at 10.) Upon consideration of Ms. Stewart's subsequent motion for reconsideration, the court also granted her leave to amend her Complaint to add her own retaliation claim against the defendants. (Docket No. 110 at 5.) The plaintiffs then filed another motion for reconsideration on December 6, 2012, seeking to expand the scope of the Nashville class asserting off-the-clock claims to include all

company-owned Coyote Ugly Saloons.[5]  (Docket No. 126.)  On the same date, the plaintiffs and

defendants filed the pending summary judgment motions .  (Docket Nos. 119 and 123.)

## ANALYSIS

### I.    Standard of Review

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue

of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the

plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that

there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.

2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Conversely, a moving

plaintiff must show that the defendant cannot raise a genuine issue of fact regarding any element

of the relevant claims.  In both instances, "[i]n evaluating the evidence, the court must draw all

inferences in the light most favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the

party's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249, 252.  An issue

---

[5] That motion is the subject of a separate Memorandum Opinion.

of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     The Pending Motions

The defendants have moved for summary judgment with respect to: (1) the claim of the nationwide class alleging that the tip pooling arrangement in operation at Coyote Ugly's company-owned saloons violates the FLSA; (2) all claims asserted against CUEI; and (3) the individual retaliation claims brought by Ms. Stewart and Ms. Stone.[6]  (Docket No. 119 at 2.)  In opposing the defendants' motion, the plaintiffs effectively abandoned their claims against CUEI, as they conceded that none of the class members were involved with the operations of that entity and failed to otherwise respond to the defendants' argument that CUEI could not be held liable as an "employer" under the FLSA.  (*See* Docket No. 135; Docket No. 136 at 2-3.)  Accordingly, summary judgment will be granted to CUEI with respect to all of the plaintiffs' claims.

The plaintiffs have also moved for summary judgment concerning the legality of the tip pooling arrangement.  (Docket No. 123 at 1.)  In addition, they seek summary judgment with respect to the individual retaliation claim brought by Ms. Stone.  (*Id.*)  The court will address the parties' respective arguments concerning the tip pooling arrangement and the individual retaliation claims in turn.

### A.     Tip Pooling Arrangement

---

[6] In addition, the defendants previously sought decertification of the Nashville off-the-clock class or, in the alternative, summary judgment as to the off-the-clock claims brought by plaintiff Katherine J. Sharbar-Timberlake.  (Docket No. 119 at 2.)  However, after the plaintiffs subsequently supplemented Ms. Sharbar-Timberlake's interrogatory responses and filed their opposition brief, the defendants withdrew both of the aforementioned requests for relief. (Docket No. 143 at 3.)

The nationwide class members each allege that the defendants' policy of requiring bartenders to participate in a tip pool with security guards at Coyote Ugly's company-owned saloons violates the FLSA, because security guards are statutorily ineligible to participate in the pooling arrangement. The FLSA establishes a minimum wage for employers to pay their employees.[7] 29 U.S.C. §§ 201-219. However, the statute authorizes employers to pay less than the minimum wage to a "tipped employee" through a "tip credit" that takes into account the amount of tips actually received by that employee. 29 U.S.C. § 203(m).[8] A "tipped employee"

---

[7] The FLSA specifically provides that:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>
> (1) except as otherwise provided in this section, not less than –
>
>> (A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
>>
>> (B) $6.55 an hour, beginning 12 months after that 60th day; and
>>
>> (C) $7.25 an hour, beginning 24 months after that 60th day . . . .

29 U.S.C. § 206(a)(1).

[8] The relevant section provides in pertinent part that:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to –
>
>> (1) the cash wage paid such employee which for purposes

12

is, in turn, defined as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). While tip pooling arrangements are authorized under the statute, they are only permitted amongst those employees who "customarily and regularly receive tips." 29 U.S.C. § 203(m).

The parties have separately moved for summary judgment as to the legality of the tip pooling arrangement in place at Coyote Ugly's company-owned saloons. The defendants contend that the record evidence demonstrates that the tip pool at issue is valid under the FLSA, because security guards at company-owned saloons sufficiently interact with customers so as to constitute employees who "customarily and regularly receive tips" under the leading case *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301 (6th Cir. 1998). (Docket No. 121 at 14.) To support their contention, they not only cite to the duties performed by security guards, but also present evidence concerning the alleged industry standard concerning similar tip pooling arrangements in five cities where the defendants currently have, or once had, company owned stores. (*Id.* at 15-16.) The plaintiffs, on the other hand, argue that the defendants are not

_____

of such determination shall not be less than the cash wage required to be paid such an employee on August 20, 1996; and

(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee.

