## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

MISTY BLU STEWART, on behalf )
of herself and all others similarly situated, )
         )
  Plaintiff,     )
         )
v.         )  **Case No. 3:11-cv-0342**
         )  **Judge Trauger**
CUS NASHVILLE, LLC, COYOTE UGLY )
SALOON DEVELOPMENT CORP., )
COYOTE UGLY ENTERTAINMENT, INC., )
and LILIANA LOVELL,   )
         )
  Defendants.    )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

   This federal wage and hour collective action asserts claims under the Fair Labor

Standards Act ("FLSA") arising out of the defendants' alleged operation of an illegal tip pool

and its failure to compensate employees for work performed off the clock and during overtime

hours.  The plaintiffs belong to two separate classes.  The first includes those current and former

employees who worked as bartenders, barbacks, or waitresses at any company-owned Coyote

Ugly Saloon and were required to contribute their tips to a tip pool in which security guards also

shared (the "Nationwide class").  The second class includes those current and former employees

who worked as bartenders at the company-owned saloon in Nashville, Tennessee and performed

uncompensated off-the-clock and overtime work ("the Nashville class").  In addition to the

aforementioned claims, two individual class members allege that the defendants retaliated

against them for engaging in activities protected under the FLSA.

1

The court conducted a three-day bench trial of this case on April 16-18, 2013. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court sets forth herein its findings of fact and conclusions of law.

**FINDINGS OF FACT**

## I. Introduction

This case involves employees who work at the Coyote Ugly Saloon. The concept for the saloon was formed and developed by defendant Liliana Lovell twenty years ago while she was living in New York City. (Trial Transcript "Tr." at 418-19.) The saloon employs female bartenders known as "Coyotes" who, in addition to mixing and selling drinks, entertain customers by engaging in a host of activities that include performing choreographed dances on the bar and selling "body shots" of alcohol off of their stomachs.[1] (*Id.* at 419-421, 431, 454.) Given the scope of their duties, "Coyotes" are expected to be charismatic. (*Id.* at 421.) To add to the saloon's festive atmosphere, female customers are permitted and encouraged to dance on the bar. (*Id.*)

Defendant Liliana Lovell is currently the President of defendant Coyote Ugly Saloon Development Corp. ("CUSDC"),[2] which in turn is a majority owner of several limited liability companies that own seven Coyote Ugly Saloons nationwide ("company-owned saloons"). (Tr.

---

[1] The court uses the term "bartender" and "Coyote" interchangeably throughout this opinion.

[2] For purposes of this opinion, the court will assume that Ms. Lovell is being sued in her capacity as President of CUSDC. There is no evidence in the record indicating that Ms. Lovell acted in her personal capacity in connection with any of the claims that are at issue in this lawsuit. Nor do the plaintiffs appear to suggest as much.

2

at 405-06.)  The company-owned saloons are currently located in the following cities: Denver, Colorado; Oklahoma City, Oklahoma; Memphis, Tennessee; Nashville, Tennessee; Austin, Texas; San Antonio, Texas; and Milwaukee, Wisconsin.  (*Id.* at 406.)  Another company-owned saloon located in Ft. Lauderdale, Florida is no longer in business.  (*Id.*)  Defendant CUS Nashville, LLC is the limited liability company that owns the Nashville saloon.[3]  (*Id.*)  As President of CUSDC, Ms. Lovell has the authority to establish policies governing the operation of each of the company-owned saloons.  Outside of the aforementioned corporate structure, there are several saloons throughout the United States and Europe that operate independently under the Coyote Ugly name.  (*Id.* at 422.)  Those saloons are not at issue in this lawsuit.

Each company-owned store has a general manager and at least one assistant manager. (Tr. at 508.)  Each of these employees earns a salary and receives benefits, including health insurance and paid vacation.  (*Id.*)  Managers usually undergo several weeks of training, both on- and off-site, with CUSDC's regional managers and its operations manager.  (*Id.* at 508-09.) Aside from management, all company-owned saloons employ bartenders, barbacks, and security guards, while some also have employees who waitress or sell Coyote Ugly merchandise.

## II.    The Tip Pool and its Participants

Bartenders at company-owned saloons earn the minimum wage tip rate applicable to the particular state in which they work.  (Tr. at 113.)  The remainder of their compensation is comprised of the tips that they take home after participating in a mandatory tip pool with

---

[3] All claims against defendant Coyote Ugly Entertainment, Inc., a defunct entity that was previously formed to promote a singing group of "Coyotes," were dismissed by the court on February 6, 2013.  (Docket No. 147 at 3, 11.)

3

barbacks and security guards. (*Id.*) Under this arrangement, bartenders are required to contribute all of the tips they receive during a given shift to the pool. (*Id.* at 110.) The barbacks who worked during that particular shift receive 10% of the pool's proceeds, and the security guards receive 5%. (*Id.*) Where there is no barback on shift (typically on a slower weeknight) and a security guard is performing barback duties, the security guard would receive 10% of the tips in the pool. (*Id.* at 113.) Bartenders retain the remainder in the pool to divide among themselves and, in no event, receive less than 85% of their tips. (*Id.* at 150-51, 513.)

As the foregoing discussion makes clear, bartenders receive the lion's share of the tips from the tip pool. In addition to mixing and serving drinks and performing choreographed dances and selling body shots, bartenders entertain customers by having their photographs taken with them, telling jokes, performing freestyle dances on the bar, engaging in games and contests, and encouraging female customers to get on the bar and dance. (Tr. at 12, 59.) In order to attract more customers to the saloon, bartenders would also at times venture outside and distribute flyers. (*Id.* at 856.) While engaging in this activity, commonly referred to as "flyering," a bartender would be accompanied by a security guard. (*Id.*)

Barbacks are compensated at a rate higher than the tipped rate earned by bartenders. (Docket No. 127-1 at 18.) Their responsibilities include stocking the bar with beer and liquor, changing kegs, washing and collecting glasses, washing dishes, wiping down the bar, and picking up and disposing of trash. (Tr. at 74, 279, 430-31, 788.) In essence, barbacks are there to do whatever is necessary to help the bartenders during their shift. (*Id.* at 20, 92.) The plaintiffs do not challenge their participation in the tip pool.

4

Security guards make up the last group of participants in the tip pool.  It is their participation that lies at the heart of the FLSA claim asserted by the Nationwide class members. Specifically, plaintiffs belonging to the Nationwide class contend that the inclusion of security guards in the tip pool violates the statute's minimum wage provisions.

Like barbacks, security guards are compensated at a rate that is higher than the tip rate. (Tr. at 491-92.)  Typically, they earn $9 or $10 an hour.  (*Id.* at 492.)  As their job title implies, security guards at company-owned saloons ensure the safety and security of both the Coyotes and the customers.  (Plaintiffs' Exhibit 4; Tr. at 451.)  They do so by: (1) ensuring that customers do not touch the Coyotes at any time or female patrons while they are on the bar; (2) ejecting customers who are unruly or who have otherwise violated saloon rules; (3) accompanying Coyotes while flyering; (4) walking Coyotes to their cars after the conclusion of a shift; (5) checking ID's at the door; and (6) preventing intoxicated or unruly individuals from entering the saloon.  (Plaintiffs' Exhibit 4; Tr. at 22-23, 51-52, 142, 339, 451, 453-54, 555, 686-87, 870.)

Nevertheless, while performing these traditional functions, security guards are expected and encouraged to be funny, engaging, and charismatic.  (Plaintiffs' Exhibit 4; Tr. at 423-25, 590, 745-46.)  Ms. Lovell testified that, while the Coyotes have always been the focal point of the Coyote Ugly experience, she envisioned security guards to play a prominent role as well. (Tr. at 425.)  Because they are typically the first employees customers see upon approaching the saloon, she envisioned security guards to operate like a host.  (*Id.* at 423-24.)  The CUSDC security guard job description similarly emphasizes that security guards are part of the customer experience.  (Plaintiffs' Exhibit 4.)  Indeed, it directs them to make customers feel welcome

5

upon entry.  (*Id.*)  It also encourages security guards to have fun while performing their jobs and to speak with customers.  (*Id.*)

The weight of the evidence at trial demonstrates that security guards comport with the aforementioned expectations while performing their job duties.  In addition to checking ID's, security guards stationed at the door of each saloon "bark," or call out, to passersby encouraging them to come inside.  (Tr. at 24, 427, 452-53, 477-78.)  They announce drink specials, tell potential customers to see the Coyotes, and inform them that there are girls dancing on the bar. (*Id.* at 24, 93, 275, 390, 427, 477-78, 589.)  Security guards employ several methods to draw people into the saloon.  For instance, they dance, sing, wear wigs or silly outfits, joke, and use funny slogans ("hot beer, cold women").  (*Id.* at 456-57, 589, 643, 652, 695-96, 722, 742, 753-55.)  For one customer who regularly frequented the Milwaukee saloon, a security guard always had treats for the customer's dog.  (*Id.* at 652.)  Security guards also tailor their pitches to the people walking by, whether a couple, a group of men, a bachelorette party, or tourists.  (*Id.* at 589, 633, 643, 712, 754, 865.)

Security guards stationed inside the saloon also make sure that customers are enjoying themselves.  They dance with customers and, on some occasions, perform the same choreographed dances as the Coyotes. (Tr. at 427-28, 490, 634-35, 644-45, 653, 668-69, 682-83, 689-90, 713-14, 722-23, 738-39, 768-69, 796.)  They set up games at the saloon (for instance, musical chairs), participate in them, and encourage customers to play as well.  (*Id.* at 480-81, 654, 666-67, 697-98, 722, 743, 756, 795, 797-98, 867, 869.)  In the Memphis saloon, security guards encourage patrons to ride a mechanical bull and are sometimes paid by customers to ride

6

the bull themselves.  (*Id.* at 634.)  Security guards flirt with female customers, encourage them to dance on the bar, and physically assist them in getting up and down.  (*Id.* at 591, 645, 653, 678, 680, 696-98, 712-14, 724-25, 742-43, 766-67, 794, 867.)  Often, security guards take photographs for female customers and pose for pictures as well.  (*Id.* at 591, 654-55, 659, 679, 725, 744 799-800, 850.)  They also encourage customers to purchase body shots from the Coyotes or from female patrons and, in some instances, customers take body shots off of the security guards themselves.  (*Id.* at 456, 490-91, 594, 644, 653-54, 678-79, 713, 726, 744-45, 756.)  Finally, security guards inside the saloon help keep the saloon clean by picking up glassware and trash and mopping up spills.  (Plaintiffs' Exhibit 4; Tr. at 424, 489-90, 562, 594, 633, 715-16, 866-67.)

The security guards' attire draws significant attention from customers as well.  While performing their duties, security guards wear t-shirts with the Coyote Ugly logo on the front and the letters "BMF" on the back.  (Tr. at 21, 448.)  The letters "BMF" stand for either "big mother f***er" or "bad mother f***er."  (*Id.* at 448.)  Customers often ask security guards about the meaning of "BMF," offer money to purchase their shirts, and seek to take photos of them.  (*Id.* at 428, 591, 850.)  Moreover, although the overwhelming majority of customers come to the saloon to see the Coyotes, the security guards also have regulars that come to visit them.  (*Id.* at 447-48, 485-86, 652-53, 679-80, 714-15, 743-44.)