29 U.S.C. § 203(m).

entitled to summary judgment and that, instead, the undisputed record evidence shows that security guards at Coyote Ugly's company-owned saloons, as a matter of law, lack the requisite amount of customer interaction to constitute employees who "customarily and regularly receive tips" under *Kilgore*.[9]  (Docket No. 124 at 8-11; Docket No. 135 at 5-12.)  The plaintiffs also argue that the defendants' evidence concerning an alleged industry standard is not relevant to the inquiry assessing the tip pool's legality and, in any event, does not persuasively establish the existence of a pervasive standard.  (Docket No. 135 at 9-10, 12-13.)

In *Kilgore*, the Sixth Circuit considered the legality of an arrangement requiring servers at Outback Steakhouses to participate in a tip pool with hosts, bus persons, and bartenders.  160 F.3d at 296.  The plaintiffs, comprising Outback servers and hosts, contended that the tip pooling arrangement was illegal because hosts were not "tipped employees" under the FLSA.  *Id.* at 296, 301.  In addressing this question, the court first recognized that Department of Labor Regulations interpreting the FLSA created some circularity, because they provided that an employee who received tips only from a tip pool was an employee who "customarily and regularly receive[d] tips."  *Id.* at 301.  Thus, an employer could essentially make an employee a "tipped employee"

---

[9] In addition, the plaintiffs previously argued that, as a matter of law, the tip pooling arrangement was illegal because it improperly included heads of security, who they asserted were management-level employees based on the deposition testimony of Daniel Huckaby, Coyote Ugly's Director of Operations.  (Docket No. 124 at 11-12.)  After the defendants filed a declaration from Mr. Huckaby attempting to clarify the statements he made during his deposition concerning the duties of heads of security, the plaintiffs generally alleged that his declaration contradicted his prior testimony.  (Docket No. 132, Ex. 18; Docket No. 142 at 9.)  However, the plaintiffs have not moved to strike Mr. Huckaby's declaration in whole, or in part.  (Docket No. 142 at 9.)  Instead, they concede in their reply brief that there are disputed questions of fact concerning whether heads of security belonged to Coyote Ugly's management team.  (*Id.*)  Accordingly, it appears to the court that the plaintiffs are no longer seeking summary judgment as to this particular issue.

14

by simply placing him in a "tip pool." However, the Court of Appeals noted that this circularity was limited by the "requirement that [a tipped] employee work 'in an *occupation* in which he customarily and regularly receives . . . tips.'" *Id.* (quoting 29 U.S.C. § 203(t)) (emphasis added).

In concluding that hosts at Outback were "tipped employees" eligible to participate in the tip pooling arrangement, the court focused on their level of customer interaction. *Id.* at 301-02. It noted that the evidence demonstrated that hosts performed "important customer service functions," such as greeting customers, supplying them menus, seating them at tables, and at times, enhancing the waiting experience. *Id.* at 301. Moreover, it found that, while hosts were not the primary customer contact, they nonetheless had "more than *de minimis* interaction with the customers." *Id.* The court noted that, in this sense, restaurant hosts could be distinguished from dishwashers, cooks, or other off-hour employees (i.e., overnight janitors) who had no customer interaction at all. *Id.* Finally, the court found that the "fact that Outback prohibit[ed] hosts from receiving tips directly from customers provide[d] some evidence that Outback hosts work in an occupation that customarily and regularly receives tips." *Id.* at 301-02.

Applying these considerations to the instant case, the court finds that genuine disputes of material fact preclude a finding of summary judgment for either movant. It is undisputed that security guards at company-owned Coyote Ugly saloons perform a number of functions, such as ensuring the security of bartenders and patrons, encouraging passersby on the street to come inside the bar, checking the identification of those individuals seeking entry, helping female patrons get onto and off of the bar, and picking up glassware and garbage. It is also undisputed that, while performing their duties, security guards are visible, wear t-shirts with the "Coyote

15

Ugly Saloon" logo on the front and the letters "BMF" on the back, and occasionally receive tips from customers.