One security guard at each company-owned saloon also serves as a head of security.  The head of security acts as a liaison between the staff and management.  (Tr. at 429-30, 511-12.)  He sets staffing schedules for the other security guards, which in most cases must be approved by

7

management.[4] (*Id.* at 429-30, 595, 685, 721, 770.) Although they may interview candidates, train new employees, and recommend personnel or disciplinary action, they are not authorized to independently hire, fire, or discipline employees. (*Id.* at 429-30, 510-11, 595-96, 684-85, 721-22.) They set an example for the other security guards and work alongside them during a shift. (*Id.* at 430, 595-96, 684, 721, 770.) They are compensated for their additional duties by earning an extra one dollar per hour. (*Id.* at 510-11, 770.) Heads of security participate in the tip pool with bartenders. (*Id.* at 511, 595.)

Company-owned Coyote Ugly saloons similarly have head bartenders who, for all intents and purposes, perform a role similar to that of heads of security with respect to the bartending staff. (Tr. at 42-44, 430, 741-42, 782-85, 870-71.) They are likewise compensated at a higher hourly rate and participate in the tip pool. (*Id.* at 42, 870-71.)

## III.    Off-the-Clock Work at the Company-Owned Saloon in Nashville, Tennessee

The Nashville class includes eleven plaintiffs, each of whom are pursuing claims that they were not compensated for all of the time that they worked at the Nashville saloon. In particular, they claim that they performed compensable work both before and after their shifts, but that several of their time records were altered by management to reflect clock-in and clock-out times precisely coinciding with their shift's beginning and ending times. (Docket No. 171 at 32.) In addition to these class-wide claims, plaintiffs Misty Blu Stewart and Meggan Conti argue that they performed other work for which they were not compensated. (*Id.* at 9-10, 15.)

---

[4] Tabari Kimber, who serves as the Head of Security in Nashville, testified that his general manager granted him authority to set schedules for the security staff. (Tr. at 621-22.)

## A.     Background

Bartenders at the Nashville saloon typically work either a day or a night shift.  Like each of the other company-owned saloons, the Nashville saloon has a point-of-sale system called "Aloha" that employees use to clock in and clock out for their respective shifts.  (Tr. at 504.) Employees are trained to clock in according to the specific job they are performing, whether it be as a tipped bartender, cocktail waitress, host/cashier, barback, or security guard.  (*Id.* at 181, 802-03.)  While employees are responsible for clocking in and clocking out from work, management retains the authority to edit time entries when it believes a clocking error has occurred.  (*Id.* at 504-05, 812-16, 839-40.)

The Nashville saloon also maintains a progressive discipline policy concerning employee tardiness.   (Tr. at 816-17, 821-22.)  Pursuant to this policy, an employee first receives a written warning if she is habitually late.  (*Id.* at 811, 816-17.)  If that employee is late again, she receives a second warning that may lead to a suspension.  (*Id.* at 817.)  A third instance of tardiness results in another warning which could lead to termination.  (*Id.*)

## B.     Dance Practices

In addition to reporting for their regular shifts, bartenders at the Nashville saloon are also required to attend dance practices at least once per month to learn the choreographed dances that are performed during their shifts.  (Defendants' Exhibit 4 at 4.)  These practices take place at the saloon and bartenders are paid a minimum wage while they attend.  (Tr. at 182-83, 432, 514-15, 812.)  Typically, bartenders clock in to a dance practice by selecting a button on the cash register located at the saloon's merchandise counter.  (*Id.* at 241, 847, 876.)

9

Two of the Nashville plaintiffs, Meggan Conti and Misty Blu Stewart, claim that they were not compensated for ceratin dance practices that they attended. They base their claim on the time records produced by the Aloha point-of-sale system, which apparently fail to show, under the subheading "Total Dance/Bar Clean/etc," all of the dance practices they attended. However, the evidence at trial concerning this issue did not paint a clear picture. Among other things, the trial testimony indicated that bartenders frequently clocked in to a dance practice by selecting one of several different buttons at the register, thus raising the distinct possibility that their dance practice time entries were recorded under other subheadings in the Aloha time records. (Tr. at 241, 269-70.) Indeed, Ms. Conti testified that, for a substantial period of time, she clocked in for dance practices using the "host/cashier" button. (*Id.* at 241.) She thus acknowledged that some of the entries appearing under the "Total Host/Cashier" subheading in her Aloha time records could have reflected dance practices she attended. (*Id.* at 270.)

### C.    Day Shift

Bartenders working a day shift are expected to report to the saloon at 10:15 a.m. for an 11:00 a.m. opening. (Tr. at 790, 801, 873.) They are expected to clock in immediately upon reporting to the saloon at 10:15 a.m. (*Id.* at 801.) The day shift concludes at 7:00 p.m. (*Id.* at 144.) At that time, Coyotes working the night shift make an entrance on the bar and are introduced to customers. (*Id.* at 144, 235-36, 289, 852.) Beginning in approximately March 2012, this introductory routine was lengthened so that the night shift Coyotes performed a few dances before stepping down to their registers and officially beginning their duties. (*Id.* at 505-06, 804, 873-74.) Typically, the bartender or bartenders working the day shift continue to

perform their duties until the introduction and any accompanying dances are completed. (*Id.* at 235-36, 826, 852.)

Once the introductions are completed, the day shift bartenders proceed to close any outstanding tabs, input any credit card tips, and count the money in their register drawers from the sales made during the shift. (Tr. at 144-45, 210-11, 235, 826, 852, 873.) The bartenders then wait for the manager on duty to perform a check-out, which usually entails running a sales report, checking that report against the bartender count, and directing a recount if there is a mismatch between the two. (*Id.* at 145, 235-36, 828, 852.) After the manager has completed the check-out, the bartenders then generally count the total amount of tip money received during the shift and distribute it to the barbacks and security guards pursuant to the governing tip pool formula. (*Id.* at 145-46, 235-36.) Upon distributing the tip pool proceeds, the bartenders complete a form describing what they received in tips, the hours they worked, and the amounts tipped out to barbacks and security guards. (Defendants' Exhibit 28, Tr. at 146.) Generally, these closing/post-shift tasks can take anywhere from 20-30 minutes to complete. (*Id.* at 147, 210.) The weight of the evidence at trial showed that bartenders working the day shift did not clock out from work at precisely 7:00 p.m. (*Id.* at 144, 147, 214, 235, 237, 292, 825-27, 851-52, 873-74.)

### D. Night Shift

As a general matter, the busiest nights at the Nashville saloon are Friday and Saturday. (Tr. at 291, 832.) On those nights, there are anywhere from 7 to 10 bartenders on staff. (*See*

11

Defendants' Exhibit 28.)  The remaining nights of the week tend to be slower and are accordingly staffed with fewer bartenders.  (*See* Defendants' Exhibit 28; Tr. at 829.)

Bartenders working the night shift are required to report to the Nashville saloon at 6:30 p.m. to perform pre-shift duties in advance of their 7:00 p.m. starting time.  (Tr. at 144, 803-04, 853, 875.)  They are expected to clock in immediately upon reporting to the saloon.  (*Id.* at 804.) Generally, bartenders attend a pre-shift meeting headed by a member of management, who, among other things, discusses the goals for the night and assigns registers to each bartender.  (*Id.* at 144, 148, 246, 289, 825.)

The Nashville saloon closes at 3:00 a.m.  (Tr. at 149.)  Bartenders announce last call for drinks at 2:30 a.m.  (Tr. at 806.)  Once last call is announced, customers have 15 minutes to order a drink and are required to exit the saloon by 2:55 a.m.  (*Id.* at 601, 806-07, 861, 875.) Generally at 2:45 a.m., bartenders begin to clean and count their drawers.  (*Id.* at 831, 875.) Cleaning duties include, among other things, wiping down liquor bottles, wiping down the bar, putting away glasses, cleaning coolers, and, on Saturdays, melting the ice in each well - a process which has sometimes taken as long as 20 to 30 minutes to complete.  (*Id.* at 149-50, 212, 290-91.)  Typically, after they have completed their cleaning duties, bartenders begin to count their drawers and input any credit card tips received during the night shift.  (*Id.* at 290, 607, 806-07.)  On particularly busy nights, a bartender may have anywhere from 20 to 40 credit card tips to input.  (*Id.* at 290.)  As is the case with the conclusion of the day shift, a member of management must go to each bartender after she has completed her count, run a sales report on the register, and ensure that the report matches the bartender count or otherwise direct a recount.

12

(*Id.* at 149, 831.)  Once the report and drawer count match, the bartender is checked out.  (*Id.* at 808.)

At this point, bartenders officially have the option of remaining in the saloon to count and receive their tips, or to otherwise leave for the night and retrieve their tips at a later time.  (Tr. at 808-09, 862-63.)  However, in practice, most bartenders stay to count and receive their tips.  (*Id.* at 499, 855-56, 863, 875-76.)  Upon counting and distributing the tips according to the tip pool formula, bartenders record on a form what they received in tips, the hours they worked, and the amounts tipped out to barbacks and security guards.  (Defendants' Exhibit 28, Tr. at 151.)  While these activities are ongoing, the manager on duty generally conducts a post-shift meeting to point out what went well during the night and what could be improved.  (Tr. at 883-84.)  Bartenders also spend some portion of their post-shift time socializing with one another.  (*Id.* at 432, 883.)  Following the post-shift meeting, the bartenders typically leave the saloon accompanied by a security guard, as required by company policy.  (*Id.* at 152-53.)

The weight of the evidence at trial shows that bartenders at the Nashville saloon did not typically clock out from the night shift at precisely 3:00 a.m.  Indeed, each of the four testifying Nashville plaintiffs offered such testimony.  (Tr. at 157, 214, 237-38, 324. )  Plaintiff Lakenya Hannah testified that bartenders generally stayed at the saloon until between 3:30 a.m. and 4:30 a.m.  (*Id.* at 157.)  Plaintiff Katherine Sharber-Timberlake stated that bartenders usually left the saloon between 3:30 and 4:00 a.m.  (*Id.* at 218.)  Ms. Conti testified that her closing/post-shift duties typically kept her in the saloon until between 4:00 and 4:30 a.m., although on Saturday nights, she often left the saloon at approximately 5:00 a.m.  (*Id.* at 251.)

13

For her part, Ms. Stewart testified that, on a slower night, bartenders working the night shift might have wrapped up their duties closer to 3:00 a.m.[5]  (*Id.* at 291, 324.)  Ms. Hannah and Ms. Conti also stated that on a slower night, bartenders could begin performing some of their closing/post-shift duties at 2:30 a.m.  (*Id.* at 184, 257-58.)  Nevertheless, Ms. Stewart testified that, on typically busier Friday and Saturday nights, she would remain at the saloon until between 4:15 a.m. and 4:45 a.m.  (*Id.* at 291.)  Aside from the testifying plaintiffs, Kahlia Moore, a defense witness who currently works at the Nashville saloon, testified that she never clocks out from the night shift at exactly 3:00 a.m. because she is still performing her closing/post-shift duties.[6]  (*Id.* at 862.)