However, what is disputed between the parties is the degree to which security guards interact with customers. For their part, the defendants have presented evidence showing that security guards attempt to "sell" the bar to passersby and to customers inside, welcome patrons, interact with customers frequently, are engaged in the Coyote Ugly experience, encourage female patrons to dance on the bar, encourage all patrons to buy drinks and merchandise, and are required to be in good spirits while speaking with customers. The plaintiffs, on the other hand, present evidence indicating that security guards spend almost all of their time watching customers and providing associated security services, rarely pick up empty bottles or trash, only "sell" the bar to passersby on the street, do not engage in friendly conversations with patrons, and do not otherwise interact with customers unless they threaten the safety and security of the bartenders or other patrons.[10]

In essence, these factual disputes are directed to the core of the *Kilgore* inquiry - that is, whether an employee's customer interaction is more than *de minimis*. While the court acknowledges that security guards apparently occasionally receive tips from customers, it believes that this fact, by itself, does not establish whether such employees work in an occupation where they "customarily and regularly" receive tips for purposes of being "tipped

---

[10] The defendants seek to undermine the evidence adduced by the plaintiffs by challenging the credibility of both Ms. Thomas and Mr. Griner. (Docket No. 143 at 1-2.) In forwarding this argument, however, the defendants overlook the well-settled rule that, when ruling on a motion for summary judgment, the court is to refrain from making credibility determinations. *Anderson*, 477 U.S. at 255.

16

employees" eligible to participate in a tip pool, especially in light of the aforementioned factual disputes. In sum, because there are genuine disputes of material fact concerning whether security guards are "tipped employees" for purposes of the FLSA, the court will deny both motions for summary judgment concerning the legality of the tip pooling arrangement in place at Coyote Ugly's company-owned saloons.

The defendants nonetheless contend that summary judgment is appropriate because they have presented evidence demonstrating an industry standard in 5 cities where Coyote Ugly company-owned saloons either operate or once operated.[11] (Docket No. 121 at 15.) Specifically, they argue that this evidence shows that the prevailing industry practice in those five cities is to include security guards having duties similar to those performed by security personnel at Coyote Ugly's company-owned saloons in tip pools. (*Id.* at 15-16.) While they acknowledge that evidence concerning an industry standard is not binding on this court, the defendants, citing *Wajcman v. Investment Corp. of Palm Beach*, No. 07-80912-Civ., 2009 WL 465071, at *4 (S.D. Fla. Feb. 23, 2009), still assert that such evidence is an important consideration that should inform the court's analysis of the "tipped employee" issue. (Docket No. 143 at 8-9.)

The defendants' argument is unavailing. The existence of a prevailing industry standard has played no role in the Sixth Circuit's analysis of whether a person qualifies as a "tipped employee" eligible to participate in a tip pool. *See Kilgore*, 160 F.3d at 301-02 (focusing on hosts' level of customer interaction to determine whether they were "tipped employees" for purposes of the FLSA); *Myers v. The Copper Cellar Corp.*, 192 F.3d 546, 550 (6th Cir. 1999)

---

[11] The defendants specifically allege that this industry standard exists in Austin, San Antonio, Denver, Milwaukee, and Ft. Lauderdale. (Docket No. 121 at 15-16.)

(applying *Kilgore* to find that salad preparers were not "tipped employees"). Indeed, in presenting evidence of an alleged industry standard, the defendants are essentially arguing that security guards should be considered eligible to participate in a tip pool because their employer decided to include them in the pool, which raises the circularity issue highlighted by the Court of Appeals in *Kilgore*. *See* 160 F.3d at 301. Moreover, the defendants' reliance on *Wajcman*, a non-binding Florida district court decision, is misplaced. While that decision did note that "industry norms are an important consideration in determining which employees are properly included in a tip pool under the FLSA," it specified that "industry custom from the *patron's* perspective is relevant."[12] *Wajcman*, 2009 WL 465071, at *4.