### E.    Defendants' Alteration of Time Records

As previously mentioned, managers at the Nashville saloon possess the authority to enter the Aloha point-of-sale system and edit time entries when they believe a clocking error has occurred.  (Tr. at 504-05, 812-16, 839-40.)  The Aloha time records of the Nashville plaintiffs show multiple clock-in or clock- out times that precisely coincide with the beginning and ending times of the day or night shift.  (Plaintiffs' Exhibit 12Q.)  The weight of the evidence shows that the prevalence of these specific clock-in and clock-out times was the result of management's manipulation of employee time records.

---

[5] Dinesti Golightly,a defense witness who currently works at the Nashville saloon, similarly testified that, during a slower night, bartenders could potentially clock-out by 2:50 a.m. (Tr. at 881.)

[6] Ms. Golightly testified that bartenders usually clock out at 2:59 or 3:00 a.m.  (Tr. at 882.)

14

Ms. Hannah, a former bartender at the Nashville saloon, kept her own time slips produced by the register from which she clocked out. (Plaintiffs' Exhibit 2; Tr. at 154.) A comparison of those time slips with the relevant Aloha time records kept by the defendants reveals several discrepancies. For instance, on May 23, 2011, the defendants' Aloha time records indicate that Ms. Hannah clocked in for the night shift at 7:00 p.m. and clocked out at 3:00 a.m. (Plaintiffs' Exhibit 12Q.) However, Ms. Hannah's time slip for that evening shows that she actually clocked in at 6:23 p.m. and clocked out at 4:12 a.m. (Plaintiffs' Exhibit 2.) On June 6, 2011, the Aloha time records show that Ms. Hannah clocked out of the night shift at 3:00 a.m., while her time slip for that evening shows that she actually clocked out at 3:42 a.m. (Plaintiffs' Exhibit 12Q; Plaintiffs' Exhibit 2.) On June 12, 2011, the Aloha time records show Ms. Hannah clocking out from her day shift at precisely 7:00 p.m., while her time slip reveals that she actually clocked out at 7:49 p.m. (*Id.*) On July 2, 2011, the Aloha records again show that Ms. Hannah clocked out at 3:00 a.m., although her time slip for that evening shows that she clocked out at 3:15 a.m. (*Id.*) Finally, on July 9, 2011, the defendants' records state that Ms. Hannah clocked out at 3:00 a.m., while her time slip shows that she clocked out at 4:06 a.m. (*Id.*)

Each of the four Nashville plaintiffs who testified in this case question the accuracy of the Aloha time records, to the extent that they show clock-in or clock-out times of either 11:00 a.m., 7:00 p.m., or 3:00 a.m. Ms. Sharber-Timberlake testified that she never clocked in or clocked out at precisely the beginning or ending time of a shift. (*Id.* at 214.) Ms. Hannah questioned the accuracy of a 7:00 p.m. to 3:00 a.m. night shift time entry in her Aloha records and testified that the 3:00 a.m. night shift clock-out times appearing in those records were

15

inaccurate because she would still be at the saloon performing closing/post-shift duties at that time.  (*Id.* at 157-59.)

Ms. Stewart questioned the accuracy of multiple 7:00 p.m. day shift clock-out times appearing in her Aloha records.  (*Id.* at 292.)  Specifically, she testified that it was not possible for her to have clocked out at exactly 7:00 p.m., because that was the time that the Coyotes working the night shift arrived on the bar for their introductions.  (*Id.*)  Ms. Stewart also testified that the 7:00 p.m. night shift clock-in times were inaccurate, because she was required to report to the saloon at 6:30 p.m. for pre-shift duties.  (*Id.* at 293.)  Moreover, she distrusted the 3:00 a.m. night shift clock-out times appearing in the defendants' records because she never left the saloon at precisely that time.  (*Id.*)

Ms. Conti testified that she could not have possibly clocked in for a day shift at precisely 11:00 a.m., because she was required to report to work at 10:15 a.m.  (*Id.* at 234-35.)  She also testified that she could not have clocked out from her day shift at precisely 7:00 p.m. because the night shift arrives on the bar at that time and performs an introductory routine.  (*Id.* at 234-37.)  Ms. Conti also stated that she could not clock in for a night shift at exactly 7:00 p.m. because company policy required her to report to the saloon at 6:30 p.m.  (*Id.* at 239.)  Referring to the multiple 3:00 a.m. night shift clock-out times appearing in the defendants' records, Ms. Conti testified that there was no way she could have completed all of her closing/post-shift duties by the time the saloon closed.  (*Id.* at 237-38.)

During her testimony, Ms. Conti recalled one specific instance where, on October 30, 2011, she saw a manager roll back her clock-out time from approximately 4:15 a.m. to 3:00 a.m. (*Id.* at 238-40.)  She stated that the manager also rolled back the clock-out times of every other

16

bartender working the night shift that evening. (*Id.*) When asked how she remembered that specific event, Ms. Conti answered that it transpired on the night of her boyfriend's birthday. (*Id.* at 265.)

Jessica Bucklin, the current General Manager of the Nashville saloon, was shown Ms. Conti's Aloha time records during trial. Specifically, she was directed to one of many 7:00 p.m. day shift clock-out times appearing in Ms. Conti's time records and acknowledged that a bartender cannot clock out at exactly 7:00 p.m. because the night shift bartenders would just be making their entrance onto the bar at that time. (Tr. at 825-28.) She was also shown a host of 7:00 p.m. night shift clock-in times, which, being 30 minutes after the required 6:30 p.m. night-shift report time, would constitute late arrivals and would implicate the saloon's progressive discipline policy. (*Id.* at 816-824.) Ms. Bucklin, who was an Assistant Manager during much of the time covered by the aforementioned entries, testified that she would be aware if an employee was consistently late for work, but stated that she was unaware of any disciplinary action taken against Ms. Conti for being consistently tardy.[7] (*Id.* at 823-24.) Ms. Bucklin was otherwise unable to explain these numerous 7:00 p.m. night shift clock-in times. (*Id.* at 818, 822.) Nor was she able to explain the appearance of multiple 3:00 a.m. night shift clock-outs. (*Id.* at 834.)

Although Ms. Bucklin speculated at trial that some of Ms. Conti's time records could have been edited due to a clocking error on Ms. Conti's part, she was unable to point to any evidence indicating that the prevalence of 11:00 a.m., 7:00 p.m., or 3:00 a.m. clock-in or clock-

---

[7] Ms. Conti testified that she recalled one instance in 2010 when she was written up for being late to the night shift. (Tr. at 234.) Ms. Bucklin was not the Assistant Manager at that time. (*Id.* at 782.)

out times in Ms. Conti's Aloha records were the result of such an error.[8]  Nor is there any

evidence in the record explaining the presence of such entries in the Aloha time records of the

other Nashville plaintiffs.  Instead, the evidence adduced at trial reasonably shows that the

defendants altered the Nashville plaintiffs' time records so that they did not accurately reflect the

number of hours each plaintiff actually worked.

### F. Incidences of Exact Clock-In or Clock-Out Times in the Plaintiffs' Time Records

#### 1) Lakenya Hannah

Ms. Hannah worked at the Nashville saloon as a bartender between May 2011 and

August  2011.  (Tr. at 134.)  She worked 35 bartender shifts during her tenure.  (Plaintiffs'

Exhibit 12Q.)  Her Aloha time records display one day-shift clock-out at 7:00 p.m., seven night-

shift clock-ins at precisely 7:00 p.m., and 16 night-shift clock-outs at exactly 3:00 a.m.  (*Id.*)  Of

the 3:00 a.m. night-shift clock-outs, 5 fell on a weeknight (herein defined as Sunday-Thursday).

(*Id.*)

#### 2) Katherine Sharber-Timberlake

---

[8] At all relevant times, management at the Nashville saloon edited employee time records every two weeks.  (Tr. at 839.)  Ms. Bucklin stated that, as a general matter, employee clock-in and clock-out times are changed when an employee clocks in before they are required to be at the saloon, clocks in late, or forgets to clock in or clock out.  (*Id.* at 839-41.)  She testified that, in the event an employee forgets to clock out from the night shift, the Aloha system records a default 6:00 a.m. clock-out time.  (*Id.* at 840-41.)  In such instances, Ms. Bucklin stated that she would input a 3:00 a.m. clock-out time because she would assume that the employee was at the saloon until at least that time.  (*Id.* at 841.)  She testified that the exception to this rule is when she either receives a note from an employee stating what time he or she clocked out or is otherwise notified by an employee of his or her specific clock-out time.  (*Id.*)  Ms. Bucklin testified that she typically has only 1 or 2 notes from employees regarding clocking errors each time she sits to edit time records.  (*Id.* at 840-41.)

Ms. Timberlake worked at the Nashville saloon between February 2010 and July 2010. (Tr. at 200.) She worked 38 bartender shifts during the course of her employment. (Plaintiffs' Exhibit 12Q.) Her Aloha time records display one day-shift clock-in at precisely 11:00 a.m. and 5 day-shift clock-outs at exactly 7:00 p.m. (*Id.*) They also show 4 night-shift clock-ins at 7:00 p.m. and 8 night-shift clock-outs at 3:00 a.m. (*Id.*) Of the 3:00 a.m. night-shift clock-outs, 3 fell on a weeknight.

### 3) **Misty Blu Stewart**

Ms. Stewart worked at the Nashville saloon between October 2008 and December 2009. (Tr. at 272.) While employed, she worked 207 bartending shifts. (Plaintiffs' Exhibit 12Q.) Her Aloha time records reflect 38 day-shift clock-outs at 7:00 p.m., 7 night-shift clock-ins at exactly 7:00 p.m., and 20 night-shift clock-outs at 3:00 a.m. (*Id.*) Of the 3:00 a.m. night-shift clock-outs, 7 fell on a weeknight. (*Id.*)

Ms. Stewart also claims that her Aloha time records fail to account for six audition/training shifts. (Tr. at 295-96.) She testified that two of those shifts were strictly auditions to be hired as a Coyote, for which she should not be paid. (*Id.* at 295.) The remaining four shifts consisted of training sessions that ran for approximately 6 hours each. (*Id.* at 295-96.) Ms. Stewart maintains that she was not paid for those training shifts. (*Id.* at 295.) The defendants do not dispute this fact. Ms. Bucklin testified that it was company policy to compensate bartenders the minimum wage for each training shift that they attend. (*Id.* at 786-87.) Nevertheless, Ms. Stewart's Aloha time records contain zero entries under the subheading for bartender training. (Plaintiffs' Exhibit 12Q.) Finally, Ms. Stewart testified that she was not compensated for time spent during an approximately 3-4 hour photo shoot for the 2010 Coyote

19

Ugly swimsuit calendar, which took place sometime in 2009 in Biloxi, Mississippi. (*Id.* at 298-99.) The defendants similarly do not dispute Ms. Stewart's testimony as to this issue.