### B. Individual Retaliation Claims

The plaintiffs and defendants have also moved for summary judgment with respect to the individual retaliation claims asserted by Ms. Stewart and Ms. Stone. For their part, the defendants seek summary judgment as to both of these plaintiffs. (Docket No. 121 at 18.) The plaintiffs, on the other hand, move only for summary judgment with respect to the retaliation

---

[12] The defendants also point out that the Department of Labor took no adverse action in an investigation that it initiated into the Ft. Lauderdale Coyote Ugly Saloon's wage and hour practices, including its tip pooling arrangement, after CUSDC's General Counsel asserted that security guards at the now-closed company-owned saloon were properly tipped employees. (Docket No. 121 at 15; Docket No. 121, Ex. 21 at 1-2.) To the extent that the defendants contend that that series of events singularly demonstrates that the tip-pooling arrangement at issue in this case is FLSA-compliant, that argument is unavailing. Unlike the mandatory arrangement at issue here, participation in the tip pool investigated by the Department of Labor was voluntary. (Docket No. 139, Ex. 4 at 1.) More importantly, however, *Kilgore* requires that the court examine an employee's level of customer interaction in assessing whether he is eligible to participate in a tip pooling arrangement. 160 F.3d at 301-02. Again, having completed that analysis, the court believes that genuine disputes of material fact preclude a finding of summary judgment for either movant.

claims asserted by Ms. Stone.  (Docket No. 124 at 12.)  The court will address the individual

retaliation claims in turn.

### (1)    Misty Blu Stewart

The defendants contend that they should be granted summary judgment with respect to

Ms. Stewart's retaliation claim because she cannot establish a prima facie case.  (Docket No. 121

at 19.)  Specifically, they assert that defendant Lovell's post on her "Lil Spills" blog appearing

on Coyote Ugly's website did not constitute an adverse action.  (*Id.*)  They also note that the

subject post did not identify Ms. Stewart by name and that, in any event, she was already

employed elsewhere at the time the post was made and suffered no economic or other damages.

(*Id.* at 18-20.)  In their opposition brief, the plaintiffs point out that defendant Lovell's post

appeared on the "Lil Spills" blog just over one month after Ms. Stewart commenced this FLSA

action, that Ms. Stewart suffered embarrassment and humiliation as a result of the post, and that

factual disputes preclude the court from granting summary judgment in the defendants' favor.

(Docket No. 135 at 17-18.)

In construing Title VII's antiretaliation provision in *Burlington N. & Sante Fe. Ry. v.*

*White*, the Supreme Court noted that the provision  "protects an individual not from all

retaliation, but from retaliation that produces an injury or harm."  548 U.S. 53, 67 (2006).  The

court elaborated that, to bring an actionable retaliation claim, "a plaintiff must show that a

reasonable employee would have found the challenged action materially adverse, which in this

context means it well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination."  *Id.* (internal quotation marks and citations omitted).  The Sixth

Circuit has applied *White's* standard concerning what constitutes an adverse action in analyzing

FLSA retaliation claims. *See Petit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F.App'x. 524, 531-32 (6th Cir. 2011).

Applying that standard here, the court finds that genuine disputes of material fact preclude it from granting summary judgment to the defendants. Indeed, while the defendants maintain that Ms. Stewart was terminated from her employment in December of 2009 for engaging in theft, Ms. Stewart asserts that she never engaged in theft while working at Coyote Ugly's company-owned saloon in Nashville. Nonetheless, on May 11, 2011, just over one month after Ms. Stewart filed the present suit against her employer, its founder and president posted a blog entry on the company's website that referenced a lawsuit initiated by someone who had been previously terminated for theft and contained the following statement directed to that individual: "Fu** that b*tch." Ms. Stewart testified that she suffered embarrassment and humiliation as a result of the posting of this blog entry. Viewing these facts in the light most favorable to Ms. Stewart, the court believes that a reasonable jury could find that the posting of this blog entry constituted an adverse action, since it falsely stated that she engaged in theft. Indeed, a jury could find that this alleged conduct would have likely dissuaded a reasonable worker from making or supporting an FLSA claim.[13]

**(2)  Sarah Stone**

The defendants similarly contend that Ms. Stone's individual retaliation claim must be dismissed because she too cannot demonstrate that she suffered an adverse action. (Docket No.

---

[13] As for the defendants' contentions concerning Ms. Stewart's lack of damages, whether economic or otherwise, the court believes that those arguments are more suitably presented at trial.

121 at 21-22.)  Specifically, they assert that she has failed to adduce evidence demonstrating that she was constructively discharged in retaliation for joining this lawsuit.  (*Id.*)  In response, the plaintiffs not only contend that the defendants' motion for summary judgment as to this claim should be denied, but further assert that the record evidence demonstrates, as a matter of law, that Ms. Stone was constructively discharged.  (Docket No. 124 at 12-14; Docket No. 135 at 15-17.)