### 4) Amanda Ogborn

Ms. Ogborn was employed at the Nashville saloon between October 2010 and December 2010. (Plaintiffs' Exhibit 12Q.) She worked 10 bartending shifts during the course of her employment. (*Id.*) Her Aloha time records reflect one night-shift clock-out at 3:00 a.m. (*Id.*) This clock-out time fell on a weeknight. (*Id.*)

### 5) Raven Morris

Ms. Morris worked at the Nashville saloon from January 2011 until March 2011. (Plaintiffs' Exhibit 12Q.) During that span, she worked 10 bartending shifts. (*Id.*) Her Aloha time records reflect one night-shift clock-in at 7:00 p.m. and 2 night-shift clock-outs at 3:00 a.m. that both fell on a weekend night (herein defined as Friday and Saturday). (*Id.*)

### 6) Nicole Lee

Ms. Lee was employed at the Nashville saloon from January 2011 until May 2011. (Plaintiffs' Exhibit 12Q.) She worked a total of 18 bartending shifts during that span. (*Id.*) Her Aloha time records show 3 night-shift clock-outs at precisely 3:00 a.m. (*Id.*) Two of these clock-outs fell on a weeknight.

### 7) Maya Jordon

Ms. Jordon worked at the Nashville saloon between May 2010 and February 2011. (Plaintiffs' Exhibit 12Q.) During the course of her employment, she worked a total of 62 bartending shifts. (*Id.*) Her Aloha time records show 22 night-shift clock-ins at 7:00 p.m. and 11 night-shift clock-outs at exactly 3:00 a.m. (*Id.*) Of the 3:00 a.m. night shift clock-outs, 2 fell on a weeknight. (*Id.*)

### 8) Kandi Fletcher

Ms. Fletcher worked at the Nashville saloon between October 2010 and July 2012. (Plaintiffs' Exhibit 12Q.) While employed, she worked a total of 158 bartending shifts. (*Id.*) Her Aloha time records reflect one day-shift clock-in at exactly 11:00 a.m. and one night-shift clock-out at 7:00 p.m. (*Id.*) As for the night shift, her records reflect 24 clock-ins at 7:00 p.m. and 64 clock-outs at precisely 3:00 a.m. (*Id.*) Of the 3:00 a.m. clock-outs, 2 fell on a weeknight. (*Id.*)

### 9) Delaney James

Ms. James was employed at the Nashville saloon from December 2011 until April 2012. (Plaintiffs' Exhibit 12Q.) She worked a total of 28 bartending shifts during the course of her employment. (*Id.*) Her Aloha time records show 4 night-shift clock-ins at exactly 7:00 p.m. and 12 night-shift clock-outs at 3:00 a.m. (*Id.*) Of the 3:00 a.m. clock-outs, 4 fell on a weeknight. (*Id.*)

### 10) Keyawana Majors

Ms. Majors was employed at the Nashville saloon between August 2010 and December 2010. (Plaintiffs' Exhibit 12Q.) During that span, she worked a total of 28 bartending shifts.

(*Id.*)  Her Aloha time records reflect 13 night-shift clock-ins at 7:00 p.m. and 6 night-shift clock-outs at 3:00 a.m.  (*Id.*)  Of the 3:00 a.m. clock-outs, 2 fell on a weeknight.  (*Id.*)

**11)    Meggan Conti**

Ms. Conti was employed at the Nashville saloon from November 2010 until July 2012. (Tr. at 229.)  During that span, she worked 241 bartending shifts.  (Plaintiffs' Exhibit 12Q.)  Her Aloha time records show 3 day-shift clock-ins at 11:00 a.m. and 17 day-shift clock-outs at exactly 7:00 p.m.  (*Id.*)  They also display 21 night-shift clock-ins at 7:00 p.m. and 80 night-shift clock-outs at precisely 3:00 a.m.  (*Id.*)  Of the 3:00 a.m. night-shift clock-outs, 27 fell on a weeknight. (*Id.*)  Unlike the other Nashville plaintiffs, Ms. Conti provided an estimate of the number of hours she believed the defendants had shaved from her time records.  (Tr. at 240.) She placed that estimate at 240 hours.  (*Id.*)

In addition to claiming that the defendants failed to compensate her for work performed before and after her shifts, Ms. Conti also claims that she was not compensated for approximately 14 shifts at the beginning of her employment.  (Tr. at 231-32.)  During that time, however, Ms. Conti was working as a merchandise girl, which is a position that is outside the scope of the Nashville off-the-clock bartender class.  (*Id.*)

## IV.    Alleged Retaliatory Incidents Involving Individual Plaintiffs

In addition to the claims belonging to the Nationwide and Nashville classes, two individual plaintiffs, Ms. Stewart and Sarah Stone, have each asserted retaliation claims against the defendants.

A.      **Misty Blu Stewart**

As the court previously noted, Ms. Stewart left her employment at the company-owned Coyote Ugly saloon in Nashville in December 2009.  She was terminated for engaging in what the defendants considered to be theft - namely, pouring drinks and failing to ring them up in the Aloha point- of-sale system.  (Defendants' Exhibit 4 at 12; Tr. at 312, 436, 460-61, 522-30, 813.) Ms. Stewart admits that the defendants consider such conduct to constitute theft.  (*Id.* at 312, 314-15.)       Ms. Stewart's retaliation claim is predicated on an entry posted by defendant Lovell in her "Lil Spills" blog, which appears on Coyote Ugly's website.  (Tr. at 437.)  The blog entry in question was posted on May 11, 2011, which was just over one month after Ms. Stewart initiated the instant action on April 7, 2011, and stated the following:

> "By the way Lil, you should be getting served with a lawsuit.  No worries[,] just sign for it."  This particular case will end up pissing me off[,] cause it is coming from someone we terminated for theft. I have to believe in my heart that[,] somewhere down the road, bad people end up facing bad circumstances!
>
> I have been reading the basics of Buddhism[,] and am going to a class on Monday.  The Buddhist way would be to find beauty in the situation   and   release   anger   knowing   that   peace   will   come. Obviously, I am still a very new Buddhist[,] cause my thoughts are "[f***k] that [b**ch.]"  Let me do my breathing exercises and see if any of my thoughts change.  Lol . . . [.]

(Plaintiffs' Exhibit 14.)

Ms. Stewart claims that this blog inaccurately states that she was terminated for theft. (Tr. at 322.)  At trial, she testified that, at the time of her termination in December 2009, she was informed in an email from Ms. Lovell that she was not terminated for theft.  (*Id.*)  The e-mail, which was sent on December 15, 2009, states in pertinent part:

>Misty Blu,
>
>I appreciate your well worded and documented email. My understanding from the manager[s] was that the decision to terminate you was actually made pre-Saturday evening. Call it creative difference or inability to work well with others.
>
>I will make sure that theft is not the explanation for your termination.

(Plaintiffs' Exhibit 3.) Ms. Lovell testified that she wrote this e-mail in 2009 after learning that Ms. Stewart had filed an unrelated lawsuit against the company. (Tr. at 460.) Ms. Lovell explained that, although theft remained the actual grounds for termination, she was willing to omit it because she feared that Ms. Stewart might initiate another lawsuit. (*Id.*)

While the May 11, 2011 blog entry does not identify Ms. Stewart by name, Ms. Lovell conceded at trial that she was writing about her. (Tr. at 460.) She further testified that she was personally upset with Ms. Stewart for filing the instant action after she had already initiated a prior lawsuit against the company and caused the U.S. Department of Labor to conduct an audit. (*Id.* at 438.)

In any event, Ms. Stewart was already employed at another bar at the time the blog entry was posted. (Tr. at 307, 319.) She concedes that Coyote Ugly has not tried to interfere with her employment and that she has suffered no economic damages. (*Id.* at 307, 319.) Nevertheless, Ms. Stewart testified that she was embarrassed by the blog entry and worried that some of her current bartending customers who continue to go to the Nashville Coyote Ugly saloon might read the post. (*Id.* at 307.) However, she also admitted that the only individuals she knew who had read the post and were aware that it was about her were her boyfriend, her attorneys, and a former customer from the Nashville saloon who informed her that he had seen the blog entry.

24

(*Id.* at 317-18.)  This customer, who often took photos for Coyote Ugly, frequently visits the company website and has followed developments in this case.  (*Id.*)  Ms. Stewart has not sought any medical treatment for the embarrassment she suffered.  (*Id.* at 307, 319.)

**B.    Sarah Stone**

Sarah Stone joined this lawsuit on April 26, 2012.  (Docket No. 83-1.)  She resigned from her employment at the company-owned saloon in Oklahoma City on July 1, 2012, after what she perceived were retaliatory comments made to her by Daniel Huckaby, CUSDC's Director of Operations.  Mr. Huckaby, who supervised the regional managers and reported directly to Ms. Lovell, was in town on June 29, 2012 to attend an anniversary party at the saloon.  (Tr. at 378.) Apart from placing a drink order, Mr. Huckaby did not speak to Ms. Stone on the night of the party.  (*Id.* at 379.)

During the course of the night, Mr. Huckaby was seated at the bar approximately three feet away from Ms. Stone.  (*Id.* at 379-80.)  At approximately 2:49 a.m., Mr. Huckaby made the following post to his Facebook page: "Dear God, please don't let me kill the girl that is suing me . . . . that is all . . . ."  (Tr. at 379-80; Plaintiffs' Exhibit 10.)  Ms. Stone, who was a Facebook "friend" of Mr. Huckaby's, viewed this post at approximately 3:47 a.m.  (*Id.*)  By the time Ms. Stone woke up the following day, the post had been removed.  (Tr. at 398.)  Although it did not identify her by name, Ms. Stone believed the Facebook post was written about her.  (Tr. at 381.) While she was specifically unaware of any in attendance, she acknowledged that other plaintiffs from the Oklahoma City saloon who had joined this suit could have been at the anniversary party.  (*Id.* at 397.)

Mr. Huckaby was intoxicated at the party and testified that he did not remember making the post and had no idea what it was referring to.  (Tr. at 385, 532-34, 536-37, 774.)  He did admit, however, that he became aware that Ms. Stone had joined this lawsuit prior to the date of the party.  (*Id.* at 536.)

The following night, Ms. Stone was working a shift at the saloon when a female customer fell and threatened to sue the company.  (Tr. at 383, 772-73.)  At the time of the fall, Mr. Huckaby was out with some other members from the CUSDC corporate team enjoying a night on the town.  (*Id.* at 383, 533-34.)  When he returned, Amber Almond, the Assistant Manager at the Oklahoma City saloon recounted what had happened earlier with the female customer. (*Id.* at 773.)  Ms. Stone, who was in the saloon at the time, testified that Mr. Huckaby responded by yelling that he did not know why "all these "bi***es decide to sue our company" and that they are "f***ing idiots."  (*Id.* at 384, 400.)  Although Mr. Huckaby was speaking to Ms. Almond, Ms. Stone perceived those comments to be about her because he used the plural form of the word "b**ch."  (*Id.*)  Ms. Stone and Mr. Huckaby did not otherwise directly speak with each other that night.  (*Id.* at 401, 535.)

Both Ms. Stone and Ms. Almond perceived Mr. Huckaby to be intoxicated at the time he made the aforementioned comments.  (*Id.* at 383, 775.)  Mr. Huckaby himself acknowledged that he had been drinking that night.  (*Id.* at 539.)  Ms. Almond testified that Mr. Huckaby's comments were directed to the woman who had earlier threatened to sue the company after falling down the stairs, rather than Ms. Stone.  (*Id.* at 773-74, 779.)  She added that she did not believe that Mr. Huckaby was threatening Ms. Stone.  (*Id.* at 774.)

Nevertheless, Ms. Stone submitted her resignation the following day.  (Tr. at 386.)  She

testified that she was embarrassed and threatened by Mr. Huckaby's actions and feared the prospect of him returning to the saloon and repeating the same behavior. (*Id.*) While Ms. Stone did not know when Mr. Huckaby would return to the Oklahoma City saloon, she stated that, during the course of her employment, Mr. Huckaby had visited the saloon approximately once every four months. (*Id.* at 403.)

Shortly after Ms. Stone joined this suit, Lizzie Jones, the General Manager of the Oklahoma City saloon reached out to Ms Stone and informed her that her participation would create no problems. (Tr. at 391-92.) Indeed, Ms. Stone testified that she subsequently suffered no adverse changes to her compensation, responsibilities, or scheduled hours. (*Id.* at 392-93.) Nor did she receive any negative comments about joining this lawsuit. (*Id.* at 402.)

## CONCLUSIONS OF LAW

I.      **Liability**

    A.      **Tip Pooling Arrangement**

The Nationwide class members each allege that the defendants' policy of requiring bartenders to participate in a tip pool with security guards at Coyote Ugly's company-owned saloons violates the FLSA because security guards are statutorily ineligible to participate in the pooling arrangement. They also contend that the tip pool is invalid because it allegedly allows management - namely, the heads of security - to participate. For their part, the defendants contend that the tip pool does not contravene the FLSA's statutory requirements because security guards are tipped employees who are not a part of management.

27

The FLSA establishes a minimum wage for employers to pay their employees.[9]  29

U.S.C. §§ 201-219.  However, the statute authorizes employers to pay less than the minimum

wage to a "tipped employee" through a "tip credit" that takes into account the amount of tips

actually received by that employee.  29 U.S.C. § 203(m).[10]  A "tipped employee" is, in turn,

---

[9] The FLSA specifically provides that:

> Every employer shall pay to each of his employees who in any
> workweek is engaged in commerce or in the production of goods
> for commerce, or is employed in an enterprise engaged in
> commerce or in the production of goods for commerce, wages at
> the following rates:
>
> (1) except as otherwise provided in this section, not less than –
>
>> (A) $5.85 an hour, beginning on the 60th day after May 25,
>> 2007;
>>
>> (B) $6.55 an hour, beginning 12 months after that 60th day;
>> and
>>
>> (C) $7.25 an hour, beginning 24 months after that 60th day
>> . . . .

29 U.S.C. § 206(a)(1).

[10] The relevant section provides in pertinent part that:

> In determining the wage an employer is required to pay a tipped
> employee, the amount paid such employee by the employee's
> employer shall be an amount equal to –
>
>> (1) the cash wage paid such employee which for purposes
>> of such determination shall not be less than the cash wage
>> required to be paid such an employee on August 20, 1996;
>> and
>>
>> (2) an additional amount on account of the tips received by
>> such employee which amount is equal to the difference

28

defined as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. § 203(t).  While tip pooling arrangements are authorized under the statute, they are only permitted amongst those employees who "customarily and regularly receive tips."  29 U.S.C. § 203(m).

The defendants contend that the record evidence demonstrates that the tip pool at issue is valid under the FLSA, because security guards at company-owned saloons sufficiently interact with customers so as to constitute employees who "customarily and regularly receive tips" under the leading case of *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301 (6th Cir. 1998).  (Docket No. 169 at 22-24.)  The plaintiffs agree that *Kilgore*'s customer interaction test governs the court's inquiry into this issue.  (Docket No. 171 at 24.)  However, they argue that security guards employed at company-owned Coyote Ugly saloons fail to sufficiently interact with customers so as to constitute "tipped employees."  (*Id.* at 26.)

In *Kilgore*, the Sixth Circuit considered the legality of an arrangement requiring servers at Outback Steakhouses to participate in a tip pool with hosts, bus persons, and bartenders.  160 F.3d at 296.  The plaintiffs, comprising Outback servers and hosts, contended that the tip pooling arrangement was illegal because hosts were not "tipped employees" under the FLSA.  *Id.* at 296, 301.  In addressing this question, the court first recognized that Department of Labor Regulations

---

between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee.

29 U.S.C. § 203(m).

interpreting the FLSA created some circularity, because they provided that an employee who received tips only from a tip pool was an employee who "customarily and regularly receive[d] tips." *Id.* at 301. Thus, an employer could essentially make an employee a "tipped employee" by simply placing him in a "tip pool." However, the Court of Appeals noted that this circularity was limited by the "requirement that [a tipped] employee work 'in an *occupation* in which he customarily and regularly receives . . . tips.'" *Id.* (quoting 29 U.S.C. § 203(t)) (emphasis added).

In concluding that hosts at Outback were "tipped employees" eligible to participate in the tip pooling arrangement, the court focused on their level of customer interaction. *Id.* at 301-02. It noted that the evidence demonstrated that hosts performed "important customer service functions," such as greeting customers, supplying them menus, seating them at tables, and at times, enhancing the waiting experience. *Id.* at 301. Moreover, it found that, while hosts were not the primary customer contact, they nonetheless had "more than *de minimis* interaction with the customers." *Id.* The court noted that, in this sense, restaurant hosts could be distinguished from dishwashers, cooks, or other off-hour employees (i.e., overnight janitors) who had no customer interaction at all. *Id.* Finally, the court found that the "fact that Outback prohibit[ed] hosts from receiving tips directly from customers provide[d] some evidence that Outback hosts work in an occupation that customarily and regularly receives tips." *Id.* at 301-02.

There is ample evidence in the record to demonstrate that security guards employed at company-owned Coyote Ugly saloons sufficiently interact with customers so as to constitute employees who "customarily and regularly receive tips" under *Kilgore*. While it is undisputed that their primary duty is to protect the Coyotes and customers, security guards are expected to,

30

and do, in fact, play a prominent role in enhancing the customer experience at company-owned saloons.  Indeed, they do more than simply perform traditional security functions.  From the outset, security guards stationed at the saloon door attempt to grab potential customers' attention when "barking," employing various methods to bring people inside.  They also greet customers at the door.

Inside the saloon, security guards dance with customers, participate in games and recruit customers to do the same, encourage customers to order body shots, give body shots themselves, flirt and take pictures with female customers, urge them to dance on the bar, and assist them in getting up and down.  The security guards' attire itself is a conversation piece that sparks customer interaction.  Security guards also have their own regulars who come to visit them. While it is undisputed that the Coyotes are primarily what draws customers to the saloons, the record evidence nevertheless shows that, as a group, security guards at company-owned saloons have more than *de minimis* interaction with customers.  Accordingly, they are tipped employees eligible to participate in the tip-pool with bartenders and barbacks.

The plaintiffs nevertheless argue that the tip pooling arrangement in place at company-owned Coyote Ugly saloons is invalid because it allows management employees - namely, heads of security - to participate.  (Docket No. 171 at 29-30.)  They cite *Morgan v. SpeakEasy, LLC*, 625 F.Supp.2d 632, 652 (N.D. Ill. 2007) for the proposition that management employees acting in the interest of an employer cannot participate in a tip pool.  Under the FLSA, an "employer" is defined to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).

31

In determining whether a party is an employer, courts examine the "'economic reality' of the relationship between a plaintiff and a defendant." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012). The "economic reality" standard, however, is not amenable to formulaic application, but instead compels a case-by-case approach that considers the circumstances surrounding the entirety of the business activity at issue. *Id.* Factors relevant to this inquiry "may include whether the plaintiff is an integral part of the operations of the putative employer . . .; the extent of the plaintiff's economic dependence on the defendant . . .; the defendant's substantial control of the terms and conditions of the work of the plaintiff . . .; the defendant's authority to hire or fire the plaintiff . . .; and whether the defendant maintains the plaintiff's employment records and establishes the rate and method of payment[.]" *Id.* (internal citations and quotation marks omitted).

Taking into account the totality of the circumstances, the court concludes that heads of security were not "employers" under the FLSA. It is true that heads of security serve as a liaison between the security staff and management and lead by example while working alongside their fellow security guards. However, given the weight of the evidence in the record, it cannot reasonably be said that heads of security exercise substantial control over the terms and conditions of other security staff at company-owned saloons. Indeed, they possess no authority to independently hire, fire, or discipline employees. While they possess authority to set staffing schedules for their fellow security guards, in most instances, those schedules must be approved by management. The plaintiffs have pointed to no evidence showing that heads of security otherwise maintain employment records or determine the rate and method of security guard compensation. The record shows that, at most, heads of security are "low-level supervisors who

32

cannot be considered employers under the FLSA." *Morgan*, 625 F.Supp.2d at 653 (concluding that senior servers were not employers under the FLSA because, while they were able to send employees home, request additional staff, and supervise work, they lacked authority over hiring, firing, or scheduling, and did not otherwise determine the rate or method of employee compensation or maintain employment records beyond performing clerical duties); *see also Hernandez v. City Wide Insulation of Madison, Inc.*, No. 05-C-303, 2006 WL 1993552, at *3 (E.D. Wis. July 14, 2006) (concluding that supervisor was not an employer when he possessed hiring authority and some control over employee work schedules, but could not determine the rate or method of employee compensation and only had clerical duties relating to the maintenance of employment records).

The plaintiffs make much of the fact that CUSDC's Director of Operations, Daniel Huckaby, testified at his deposition that he considered heads of security to be part of the management team. (Docket No. 127-1 at 21.) However, the Sixth Circuit has made clear that "the employment relationship determination 'is not fixed by labels that parties may attach to their relationship.'" *Ellington*, 689 F.3d at 555 (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950)). In any event, during his deposition, Mr. Huckaby also testified that he considered head bartenders to be management employees. (Docket No. 127-1 at 21.) In all significant respects, head bartenders perform a function similar to that of heads of security and likewise participate in the tip pool. Yet, despite the fact that head bartenders and heads of security perform a similar role, the plaintiffs do not argue that participation by head bartenders renders the pooling arrangement invalid. The plaintiffs' reliance on Mr. Huckaby's deposition testimony is thus unavailing.

Accordingly, for all of the foregoing reasons, the court concludes that the defendants' policy of requiring bartenders to participate in a tip pool with security guards at Coyote Ugly's company-owned saloons does not violate the FLSA.

## B.      Off-the-Clock Work at the Nashville Saloon

Each of the members belonging to the Nashville class allege that they performed uncompensated work both before and after their shifts.  (Docket No. 171 at 32.)  Specifically, they argue that management altered their time records and that such conduct amounts to a willful violation of the FLSA.  (*Id.*)  In addition, plaintiffs Meggan Conti and Misty Blu Stewart contend that they were not compensated for dance practices that they actually attended.  (*Id.* at 15, 19.)  Ms. Stewart claims that she also was not compensated for four training shifts and a photo shoot for the 2010 Coyote Ugly swimsuit calendar.  (*Id.* at 10.)  The defendants argue that the plaintiffs have failed to show that they were not paid for work performed off-the-clock. (Docket No. 169 at 27.)  Alternatively, they argue that, even if they did violate the FLSA, they did not do so willfully. (*Id.*)

To prevail on a claim for unpaid wages under the FLSA, a plaintiff "must prove by a preponderance of evidence that he or she 'performed work for which he [or she] was not properly compensated.'" *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946).  In collective actions like the case at bar, an FLSA violation may be shown through representative testimony. *See O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009.)  The defendants do not contend otherwise.

## 1)      Class-wide Claim Alleging that the Defendants Altered Time Records

34

Based on the documentary and testimonial evidence presented at trial, the court concludes that the defendants altered the Nashville plaintiffs' time records to their detriment and that the plaintiffs accordingly worked off-the-clock. Ms. Bucklin, the General Manager of the Nashville saloon, admitted that management possessed the authority and did, in fact, alter bartender time records. Indeed, the Aloha time records of the Nashville plaintiffs reveal numerous clock-in and clock-out times that precisely match the beginning or ending times of day and night shifts. However, each of the four testifying plaintiffs from the Nashville class offered testimony stating that the aforementioned time entries were inaccurate, given the nature and extent of their pre-shift and closing/post-shift duties. The court finds the testimony on this topic from these four employees, collectively constituting 36% of the Nashville class, to be credible, persuasive, and representative. Ms. Hannah kept time slips showing several discrepancies between the times she actually clocked in or clocked out and the clock-in and clock-out times reported in her Aloha records. Ms. Conti specifically recalled observing a manager roll back, to 3:00 a.m., her own clock-out time, in addition to the clock-out times of each bartender working the night shift on October 30, 2011. When presented with Ms. Conti's Aloha time records, which were replete with multiple clock-in and clock-out times of either 11:00 a.m., 7:00 p.m., or 3:00 a.m., Ms. Bucklin was unable to satisfactorily explain the prevalence of such entries. The defendants have otherwise failed to explain the appearance of such entries in the Aloha time records of the remaining Nashville plaintiffs.

The court also concludes that the defendants' aforementioned conduct amounted to a willful violation of the FLSA, thus extending the applicable statute of limitations period to three years. *See* 29 U.S.C. § 255(a). A violation is willful if "'the employer either knew or showed

35

reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 129 (1985)). Here, the defendants have maintained that it is company policy not to have employees work off-the-clock. (Tr. at 575.) Nevertheless, despite the presence of this policy, the record evidence shows that management at the Nashville saloon frequently altered the plaintiffs' time records so that the plaintiffs did not receive credit for hours actually worked. At the very least, such conduct demonstrates a reckless disregard for the Act.

### 2) Individual Claims

The court now turns its attention to the claims asserted by Ms. Stewart and Ms. Conti. The court concludes that both of these plaintiffs' claims for uncompensated dance practices must fail. Again, the evidence at trial did not create a clear picture as to whether these two plaintiffs failed to receive compensation for certain dance practices that they attended. Indeed, the trial testimony raised the distinct possibility that dance practice time entries were recorded in the Aloha time records under a variety of different subheadings, aside from the one entitled "Total Dance/Bar Clean/etc." Given the state of the evidentiary record on this issue, the court concludes that Ms. Stewart and Ms. Conti have failed to carry their burden to hold the defendants liable.[11]

---

[11] Ms. Conti also cannot seek compensation for the 14 shifts she worked at the beginning of her employment at the Nashville saloon because she was working those shifts as a merchandise girl, and the scope of the Nashville off-the-clock class is limited to bartenders.

As for Ms. Stewart's individual claims, the court concludes that she was not compensated for four bartender training shifts at the beginning of her employment.[12]  The defendants do not dispute that Ms. Stewart failed to receive compensation for such shifts.  Moreover, while CUSDC's policy is to compensate bartenders for all training sessions that they attend, Ms. Stewart's Aloha time records reflect zero entries under the bartender training subheading.

Nevertheless, Ms. Stewart has failed to show that the defendants' violation of the statute in this regard was willful.  Indeed, she has failed to provide any evidence from which this court can reasonably infer that the defendants' were acting with a culpable mental state.  This deficiency thus distinguishes her individual claim for uncompensated training shifts from the class-wide claim concerning pre-shift and closing/post-shift work.  Because Ms. Stewart has failed to show a willful violation of the statute, the applicable limitations period is two years. See 29 U.S.C. § 255(a).  Moreover, because this action was commenced on April, 7, 2011 (Docket No. 1.), Ms. Stewart's claim is clearly outside the limitations period, since her training shifts occurred at the beginning of her employment in October 2008.

The court also concludes that Ms. Stewart is entitled to compensation for three hours spent during a photo shoot for the 2010 Coyote Ugly swimsuit calendar.  The defendants do not dispute that Ms. Stewart failed to receive compensation during the shoot.  Nevertheless, for the reasons expressed above, the court finds that Ms. Stewart has not demonstrated that the defendants' violation was willful.  Thus, the two-year limitations period applies.  At trial, Ms.

_____

[12] However, Ms. Stewart cannot seek compensation for the audition sessions she attended prior to getting hired at the Nashville saloon because she necessarily was not a saloon employee at that time.

37

Stewart testified that the photo shoot for the 2010 calendar occurred sometime in 2009, although she was unable to recall precisely whether it occurred before or after April 7, 2009. Although the limitations question is thus unsettled, the court will resolve the uncertainty in favor of Ms. Stewart, in light of the fact that the defendants have raised no opposition to her claim.

### C. Individual Retaliation Claims

Ms. Stewart and plaintiff Sarah Stone both contend that they were retaliated against for their participation in this lawsuit. (Docket No. 171 at 36.) The defendants argue that the record evidence shows otherwise. (Docket No. 169 at 24-26.) In particular, they assert that Ms. Stewart has failed to show that she suffered an adverse action for initiating this lawsuit and, in any event, has suffered no measurable harm. (*Id.* at 24-25.) As for Ms. Stone's claim, the defendants contend that the evidence fails to show that Daniel Huckaby's actions were specifically targeted at her and that, even if they were, they fail to rise to a level sufficient to constitute a constructive discharge. (*Id.* at 26.) The court will consider each of the individual retaliation claims in turn.

### 1) Misty Blu Stewart

Having reviewed the record evidence, the court concludes that Ms. Stewart's retaliation claim must fail because she cannot demonstrate that Ms. Lovell's blog post constituted a materially adverse employment action. "To be materially adverse, an adverse action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Pettit v. Steppingstone Ctr. for the Potentially Gifted*, 429 F. App'x. 524, 532 (6th Cir. 2011) (quoting *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886 (6th Cir. 1996)). Here, the evidence fails to show that the aforementioned blog post, which did not identify Ms. Stewart, caused any significant

disruption to her current employment. Indeed, she conceded at trial that Coyote Ugly has not attempted to interfere with her current position. Moreover, the evidence shows that the blog post truthfully conveyed the company's rationale for terminating her. While the post was seen by Ms. Stewart's boyfriend, counsel, and former customer, there is no evidence that their awareness of it has resulted in any tangible detriment to Ms. Stewart, as she admitted at trial that she has suffered no economic damages and has not sought medical treatment for her feeling of embarrassment. In sum, the record evidence simply fails to show that Ms. Stewart has suffered any harm from the blog post. Accordingly, her retaliation claim must be dismissed. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm").

### 2) Sarah Stone

Ms. Stone's retaliation claim fares no better. The plaintiffs argue that Ms. Stone was constructively discharged in retaliation for joining this lawsuit. (Docket No. 171 at 33.) To establish that she was constructively discharged, Ms. Stone must adduce evidence showing that "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012) (internal quotation marks and citations omitted). In undertaking this inquiry, a court must examine "both the employer's intent and the employee's objective feelings." *Logan v. Denny's Inc.*, 259 F.3d 558, 569 (6th Cir. 2001). When evaluating the first prong of this test, courts in this circuit have noted that:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* (internal quotations and citations omitted).

Ms. Stone has not presented evidence showing that the defendants deliberately created intolerable working conditions calculated to encourage her resignation. Again, her constructive discharge claim is predicated on two incidents involving Daniel Huckaby, CUSDC's Director of Operations. Nevertheless, Ms. Stone has not established that she was the intended target of Mr. Huckaby's Facebook post or his comment to Ms. Almond about "b\*\*ches suing the company." The Facebook post neither mentions Ms. Stone by name nor references this particular lawsuit. The comment to Ms. Almond was made immediately after Mr. Huckaby learned that a customer had fallen at the Oklahoma City saloon and threatened to sue. Indeed, Ms. Almond did not perceive Mr. Huckaby's comment to be directed at Ms. Stone. Moreover, it is unclear what Mr. Huckaby's intentions were in making the above statements, since he was intoxicated at the time of both incidents.

At bottom, there is no evidence that Mr. Huckaby ever directly spoke with Ms. Stone about this lawsuit, no evidence that she directly received any negative comments about her participation in the same, and no evidence that she otherwise experienced any adverse changes to her compensation, responsibilities, or schedule after joining this collective action. While she may have subjectively perceived Mr. Huckaby's drunken and rather ambiguous comments to

have been made with the intention of forcing her to resign, the court cannot conclude that those

perceptions were reasonable as an objective matter. Because the court believes that a reasonable

person would not find that Ms. Stone's working conditions were intolerable, her retaliation claim

must fail.

## II.    Damages

### A.    FLSA Backpay

Because the court has concluded that the plaintiffs belonging to the Nashville class are

entitled to recover unpaid wages for work performed off the clock, it must assess what, if any,

damages are recoverable. The Supreme Court has articulated the following burden shifting

framework for courts to apply when determining the extent of damages:

> When the employer has kept proper and accurate records the
> employee may easily discharge his burden by securing the production
> of those records. But where the employer's records are inaccurate or
> inadequate . . . an employee has carried out his burden if he proves
> that he has in fact performed work for which he was improperly
> compensated and if he produces sufficient evidence to show the
> amount and extent of that work as a matter of just and reasonable
> inference. The burden then shifts to the employer to come forward
> with evidence of the precise amount of work performed or with
> evidence to negative the reasonableness of the inference to be drawn
> from the employee's evidence. If the employer fails to produce such
> evidence, the court may then award damages to the employee, even
> though the result be only approximate.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), *superseded by statute on*

*other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972).

The evidence in the record amply demonstrates that the defendants failed to keep

accurate records of employees' wages and hours at the Nashville saloon. Indeed, the court has

concluded that the defendants willfully altered the Nashville plaintiffs' Aloha time records,

resulting in a failure to record all hours actually worked. Thus, the plaintiffs must now "produce[ ] sufficient evidence to show the amount and extent of [their] work as a matter of just and reasonable inference." *Mt. Clemens Pottery*, 328 U.S. at 687.

### 1) Plaintiffs' Estimate of Uncompensated Time

The plaintiffs have offered two separate methods for estimating the amount of uncompensated work they performed. For all but one plaintiff in the Nashville class, the plaintiffs argue that each entry in their respective Aloha time records displaying a clock-in or clock-out time precisely coinciding with the beginning or ending time of their day or night shift (i.e., 11:00 a.m., 7:00 p.m., or 3:00 a.m.) is inaccurate. (*Id.* at 15-19.) They further contend that each inaccurate time entry excluded at least 30 minutes of work performed off the clock. (*Id.*) However, for Meggan Conti, the plaintiffs assert that a total of 240 hours were shaved by the defendants during the twenty-month period that she worked at the Nashville saloon. (*Id.* at 16.) The court will consider each estimate in turn.

### a. Nashville Class Excluding Meggan Conti

Again, the Nashville plaintiffs primarily contend that each 11:00 a.m., 7:00 p.m., or 3:00 a.m. clock-in or clock-out time appearing in the defendants' Aloha time records is an inaccurate entry excluding at least 30 minutes of work performed off the clock. The court concludes that the record evidence sufficiently supports this estimate as a matter of just and reasonable inference. Each of the four Nashville plaintiffs who testified in this case stated that the aforementioned entries failed to take into account certain pre-shift and closing/post-shift duties that they performed. The court has already found that their testimony on this topic is fairly representative. *See U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 781 (6th Cir. 1995)

42

("The testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees"). The defendants do not contend otherwise. Taken together, their testimony revealed that, for the day shift, pre-shift duties lasted approximately 45 minutes, while closing/post-shift duties ranged from 20 to 30 minutes in duration. For the night shift, pre-shift duties often lasted 30 minutes, while closing/post-shift duties could keep bartenders in the saloon until anywhere from 3:30 a.m. to 5:00 a.m. Given this evidence, the court believes that the plaintiffs' 30 minute estimate is reasonable.

The burden thus shifts to the defendants to present evidence of the precise amount of work performed or evidence that otherwise negates the reasonableness of the plaintiffs' 30 minute estimate. The defendants have failed to present evidence of the former. However, they nonetheless argue that some reasonable adjustments should be made to the plaintiffs' 30 minute estimate. (Docket No. 169 at 16-22.)

First, they assert that, at the end of the day-shift, closing/post-shift duties typically last only 5 minutes, as opposed to the 20 to 30 minutes claimed by the plaintiffs. The weight of the record evidence does not support the defendants' assertion. Ms. Bucklin, a defense witness, testified to the 5 minute figure being applicable before March 2012, when the introductory routine for the night shift bartenders was lengthened. (Tr. at 825.) However, Ms. Hannah and Ms. Timberlake, both of whom bartended prior to this change, testified that their closing/post-shift duties lasted between 20 to 30 minutes. (*Id.* at 147, 210.) Ms. Stewart's testimony similarly indicates that, on average, her closing/post-shift duties were of the same duration. (*Id.* at 326.) Like Ms. Hannah and Ms. Timberlake, Ms. Stewart bartended at the saloon prior to March 2012. Nevertheless, in light of the disparity between the testimony of Ms. Bucklin and the testifying

43

plaintiffs, the court believes that a 10 minute reduction from the plaintiffs' 30 minute estimate is reasonable. With this adjustment, the court concludes that the plaintiffs are entitled to 20 minutes of uncompensated time with respect to each 7:00 p.m. day-shift clock-out appearing in the Aloha time records of each Nashville plaintiff.

The defendants next address the 3:00 a.m. night shift clock-out entries appearing in the Aloha time records. Specifically, they assert that a distinction should be made between those 3:00 a.m. clock-outs falling on a typically busier Friday or Saturday night, where a bartender could have worked 30 minutes past their recorded 3:00 a.m. clock-out time, and those 3:00 a.m. clock-outs falling on a typically slower Sunday through Thursday night. (Docket No. 169 at 16-22.) Given the evidence in the record, the court believes that this distinction is reasonable. Indeed, the evidence amply shows that Friday and Saturday nights are the busiest nights at the saloon. Both Ms. Conti and Ms. Stewart testified that they usually left the saloon anywhere from 4:15 a.m. to 5:00 a.m. on Friday or Saturday night. In contrast, Ms. Stewart testified that, on slower nights, bartenders might leave the saloon closer to 3:00 a.m. For their part, Ms. Hannah and Ms. Conti testified that, on a slower night, bartenders could begin performing some of their closing/post-shift duties at 2:30 a.m.

Accordingly, the court believes that the Nashville plaintiffs' estimate of uncompensated time should remain unchanged for those 3:00 a.m. night-shift clock-outs falling on a Friday or Saturday night. Thus, the plaintiffs are entitled to 30 minutes of uncompensated time with respect to each of the aforementioned clock-outs. However, the court will apply a 15 minute reduction to the plaintiffs' damages estimate for those 3:00 a.m. night-shift clock-outs falling on

44

a Sunday through Thursday night. For each of these weeknight clock-outs, the plaintiffs are entitled to 15 minutes of uncompensated time.

### b. Nashville Plaintiff Meggan Conti

As the court stated above, the plaintiffs have advanced a separate estimate for Ms. Conti. Specifically, they rely on her trial testimony, in which she estimated that the defendants had shaved approximately 240 hours from her time records. Ms. Conti worked 241 bartending shifts while employed at the Nashville saloon. Her Aloha time records reflect 121 entries containing clock-in or clock-out times of precisely 11:00 a.m., 7:00 p.m., or 3:00 a.m. Thus, in contrast to each of the other Nashville plaintiffs, Ms. Conti estimates that, on average, each inaccurate time entry excludes 1.98 hours of uncompensated work.[13] Ms. Conti did not explain the basis for her estimate during the trial. In any event, the court does not find that her testimony concerning the amount and extent of her pre-shift and closing/post-shift duties so uniquely sets her apart so as to warrant such a substantial departure from the estimate advanced by the rest of the Nashville class. Indeed, because her testimony as to this issue is fairly consistent with that of the other testifying witnesses, the court believes that it is reasonable to apply the estimate advanced by each of the other Nashville class members, subject to the adjustments discussed in the previous section.

### c. Summary

---

[13] To arrive at this figure, the court divided the 240 hours Ms. Conti estimates were shaved from her time records by 121, which denotes the number of inaccurate time entries appearing in her Aloha records.

45

To summarize, the court concludes that the Nashville plaintiffs are entitled to 30 minutes of uncompensated time for each 11:00 a.m. day-shift clock-in and each 7:00 p.m. night-shift clock-in appearing in their respective Aloha time records. In addition, the court concludes that the Nashville plaintiffs are entitled to 20 minutes of uncompensated time for each 7:00 p.m. day-shift clock-out appearing in those records. Finally, as for the night-shift clock-outs, the court concludes that the plaintiffs are entitled to 30 minutes of uncompensated time for each weekend 3:00 a.m. clock-out and 15 minutes of uncompensated time for each weeknight 3:00 a.m. clock-out. While the court acknowledges that these estimates are necessarily imprecise, the defendants bear the risk of that result due to their failure to keep accurate time records. *See Mt. Clemens Pottery*, 328 U.S. at 687-88; *see also Baden-Winterwood v. Life Time Fitness, Inc.*, 729 F.Supp.2d 965, 991-92 (S.D. Ohio 2010) (noting that determining the amount of uncompensated hours each plaintiff worked "is by necessity imprecise, involving estimates and averages, since Defendant failed to keep records of the precise time Plaintiffs worked").

### 2) Liquidated Damages

The Nashville plaintiffs also contend that they are entitled to liquidated damages for the defendants' violation of the FLSA. The Act expressly provides for such damages in an amount equal to the plaintiffs' unpaid minimum wages or unpaid overtime compensation. *See* 29 U.S.C. § 216(b). The Sixth Circuit has noted that "[l]iquidated damages under the FLSA are compensation, not a penalty or punishment." *Elwell v. Univ. Hosp. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (internal quotation marks and citations omitted). Nevertheless, a district court has discretion not to award such damages to a prevailing plaintiff if "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good

46

faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938." 29 U.S.C. § 260. The burden placed on the employer is substantial and requires "proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict." *Elwell*, 276 F.3d at 840 (internal quotation marks and citations omitted). Without such proof, however, the district court lacks discretion to reduce an employer's liability for liquidated damages. *Id.*

Here, the defendants have offered no proof of good faith and reasonableness. Nor do they make any credible argument on this point. Instead, they assert, in a single conclusory sentence in their post-trial brief, that their alterations of the plaintiffs' time records were reasonable and performed in good faith. (Docket No. 169 at 27-28.) In any event, the court has already concluded that the defendants' violation of the FLSA was wilful, which forecloses any good faith defense. *See Herman*, 183 F.3d at 474 (noting that the liquidated damages issue is closely related to the willfulness inquiry and that "[a]bsent a good-faith disagreement with the authority of the government to promulgate the statute, a finding of willfulness is dispositive of the liquidated damages issue"). Accordingly, the court finds that liquidated damages are appropriate.[14]

### 3)     Awards to Each Plaintiff

---

[14] The court acknowledges that it did not conclude that the defendants willfully deprived Ms. Stewart of compensation for her three-hour calendar shoot. Nevertheless, the court believes that liquidated damages are still proper because the defendants have failed to come forward with any evidence showing that their failure to compensate Ms. Stewart for the shoot was reasonable and performed in good faith.

### a.    Lakenya Hannah

Previously, the court determined that Ms. Hannah's Aloha time records displayed one day-shift clock-out at 7:00 p.m., 7 night-shift clock-ins at precisely 7:00 p.m., and 16 night-shift clock-outs at exactly 3:00 a.m.  Unlike the other Nashville plaintiffs, Ms. Hannah kept time slips reflecting her actual clock-in and clock-out times.  Those time slips showed six specific discrepancies with the clock-in and clock-out times recorded in her Aloha time records.  As to those six discrepancies, Ms. Hannah is entitled to the following:

*5/23/11 night-shift clock-in at 7:00 p.m. when actual clock-in time was 6:23 p.m.*:

$1 \times .62 \times \$2.13 = \$1.32$[15]

*5/23/11 night-shift clock-out at 3:00 a.m. when actual clock-out time was 4:12 a.m.*:

$1 \times 1.2 \times \$2.13 = \$2.56$

*6/6/11 night-shift clock-out at 3:00 a.m. when actual clock-out time was 3:42 a.m.*:

$1 \times .70 \times \$2.13 = \$1.49$

*6/12/11 day-shift clock-out at 7:00 p.m. when actual clock-out time was 7:49 p.m.*:

$1 \times .82 \times \$2.13 = \$1.75$

*7/2/11 night-shift clock-out at 3:00 a.m. when actual clock-out time was 3:15 a.m.*:

$1 \times .25 \times \$2.13 = \$0.53$

*7/9/11 night-shift clock-out at 3:00 a.m. when actual clock-out time was 4:06 a.m.*:

$1 \times 1.1 \times \$2.13 = \$2.34$

---

[15] For each of the following six calculations, the equation is represented as follows: 1 multiplied by the amount of uncompensated time (expressed as a decimal) multiplied by Ms. Hannah's hourly tip wage ($2.13).  (*See* Plaintiffs' Exhibit 12Q); *see also* 29 U.S.C. § 203(m); 29 C.F.R. § 531.50.

48

*Subtotal*: $9.99

Having addressed the aforementioned discrepancies, 6 night-shift clock-ins at 7:00 p.m. and 12 night-shift clock-outs at 3:00 a.m. remain in Ms. Hannah's Aloha time records. Of the remaining 3:00 a.m. night-shift clock-outs, 3 fell on a weeknight. Applying the plaintiffs' estimates to these specific entries, the court finds that Ms. Hannah is entitled to the following:

*6 night-shift clock-ins at 7:00 p.m.*: 6 x .5 x $2.13 = $6.39[16]

*9 weekend night-shift clock-outs at 3:00 a.m.*: 9 x .5 x $2.13 = $9.59

*3 weeknight night-shift clock-outs at 3:00 a.m.*: 3 x .25 x $2.13 = $1.60

*Subtotal*: $17.58

*Total amount including liquidated damages*: **$55.14**[17]

### b.    Katherine Sharber-Timberlake

Ms. Timberlake's Aloha time records reflect one day-shift clock-in at 11:00 a.m. and 5 day-shift clock-outs at exactly 7:00 p.m. They also display 4 night-shift clock-ins at 7:00 p.m. and 8 night-shift clock-outs at 3:00 a.m. Of the 3:00 a.m. night-shift clock-outs, 3 happened to fall on a weeknight. Accordingly, Ms. Sharber-Timberlake is entitled to the following:

---

[16] Each of the calculations involving the plaintiffs' estimates of uncompensated time is performed using the same equation. Within each category of inaccurate clock-in or clock-out times (i.e., day shift clock-ins at 11:00 a.m., day shift clock-outs at 7:00 p.m., night shift clock-ins at 7:00 p.m., and night shift clock-outs at 3:00 a.m.), the equation can be represented as follows: the number of inaccurate clock-ins or clock-outs multiplied by the estimate of uncompensated time for that category (either 15, 20, or 30 minutes expressed as a decimal) multiplied by the hourly tip wage earned by each of the Nashville plaintiffs ($2.13). (*See* Plaintiffs' Exhibit 12Q); *see also* 29 U.S.C. § 203(m); 29 C.F.R. § 531.50.

[17] To arrive at this figure, the court simply took the sum of each subtotal and then doubled that amount. *See* 29 U.S.C. § 216(b).

*1 day-shift clock-in at 11:00 a.m.*: 1 x .5 x $2.13 = $1.07

*5 day-shift clock-outs at 7:00 p.m.*: 5 x .33 x $2.13 = $3.51

*4 night-shift clock-ins at 7:00 p.m.*: 4 x .5 x $2.13 = $4.26

*5 weekend night-shift clock-outs at 3:00 a.m.*: 5 x .5 x $2.13 = $5.33

*3 weeknight night-shift clock-outs at 3:00 a.m.*: 3 x .25 x $2.13 = $1.60

*Subtotal*: $15.77

*Total amount including liquidated damages*: **$31.54**[18]

---

[18] To arrive at this figure for each of the remaining Nashville plaintiffs, the court simply takes the subtotal amount and multiplies it by two. *See* 29 U.S.C. § 216(b).

Case 3:11-cv-00342   Document 172   Filed 08/08/13   Page 50 of 56 PageID #: 4399

### c.  Misty Blu Stewart

Ms. Stewart's Aloha time records reflect 38 day-shift clock-outs at 7:00 p.m., 7 night-shift clock-ins at exactly 7:00 p.m., and 20 night-shift clock-outs at 3:00 a.m. Of the 3:00 a.m. clock-outs, 7 fell on a weeknight.

Ms. Stewart also was not compensated for three hours spent at a photo shoot in 2009 for the 2010 Coyote Ugly swimsuit calendar.  Accordingly, she is entitled to the following:

*38 day-shift clock-outs at 7:00 p.m.*: 38 x .33 x $2.13 = $26.71

*7 night-shift clock-ins at 7:00 p.m.*: 7 x .5 x $2.13 = $7.46

*13 weekend night-shift clock-outs at 3:00 a.m.*: 13 x .5 x $2.13 = $13.85

*7 weeknight night-shift clock-outs at 3:00 a.m.*: 7 x .25 x $2.13 = $3.73

*Three hour calendar shoot*: $20.70[19]

*Subtotal*: $72.45

*Total amount including liquidated damages*: **$144.90**

### d.  Amanda Ogborn

Ms. Ogborn's Aloha time records show one 3:00 a.m. night-shift clock-out that fell on a weeknight.  Accordingly, she is entitled to the following:

*1 weeknight night-shift clock-out at 3:00 a.m.*: 1 x .25 x $2.13 = $0.53

*Total amount including liquidated damages*: **$1.06**

---

[19] To arrive at this figure, the court multiplied the number of hours spent at the shoot by a wage of $6.90 per hour, which is the average of the current minimum wage of $7.25 that became effective on July 24, 2009 and the $6.55 minimum wage that was in place prior to that date.  *See* 29 U.S.C. § 206(a)(1).  The court believes that this average is reasonable in light of Ms. Stewart's trial testimony, wherein she was unable to recall precisely when in 2009 the photo shoot took place.

### e. Raven Morris

The Aloha time records of Ms. Morris display one night-shift clock-in at 7:00 p.m. and 2 night-shift clock-outs at 3:00 a.m. that both fell on a weekend night. Accordingly, she is entitled to the following:

*1 night-shift clock-in at 7:00 p.m.*: 1 x .5 x $2.13 = $1.07

*2 weekend night-shift clock-outs at 3:00 a.m.*: 2 x .5 x $2.13 = $2.13

*Subtotal*: $3.20

*Total amount including liquidated damages*: **$6.40**

### f. Nicole Lee

Ms. Lee's Aloha time records reflect 3 night-shift clock-outs at precisely 3:00 a.m. Two of those clock-outs fell on a weeknight. Accordingly, Ms. Lee is entitled to the following:

*1 weekend night-shift clock-out at 3:00 a.m.*: 1 x .5 x $2.13 = $1.07

*2 weeknight night-shift clock-outs at 3:00 a.m.*: 2 x .25 x $2.13 = $1.07

*Subtotal*: $2.14

*Total amount including liquidated damages*: **$4.28**

### g. Maya Jordon

The Aloha time records of Ms. Jordon show 22 night-shift clock-ins at exactly 7:00 p.m. and 11 night-shift clock-outs at 3:00 a.m. Of the 3:00 a.m. night-shift clock-outs, 2 fell on a weeknight. Accordingly, Ms. Jordon is entitled to the following:

*22 night-shift clock-ins at 7:00 p.m.*: 22 x .5 x $2.13 = $23.43

*9 weekend night-shift clock-outs at 3:00 a.m.*: 9 x .5 x $2.13 = $9.59

*2 weeknight night-shift clock-outs at 3:00 a.m.*: 2 x .25 x $2.13 = $1.07

52

*Subtotal*: $34.09

*Total amount including liquidated damages*: **$68.18**

> **h.    Kandi Fletcher**

Ms. Fletcher's Aloha time records display one day-shift clock-in at 11:00 a.m. and one day-shift clock-out at 7:00 p.m.  As for the night shift, her records show 24 clock-ins at 7:00 p.m. and 64 clock-outs at precisely 3:00 a.m.  Of the 3:00 a.m. clock-outs, 2 fell on a weeknight.  Accordingly, Ms. Fletcher is entitled to the following:

*1 day-shift clock-in at 11:00 a.m.*: 1 x .5 x $2.13 = $1.07

*1 day-shift clock-out at 7:00 p.m.*: 1 x .33 x $2.13 = $0.70

*24 night-shift clock-ins at 7:00 p.m.*: 24 x .5 x $2.13 = $25.56

*62 weekend night-shift clock-outs at 3:00 a.m.*: 62 x .5 x $2.13 = $66.03

*2 weeknight night-shift clock-outs at 3:00 a.m.*: 2 x .25 x $2.13 = $1.07

*Subtotal:* $94.43

*Total amount including liquidated damages*: **$188.86**

> **i.    Delaney James**

Ms. James' Aloha time records reflect 4 night-shift clock-ins at 7:00 p.m. and 12 night-shift clock-outs at 3:00 a.m.  Of the 3:00 a.m. clock-outs, 4 fell on a weeknight.  Accordingly, Ms. James is entitled to the following:

*4 night-shift clock-ins at 7:00 p.m.*: 4 x .5 x $2.13 = $4.26

*8 weekend night-shift clock-outs at 3:00 a.m.*: 8 x .5 x $2.13 = $8.52

*4 weeknight night-shift clock-outs at 3:00 a.m.*: 4 x .25 x $2.13 = $2.13

*Subtotal*: $14.91

*Total amount including liquidated damages*: **$29.82**

### j.     Keyawana Majors

The Aloha time records of Ms. Majors show 13 night-shift clock-ins at 7:00 p.m. and 6 night-shift clock-outs at 3:00 a.m.  Of the 3:00 a.m. night-shift clock-outs, 2 fell on a weeknight. Accordingly, Ms. Majors is entitled to the following:

*13 night-shift clock-ins at 7:00 p.m.*: 13 x .5 x $2.13 = $13.85

*4 weekend night-shift clock-outs at 3:00 a.m.*: 4 x .5 x $2.13 = $4.26

*2 weeknight night-shift clock-outs at 3:00 a.m.*: 2 x .25 x $2.13 = $1.07

*Subtotal*: $19.18

*Total amount including liquidated damages*: **$38.36**

### k.     Meggan Conti

The Aloha time records of Ms. Conti reflect 3 day-shift clock-ins at 11:00 a.m. and 17 day-shift clock-outs at 7:00 p.m.  They also display 21 night-shift clock-ins at 7:00 p.m. and 80 night-shift clock-outs at precisely 3:00 a.m.  At trial, Ms. Conti testified that, on October 30, 2011, she saw a manager roll back her clock-out time from approximately 4:15 a.m. to 3:00 a.m. The defendants do not dispute this fact.  Ms. Conti's Aloha time records indeed reflect a night-shift clock-out at 3:00 a.m. on October 30, 2011.  Accordingly, Ms. Conti will be entitled to $2.66 for this specific entry.[20]

---

[20] To arrive at this figure, the court multiplied 1 by 1.25 (75 minutes) by $2.13.

Having addressed the aforementioned time entry, the number of night-shift clock-outs at 3:00 a.m. now total 79. Of the remaining 3:00 a.m. night-shift clock-outs, 26 fell on a weeknight. Accordingly, Ms. Conti is entitled to the following award:

*3 day-shift clock-ins at 11:00 a.m.*: 3 x .5 x $2.13 = $3.20

*17 day-shift clock-outs at 7:00 p.m.*: 17 x .33 x $2.13 = $11.95

*21 night-shift clock-ins at 7:00 p.m.*: 21 x .5 x $2.13 = $22.37

*53 weekend night-shift clock-outs at 3:00 a.m.*: 53 x .5 x $2.13 = $56.45

*26 weeknight night-shift clock-outs at 3:00 a.m.*: 26 x .25 x $2.13 = $13.85

*10/30/11 roll back from 4:15 a.m. to 3:00 a.m.*: $2.66

*Subtotal*: $110.48

*Total amount including liquidated damages*: **$220.96**

### B.     Attorney's Fees

Section 216(b) of the FLSA provides that "the court . . . *shall*, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b) (emphasis added). Because the Nashville class has prevailed on their off-the-clock claims, they are entitled to an award of attorney's fees and applicable costs. Accordingly, the plaintiffs shall submit a motion for such fees and costs, accompanied with all supporting documentation, within thirty (30) days of the date that judgment is entered in this case.

## CONCLUSION

For all of the reasons discussed herein, judgment in this case will be entered as follows: (1) A judgment will be entered for each of the plaintiffs belonging to the Nashville class

asserting off-the-clock claims against the defendants; and (2) A judgment will be entered for the

defendants as to the illegal tip pool claim asserted by the Nationwide class and the retaliation

claims brought by plaintiffs Misty Blu Stewart and Sarah Stone.

      An appropriate Order will enter.

 

_____

ALETA A. TRAUGER
United States District Judge