To establish that she was constructively discharged, Ms. Stone must adduce evidence showing that "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit."  *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012) (internal quotation marks and citations omitted).  In undertaking this inquiry, a court must examine "both the employer's intent and the employee's objective feelings."  *Logan v. Denny's Inc.*, 259 F.3d 558, 569 (6th Cir. 2001).  When evaluating the first prong of this test, courts in this circuit have noted that:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569 (internal quotations and citations omitted).  As the quoted language makes clear, this list of factors is not exhaustive.  *Id.* at 570.

Ms. Stone's retaliation claim is predicated on two events that occurred while Mr. Huckaby was in Oklahoma City to attend an anniversary party at the company-owned saloon. On the night of the anniversary party, Ms. Stone testified that Mr. Huckaby, while sitting across the bar from her, posted the following statement on Facebook: "Dear God, please don't let me kill the girl that is suing me . . . . That is all . . . ." Though intoxicated at the time he made the post, Mr. Huckaby previously knew that Ms. Stone, who saw the post approximately one hour later, had joined this collective action. Ms. Stone testified that the next night, after removing the prior post from his Facebook page, Mr. Huckaby learned from Ms. Almond, a manager at the Oklahoma City saloon, that a patron had fallen down some stairs and threatened to file a lawsuit. According to Ms. Stone, Mr. Huckaby then yelled: "Why does everyone sue? I'm tired of all these bi***es taking their issues out on our company. They're f***ing idiots." While yelling, Mr. Huckaby was looking at Ms. Almond, although his body was facing Ms. Stone, who was approximately two feet away. Ms. Stone added that Mr. Huckaby occasionally glanced outward while yelling at Ms. Almond. The next day, Ms. Stone submitted her resignation.

Given the record, the court believes that the plaintiffs have adduced sufficient evidence to create genuine disputes of fact concerning whether Ms. Stone was constructively discharged in retaliation for joining this lawsuit. Drawing all inferences in the light most favorable to the plaintiffs, a reasonable person could find that the statements made by Mr. Huckaby, a member of CUSDC's corporate management team who supervised each of the company's regional managers and reported directly to defendant Lovell, created intolerable working conditions for Ms. Stone at the Oklahoma City saloon. Indeed, a reasonable person could find that Mr. Huckaby's Facebook post was directed at Ms. Stone, given that he was aware that she had joined

22

this action and made the post while seated across from her at the bar. The next night, after deleting the aforementioned post, Mr. Huckaby yelled, in very close proximity to the plaintiff, that he was tired of the "bi***es" suing the company and called them "f***ing idiots." Given his position within the company, a reasonable person could construe Mr. Huckaby's statements as embodying an official hostility toward those individuals, including company employees, who bring suit against Coyote Ugly. Indeed, in light of Mr. Huckaby's position, and the severity of his statements, the court believes that a reasonable person standing in Ms. Stone's shoes would have felt compelled to resign. *See Logan*, 259 F.3d at 573. The court also finds that the evidence adduced by the plaintiffs creates a genuine dispute of material fact as to whether Mr. Huckaby deliberately created these working conditions with the intention of forcing Ms. Stone to quit, as it is foreseeable that a reasonable person would have resigned under similar circumstances. *See id*; *see also West v. Tyson Foods, Inc.*, 374 F.App'x. 624, 640 (6th Cir. 2010) ("An employer's intent can be shown if the employee quitting is a foreseeable consequence of the employer's actions). Accordingly, the defendants' motion for summary judgment as to Ms. Stone's retaliation claim will be denied.

The court will similarly deny the plaintiffs' motion for summary judgment. As the defendants point out, there is no evidence in the record showing that Mr. Huckaby expressly mentioned either this particular lawsuit or Ms. Stone by name while making either of the statements underlying this retaliation claim. (Docket No. 132 at 14-15.) It is further undisputed that Mr. Huckaby was intoxicated at the time he made the Facebook post and was drinking the following night when, according to the plaintiff, he yelled about "bi***es" suing the company, which is relevant to assessing his state of mind when making the aforementioned statements.

23

Thus, viewing the evidence in the record in the light most favorable to the defendants, the court cannot conclude that the plaintiffs are entitled to judgment as a matter of law with respect to Ms. Stone's retaliation claim.

## CONCLUSION

For all of the reasons discussed herein, the Defendants' Motion for Summary Judgment and for Decertification of the Nashville Class (Docket No. 119) and the Plaintiffs' Motion for Summary Judgment (Docket No. 123) will be **DENIED**.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge