**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MISTU BLU STEWART, on behalf of herself** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:11-cv-342** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **CUS NASHVILLE, LLC, COYOTE UGLY** | ) | |
| **SALOON DEVELOPMENT CORP., COYOTE** | ) | |
| **UGLY ENTERTAINMENT, INC., and** | ) | |
| **LILIANA LOVELL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

The plaintiff has filed a Motion for Attorney's Fees and Costs (Docket No. 175), to which the defendants have filed a Response in opposition (Docket No. 178), and the plaintiff has filed a Reply (Docket No. 182).  For the reasons stated herein, the motion will be granted and, subject to the reductions set forth herein, the plaintiff will be awarded $54,295.08.

**BACKGROUND**

I.     **Procedural History**[1]

A.     **Complaint and Motion to Dismiss**

On April 7, 2011, plaintiff Misty Blu Stewart filed a Complaint against the defendants on behalf of herself and similarly situated current and former employees of "Coyote Ugly" brand

---

[1]The procedural and factual history of this case is detailed in the court's previous opinions, orders, and Findings of Fact and Conclusions of Law (*see* Docket Nos. 19, 55-56, 103, 110, 147-150, and 172-173), familiarity with which is assumed.  The court summarizes the most relevant aspects of the case history herein.

1

"Saloons" nationwide. (Docket No. 1, Compl.) The Complaint alleged that, in violation of the Fair Labor Standards Act ("FLSA"), bartenders, waitresses, and/or and barbacks at Coyote Ugly Saloons nationwide (1) were forced, as a matter of uniform company policy, to share their "tip pool" with security guards ("Tip Pool Claims"); and/or (2) were forced to work "off the clock" and/or were not paid overtime (collectively, "Off-the-Clock Claims"). The Complaint named multiple defendants, including Coyote Ugly Saloon Nashville, LLC, Coyote Ugly Saloon Development Corp., Coyote Ugly Entertainment, Inc. ("CUEI"), and Liliana Lovell (founder and Chief Executive Officer of the Coyote Ugly enterprise).

On May 24, 2011, the defendants filed a (partial) Motion to Dismiss the Complaint (Docket No. 12), seeking to dismiss (1) the Tip Pool Claims, and (2) claims against defendant CUEI. With respect to CUEI, the defendants argued that CUEI was not an "employer" for purposes of the claimed FLSA violations, while Stewart argued that, under Rule 56(f), she was entitled to discovery on this issue. With respect to the Tip Pool Claims, the parties agreed that, (a) under 29 U.S.C. §§ 203(m) and 203(t), employees who "customarily and regularly receive more than $30 a month in tips" may pe paid less than the federal minimum wage and may share in a "tip pool" under appropriate conditions, and (b) the authoritative case on this issue was *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294 (6th Cir. 1998), in which the Sixth Circuit construed §§ 203(m) and 203(t) as applying to employees who "sufficiently interact with customers in an industry [] where undesignated tips are common." *Kilgore*, 160 F.3d at 301. The parties vigorously disagreed about whether the role of security guards at Coyote Ugly Saloons met the *Kilgore* standard.

The court denied the defendants' request to dismiss CUEI without prejudice, on the

2

grounds that discovery was warranted under Rule 56(f). The court also denied the request to dismiss the Tip Pool Claims, finding that discovery on the issue was warranted because "it is entirely unclear how and to what extent these security personnel interact with customers, which is the touchstone issue under *Kilgore*." (Docket No. 19 at p. 6.)

### B. Motion for Court-Supervised Notice

`       On November 15, 2011, Stewart filed a Motion for Expedited Court-Supervised Notice (Docket No. 32).[2] In her motion, Stewart asked the court to conditionally certify, with respect to both the Tip Pool Claims and the Off-the-Clock Claims, a collective action on behalf of all tipped employees who had worked at one or more of the eight company-owned Coyote Ugly Saloons within the relevant time frame (three years).[3] (*Id.* at p. 1.)

       In support of her motion, Stewart attached affidavits from herself and three other current or former bartenders, including Samantha Ranger and Megan Rivera. (Docket Nos. 34-37.) Stewart's supporting Memorandum also contained a detailed section relating to the "employer" status of each defendant, including CUEI. In response, the defendants conceded that the eight-company Coyote Ugly Saloons required tip pooling with bartenders, but argued (this time based on evidence) that the security guards did not meet the *Kilgore* standard as a matter of law. The defendants also attempted to dispute the Nashville declarants' accusations of time-shaving and

---

[2]On November 14, 2011, November 15, 2011, and January 26, 2012 – before the court ruled on Stewart's motion for conditional certification – several additional individuals filed consents to join the case as party plaintiffs. (*See* Docket Nos. 30-31 and 52.) For purposes of linguistic simplicity and because the case caption retained Stewart's name as the lone named party plaintiff, the court will generally refer to "Stewart" or "plaintiff" in the singular when referencing the parties' positions, unless the context requires otherwise.

[3]The defendants represented that the proposed class included at least 1,260 bartenders, in addition to an unspecified number of barbacks. (*See* Docket No. 44 at p. 14.)

unpaid overtime work and argued that the court should, at a minimum, limit the Off-the-Clock Claims to employees at the Coyote Ugly Saloon in Nashville only (as opposed to nationwide), because (unlike the Tip Pool Claims) Stewart had not shown any nationwide policy or other indicia of nationwide similarity concerning those claims. The plaintiffs' Reply focused largely on the defendants' arguments concerning the Tip Pool Claims. (*See* Docket No. 49.)

On February 13, 2012, the court granted in part and denied in part the relief requested by Stewart. The court found that Stewart had made the requisite "modest factual showing" of similarity between herself and other putative class members with respect to (1) bartenders, barbacks, and waitresses at Coyote Ugly Saloons nationwide on the Tip Pool Claims, and (2) bartenders at the Nashville Coyote Ugly Saloon (rather than nationwide) on the Off-the-Clock Claims. Therefore, the court conditionally certified a nationwide class with respect to the Tip Pool Claims and a Nashville-based class with respect to the Off-the-Clock Claims. After receiving notification of the lawsuit, over 50 individuals (including Stewart) joined the lawsuit. Although she had filed an affidavit in support of the Motion for Expedited Court-Supervised Notice, Rivera did not join the lawsuit. Also, on December 3, 2012, following discovery, the parties entered into a Joint Stipulation dismissing claims by 17 plaintiffs, including (1) four plaintiffs dismissed with prejudice because they did not actually meet the requirements of either conditionally certified class, (2) two plaintiffs dismissed with prejudice because their claims fell outside the statute of limitations, (3) Tip Pool Claims by two out-of-state plaintiffs,[4] and (4) 9

---

[4]As described herein, Stewart later filed a Motion to Reconsider, in which she asked the court to certify a *nationwide* class for the Off-the-Clock claims – *i.e.*, to expand that class from a Nashville-specific class to a nationwide class. The court denied that motion without prejudice, thereby refusing to allow any out-of-state plaintiffs with putative Off-the-Clock Claims to proceed to trial. The two plaintiffs identified in ¶ 3 of the Joint Stipulation were among the

plaintiffs dismissed without prejudice – including Ranger and Craft, who also had filed affidavits supporting the Motion for Expedited Court-Supervised Notice – for failure to provide timely written discovery responses pursuant to a court order.

By the time the case reached trial, the Nationwide Tip Pool Class included 37 individuals, and the Off-the-Clock Class included 11 individuals.

### C.    Retaliation Claims

On July 31, 2011, Stewart moved for leave to amend to add three individual retaliation claims under FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), and to add claims against five individual defendants.  (*See* Docket No. 99.)  The court initially found that (1) the proposed claims against individual defendants were futile, (2) the proposed individual retaliation claims by two of the opt-in plaintiffs (Samantha Thomas and Sarah Stone) were not futile and would proceed, and (3) the individual retaliation claim by Stewart was futile because it failed to state a claim and therefore would not proceed.  (Docket No. 103.)  Stewart filed a Motion for Reconsideration of the court's decision with respect to Stewart's individual retaliation claim (Docket No. 105), which the court granted (Docket No. 110).  Accordingly, the court permitted Stewart to file an Amended Complaint asserting all three retaliation claims.  (Docket No. 111, Am. Compl.)[5]

---

putative nationwide Off-the-Clock Class that was never certified (conditionally or otherwise) in this lawsuit.  Therefore, these two plaintiffs' claims were ultimately dismissed in their entirety before trial.

[5]Briefly, Stewart alleged that defendant Lovell had retaliated against her by posting inflammatory statements about Stewart on the internet; plaintiff Thomas (a former employee at a Coyote Ugly Saloon in San Antonio) alleged that she was terminated without cause immediately after asking her manager about the nature of the lawsuit; and Stone (a former employee at a Coyote Ugly Saloon in Oklahoma) alleged that Coyote Ugly Director of Operations Daniel Huckaby made offensive and derogatory comments towards Stone at a company function, driving

5

### D.	Motion fors Summary Judgment and Motion for Reconsideration

On December 6, 2012, the parties filed several motions relevant to the court's

consideration of the appropriate fee award here.

First, the defendants filed a Motion for Summary Judgment and for Class Decertification

(Docket No. 119), in which they asked the court to (1) grant judgment in their favor on the

nationwide Tip Pool Claims, (2) grant judgment for the defendants on the individual retaliation

claims, and (3) decertify the Nashville class or, at a minimum, dismiss plaintiff Katherine J.

Sharbar-Timberlake as a plaintiff. Stewart's Response in opposition to the motion contained

sections addressing legal and factual issues specific to the nationwide Tip Pool Claims and the

retaliation claims. (*See* Docket No. 135 at pp. 3-14 (addressing Tip Pool Claims, including

application of *Kilgore*, relevant facts concerning security guards, whether an "industry standard"

was established and/or relevant, and/or whether issues of fact remained) and pp. 14-18

(addressing retaliation claims by Stewart and out-of-state plaintiff Stone)). Stewart's brief

devoted only a single paragraph to the Off-the-Clock Claims, without reference to any legal

authority. (*Id.* at pp. 18-19.)[6]

---

Stone to quit (*i.e.*, a constructive discharge). (*See* Docket No. 111, Am. Compl. ¶¶ 45-69.)

[6]For their part, the defendants filed a substantial volume of material in support of their
motion as it related to the Tip Pool Claims, retaliation claims, and defendant CUEI. (*See
generally* Docket Nos. 120-22 and 143-144). For example, bartenders at Coyote Ugly Saloons
in locations other than Nashville filed affidavits describing the relationship and respective roles of
the bartenders, barbacks, and security guards at the non-Nashville locations – affidavits that were
relevant only to the Tip Pool Claims. (*See* Docket No. 121, Exs. 10-17 (including, *inter alia*,
Cayan Benjamin Affidavit (relating to Milwaukee, Wisconsin location)), Christhian Guzman
Affidavit (relating to Oklahoma City, Oklahoma location), and Veronica Riojas Affidavit
(relating to San Antonio, Texas location).) The defendants also filed the Declaration of Jeffrey
Wiseman, which contained factual allegations specific to CUEI. (*Id.*, Ex. 4.) The defendants'
25-page Memorandum in support of the motion contained at least 17 pages concerning facts and
legal issues specific to the Tip Pool Claims, CUEI, and the retaliation claims, (Docket No. 121 at

Second, Stewart filed a cross-Motion for Summary Judgment (Docket No. 123), in which she sought judgment on (1) the nationwide Tip Pool Claims, and (2) plaintiff Stone's retaliation claim – both of which the court ultimately dismissed following the bench trial. Stewart's Rule 56 motion did not address the Nashville Off-the-Clock claims. Stewart filed a 15-page Memorandum in support of the motion (Docket No. 125), a Statement of Facts (Docket No. 126), and a Notice of Filing attaching supporting evidence (Docket No. 127). Stewart also filed a Reply in support of the motion (Docket No. 142.)[7]

Third, Stewart filed a Motion for Reconsideration (Docket No. 126), in which she asked the court to "reconsider" its refusal to certify a nationwide class for the Off-the-Clock Claims.

On February 6, 2013, the court denied the cross-motions for summary judgment, finding, in most relevant part, that disputed issues of fact precluded summary judgment in favor of either side on the nationwide Tip Pool Claims, the Nashville Off-the-Clock claims, and the individual retaliation claims. (*See generally* Docket Nos. 147 and 148.) The court also construed the plaintiffs as finally abandoning their claims against CUEI. On February 8, 2013, the court denied without prejudice the plaintiffs' request to expand the Nashville Off-the-Clock Class to include current and former employees nationwide. (Docket Nos. 150 and 151.)[8]

_____

pp. 5-22), but only two pages of legal argument specific to the Nashville Off-the-Clock Claims (*id.* at pp. 23-24).

[7]The defendants filed a substantial volume of material in response to Stewart's motion, all of which related to claims that were ultimately dismissed following the bench trial. (*See* Docket Nos. 132 (Memorandum with attached exhibits), 133 (Notice of Filing), and 134 (Response to Stewart's Statement of Undisputed Material Facts).) For example, the defendants filed affidavits concerning general tip pooling practices in the markets in which the company-owned Coyote Ugly Saloons are located. (*See* Docket No. 132, Exs. 22-25.)

[8]The court criticized the plaintiffs for failing to show why, in the exercise of reasonable diligence, they could not have discovered information concerning the proposed nationwide Off-

### E. Bench Trial and the Court's Findings of Fact and Conclusions of Law

The court held a bench trial from April 16-18, 2013, after which the parties submitted proposed findings of fact and conclusions of law. During the bench trial, the court heard extensive testimony specific to claims that were ultimately dismissed, including testimony from out-of-state plaintiffs who maintained only Tip Pool Claims and/or retaliation claims, as well as other non-Nashville witnesses who testified to facts related only to the Tip Pool Claims.[9] The court also heard testimony concerning the Nashville Off-the-Clock Claims, including testimony

the-Clock Claims and raised it with the court before the summary judgment deadline. (Docket No. 150 at 9-10.)

[9]For example, on Day 1 of the bench trial, approximately half of the day was spent hearing testimony from non-Nashville plaintiffs specific only to the Tip Pool Claims. *See, e.g.*, Docket No. 166, Apr. 16, 2013 Trial Transcript (Day 1), at pp. 7-59 (testimony of San Antonio bartender plaintiff Gina Peterson); pp. 59-82 (former San Antonio bartender plaintiff Samantha Thomas); 87-108 (former Austin, Texas bartender plaintiff Deloris Fields); and 108-133 (former Oklahoma City bartender plaintiff Nauzi Jagosh).) On Day 2 of the bench trial, the plaintiffs similarly presented direct testimony from several parties and witnesses whose testimony related only to the Tip Pool Claims and/or retaliation claims. (*See, e.g.,* Docket No. 167, Apr. 17, 2013 Trial Transcript (Day 2), at pp. 367-405 (Oklahoma City bartender plaintiff Sarah Stone, concerning Stone's individual retaliation claim); 336-350 (former Memphis bartender plaintiff Erica Small, relating to tip pool); 352-359 (bar patron David Griner concerning interactions with security guards); 417-465 (defendant Liliana Lovell, relating to, *inter alia*, nature of defendants' business, qualities of and relationships between and among the bartenders, barbacks, security guards, and other staff at Coyote Ugly Saloons nationwide, and facts concerning the retaliation claims). On Day 3 of the bench trial, in response to the plaintiffs' presentation of evidence concerning the Tip Pool Claims, the defendants presented evidence from numerous non-Nashville rebuttal witnesses whose testimony related only to the Tip Pool Claims. (*See* Docket No. 168, Apr. 18, 2013 Trial Transcript (Day 3) at pp. 631-641 (Memphis bartender Cassie Farrier), 642-650 (Memphis bartender Ashleigh Wilson), 651-661 (Milwaukee bartender Hannah Gilbert); 662-674 (Denver security guard Matt Keeling); 676-692 (San Antonio security guard Sean Gilleland); 694-706 (former San Antonio bartender, waitress, and manager Veronica Riojas); 719-732 (former San Antonio and Austin security guard Dustin Carlile); 732-739 (patron of Austin location Issam Chahine); 740-751 (former Austin, Nashville, and Key West bartender Bethany Needham – no testimony about Nashville Off-the Clock Claims); 752-764 (Fort Lauderdale and Austin bartender Kelly Byrne); and 764-781 (Oklahoma City assistant manager Amber Almond)).

8

that (1) management employees had altered time records before and after employee shifts, and (2) Stewart and bartender Meggan Conti were not compensated for additional work they performed during required dance practices and, in Stewart's case, a 2009 photo shoot.

On August 8, 2013, pursuant to Fed. R. Civ. P. 52, the court issued its Findings of Fact and Conclusions of Law (Docket No. 172) and an associated Order (Docket No. 173). First, the court found that the security guards at company-owned saloons satisfied the Sixth Circuit standard for the types of employees who "customarily and regularly receive tips" as set forth in 29 U.S.C. § 203(m). Therefore, the court found that the tip pool did not violate the FLSA and granted judgment to the defendants on the nationwide Tip Pool Claims. Second, the court found that management willfully had altered time records at the Nashville Coyote Ugly Saloon to deny plaintiffs credit for hours they had worked. Third, the court found Stewart was entitled to compensation for a 2009 photo shoot, but the court also found that (a) Conti and Stewart had not proven that they were not compensated for dance practices, and (b) Stewart's remaining individual compensation claims were time-barred. Fourth, the court granted judgment for the defendants on the three individual retaliation claims. Therefore, of the various collective and individual claims asserted in this case, the court found in favor of the defendants on all claims other than (1) claims by 11 individuals that management had willfully altered their time records, and (2) Stewart's individual claim that she was not compensated for a single photo shoot in 2009.

With respect to the issue of damages for unpaid wages by the Nashville plaintiffs, the court found that those plaintiffs were entitled to: (1) 30 minutes of uncompensated overtime for each 11:00 a.m. day-shift clock-in and each 7:00 pm. night-shift clock-in appearing in their time records, (2) 20 minutes of uncompensated time for each 7:00 p.m. day-shift clock-out time; (3)

9

30 minutes of uncompensated time for 3:00 a.m. night-shift clock-outs on Fridays or Saturdays and 15 minutes of uncompensated time for 3:00 a.m. night-shift clock-outs on other nights. The court also found that the plaintiffs were entitled to liquidated damages under 29 U.S.C. § 216(b). For each of the 11 plaintiffs, the court estimated the applicable amount of uncompensated time based on the aforementioned formula, multiplied that amount by the $2.13 hourly wage, and doubled that amount to account for liquidated damages. The court calculated that the eleven plaintiffs were entitled to a total of $394.75 in restitution – reflecting damages amounts ranging from a low of $0.53 to a high of $110.48 – and an equivalent amount of liquidated damages for a willful violation, for a total of $789.50.

## II.    Motion for Fees and Costs

In her Motion for Fees and Costs, Stewart asks the court to award her attorneys $168,408.25 in fees (reflecting 426.35 hours of work at a rate of $395 per hour) and $5,537.55 in costs accrued during their work on the case. In support of the motion, she has filed an itemized billing statement from her attorneys, declarations from her attorneys Stephen Grace and Randall Burton, and declarations from three local attorneys not involved in the case (Charles Yezbak III, Douglas Janney, III, and Kerry Knox), each of whom attests to the reasonableness of Grace and Burton's rates and the hours they expended on the case. (*See* Docket No. 177, Exs. 1-6.) In response, the defendants argue that the requested fee award should be reduced for several reasons.[10] The defendants have not introduced any competing affidavits.

## ANALYSIS

---

[10]Although the defendants' Response seeks a reduction of the requested costs, the defendants do not identify any specific costs that they believe should be disallowed.

## I.    Legal Standard for Fee Award

Under § 16(b) of the FLSA, 29 U.S.C. § 216, "[t]he court . . . shall, in addition to any judgment awarded to a plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant." *United Slate, Tile & Composition Roofers, Damp & Waterproof Works' Ass'n, Local 307 v. G &M Roofing & Sheet Metal Co.*, 732 F.2d 495, 501 (6th Cir. 1985) (quoting 29 U.S.C. § 216(b)).  As explained by the Sixth Circuit:

> The design of the Fair Labor Standards Act is intended to rectify and eliminate labor conditions detrimental to the maintenance of the minimum standard of living for workers.  The availability and award of attorney fees under § 216(b) must reflect the obvious congressional intent that the policies enunciated in § 202 be vindicated, at least in part, through private lawsuits charging a violation of the substantive provisions of the wage act.  Moreover, the purpose of § 216(b) is to insure effective access to the judicial process by providing attorney fees for prevailing plaintiffs with wage and hour grievances; obviously Congress intended that the wronged employee should receive his full wages without incurring any expense for legal fees or costs.

*Id.* at 501-502 (internal quotation marks, citations, and ellipsis omitted).  Although an award of fees under the FLSA is mandatory, the amount of the award is within the discretion of the trial court.  *Fegley v. Higgins*, 19 F.3d 1126, 1134 (6th Cir. 1994) (citing *United Slate*, 732 F.3d at 502).

In setting a "reasonable" fee award, "the starting point is the 'lodestar' amount, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate."  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551-52 (6th Cir. 2008); *see also Moore v. Freeman*, 355 F.3d 558, 565 (6th Cir. 2004); *Adcock-Ladd v. Sect'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).  Once the lodestar is determined, "[t]he trial judge may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation."  *Adcock-Ladd*, 227 F.3d at 349.  In calculating the lodestar, the court should

exclude any hours that were not "reasonably expended" or that were "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 4374 (1983). The party seeking fees has the burden of documenting the amount of fees they are requesting. *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007); *Reed v. Rhodes*, 179 f.3d 453, 471 (6th Cir. 1999).

In determining the lodestar amount and/or any adjustments thereto, the court may consider the following twelve factors listed in *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 717, 717-19 (5th Cir. 1974):

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Adcock-Ladd*, 227 F.3d at 349 n.8.

"A highly important *Johnson* factor is the *result achieved*." *Id.* at 349 (emphasis in original). Thus, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). "[A] strong presumption favors the lawyer's entitlement to his lodestar fee." *Adcock-Ladd*, 227 F.3d at 350 (internal quotation marks omitted). Accordingly, modifications to the lodestar are proper only in certain rare and exceptional cases, supported by both specific evidence on the record and detailed findings. *Id.*

In making adjustments under the *Johnson* factors, an attorney is not entitled to recover for a claim that is unsuccessful and "distinctly different" in terms of facts and legal theory from a successful compensable claim. *See Hensley*, 461 U.S. at 434. The Supreme Court has stated that

12

a potential adjustment for the "results obtained" is "particularly crucial where a plaintiff is deemed prevailing even though he succeeded on only some of his claims for relief." *Id.* Thus, the court must consider the following questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* As the Court has explained:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants – often an institution and its officers . . . – counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved. The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Id.* at 434-35.

Even where the claims are not entirely distinct, "the court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation. . . . If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most crucial factor is the degree of success obtained.

*Id.*; *see also Mann v. Acclaim Fin. Servs., Inc.*, 348 F. Supp. 2d 923, 930 (S.D. Ohio) ("Where a lawsuit consists of related claims, a plaintiff achieving limited success should be awarded only

13

fees that are reasonable in relation to the results obtained. However, in the case of a plaintiff who has won substantial relief, the award of attorney's fees should be not be limited merely because the court did not adopt each and every contention raised."); *Bates v. Dura Auto. Sys., Inc.*, 2011 WL 3664444, at *4 (M.D. Tenn. Aug. 19, 2011) (where six out of seven plaintiffs obtained some relief at trial, proportionately reducing fees by 1/7 for non-successful plaintiff and further reducing fees by 20% across the board to account for nominal and/or partial recovery by remaining plaintiffs). The Supreme Court has stated that "[t]here is no precise rule or formula" for calculating the amount of such a reduction; thus, "the district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley*, 461 U.S. at 436-37.

In applying *Hensley*, the Sixth Circuit has recognized that "litigation is not an exact science" and that "good lawyering . . . often requires lawyers to plead in the alternative" and, therefore, "when claims are based on a common core of facts or are based on related legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating related claims should not be reduced." *Jordan v. City of Cleveland*, 464 F.3d 584, 604 (6th Cir. 2006) (finding no basis to reduce fee award, where plaintiff's results were "nothing short of exemplary" and plaintiff had "obtained virtually all the types of relief he requested."). That is, "full credit" should be given to a "meaningfully successful plaintiff rather than making a mechanical per-losing claim deduction" in the award. *Id.*

## II.    Application

In support of her fee request, Stewart has filed a billing statement reflecting work on this case by attorneys Grace and Burton from March 22, 2011 (shortly before she filed the initial

Complaint) through September 10, 2013, when she filed the instant motion.  The billing statement contains itemized descriptions of the date on which the work was performed, the number of hours expended (in 0.1 increments), the attorney performing the work (either Grace or Burton), and a succinct but sufficient description of the work performed (*e.g.*, "Review Answer of Defendants").

According to Stewart, the billing statement reflects only work performed that relates to the claims on which certain plaintiffs prevailed (the Nashville Off-the-Clock Claims) but not any work attributable solely to the remaining claims that were dismissed.  Stewart essentially agrees that she is not entitled to reimbursement for work performed only on the National Tip Pool Claims and retaliation claims.  (*See* Docket No. 176 at p. 2 ("Plaintiffs' Counsel have exercised reasonable billing judgment by reducing their total lodestar for any work performed only on the National class or the retaliation claims, which were ultimately dismissed.").)[11]

**A.      Rate**

In determining whether a requested rate is reasonable, the court should consider whether the requested fee is consistent with "the prevailing market rate in the relevant community." *Adcock-Ladd*, 227 F.3d at 350 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)).  Here, Grace and Burton seek compensation at a rate of $395 per hour.  The defendants concede that, as a general matter, this rate "is not inconsistent with other employment case lead attorney rates awarded in this district."  (Docket No. 178 at p. 3.)  Furthermore, the defendants have not submitted any materials rebutting the affidavits filed by highly credentialed employment law

---

[11]For example, Stewart represents that her attorneys "are not seeking the hours spent preparing and defending the depositions of Ms. Thomas and Ms. Stone, as all their claims were dismissed."  (Docket No. 176 at p. 3.)

attorneys Yezbak, Janney, and Knox, each of whom avers that the $395 rate is a reasonable one for a plaintiff's attorney in this type of case and in this district.[12]  Grace and Burton have also provided unrebutted affidavits, which indicate that (a) they fronted the costs of this litigation with no promise of payment, and (b) both attorneys are highly experienced in employment litigation, including FLSA cases.  The court is also familiar with attorneys Grace and Burton from other cases and is familiar with rates charged by equivalently experienced and qualified counsel within this district.  Based on the essentially unrebutted information before the court, the court finds that the $395 rate for both Grace and Burton is presumptively reasonable.

Whether Grace and Burton (rather than another attorney or professional at a lower hourly rate) justifiably performed all of the tasks referenced in the billing statement is a distinct question that court the addresses separately herein

### B.      Clerical Work

The defendants argue that some of the work performed by Grace and/or Burton was either clerical or should have been performed by another attorney or legal professional at less than a "lead attorney" rate.  Indeed, it appears that Grace and Burton performed all of the work in this case, without delegating any responsibility to a lower priced attorney, a paralegal, or clerical employee.

The defendants have identified 13.4 hours of time reflecting essentially clerical work, including task entries such as 0.5 hours to "[l]ocate New Orleans process server" and "prepare service package for server" (August 8, 2011) and 11.9 hours for "preparation of Notice of

_____

[12]As Stewart points out, the defendants have not disclosed the rates charged by their own counsel for comparison purposes.

Mailing" and similar tasks (March 7 and 8, 2012). In her Reply, Stewart does not address the defendants' argument concerning these specific entries; thus, she does not contend that these tasks should be reimbursed at *any* particular rate. The court agrees with the defendants that it was unnecessary for Grace and Burton to perform these clerical functions, which could have been performed by a clerical employee. The court accordingly will deny payment for these 13.4 hours.

Burton also billed 1.8 hours for preparing a Notice of Filing of Unpublished Cases and for "locating" the underlying cases. The court finds that this work could have been performed by a paralegal at a lower rate. In the absence of a suggested figure from either party, the court finds that a paralegal reasonably could have charged $75 per hour to perform that task. *See McCutcheon v. Finkelstein Kern Steinberg & Cunningham*, 2013 WL 4521016, at *3 (M.D. Tenn. Aug. 27, 2013) ($75 appropriate as a default paralegal rate); *Smith Cnty. Educ. Ass'n v. Smith Cnty. Bd. of Educ.*, 2012 WL 78382, *2 (M.D. Tenn. Jan. 10, 2012) (same); *Garcia v. Conway*, 2011 WL 6778258, at *1 (M.D. Tenn. Dec. 23, 2011) (same).

### C.    Unjustified Work/Work on Distinct Claims

The defendants argue that Grace and Burton (a) spent too much time on certain tasks, (b) should have delegated certain tasks to lower-priced attorneys or legal professionals, and/or (c) seek remuneration for work on unsuccessful claims.

As an initial matter, the court regards the retaliation claims and the nationwide Tip Pool Claims as factually and legally distinct from the Nashville Off-the-Clock Claims, a point that Stewart has implicitly conceded by purporting to remove charges attributable "only" to those claims. The nationwide Tip Pool Claims implicated evidence concerning Coyote Ugly operations nationwide at eight company-owned stores, which the defendants conceded operated

17

under a company-wide policy requiring the bartenders and barbacks to split tips in the "tip pool" with security guards. The relevant facts concerning this claim involved the relative roles of bartenders, barbacks, and security guards and, in particular, the amount of interaction between security guards and customers (or potential customers) of the Saloons nationwide. The disputed legal issue concerned the court's application of 29 U.S.C. §§ 203(m) and (t) as they relate to tip-pooling arrangements and, in particular, the application of *Kilgore* and related caselaw concerning whether, and under what circumstances, security guards constitute employees who "customarily and regularly receive tips."

By contrast, the Nashville-specific Off-the-Clock Claims involved distinct proof concerning (a) whether managers at the Nashville Coyote Ugly Saloon had shaved time to reduce wages for the bartenders and (b) whether two particular employees (Stewart and Conti) should have received pay for attending particular company-required activities, including dance practices, training sessions, and a photo shoot. The parties' dispute concerning the Off-the-Clock Claims was largely factual. The defendants did not dispute that, as a legal matter, it would have been illegal for managers to shave time. With the exception of some minor disputes about whether certain specific incidents occurred outside of the statute of limitations and/or fell within the scope of the Nashville class, the parties simply disputed whether the evidence showed that time-shaving had actually occurred and to what extent.[13] Testimony concerning the time-shaving issue focused on Coyote Ugly's timekeeping system and whether the entries on that system accurately reflected

---

[13]The parties also disputed whether the statute of limitations barred Stewart and/or Conti from receiving payment for certain of those activities. Although the court found before trial that some of the events occurred outside the statute of limitations and were time-barred, the court granted partial relief to Stewart following the bench trial, awarding her $20.70 (plus liquidated damages) for a calendar photo shoot.

18

the "clock-in" and "clock-out" times for the Nashville bartenders. The retaliation claims also involved distinct proof having no bearing on the Off-the-Clock Claims.

The court agrees with the defendants that Stewart has not culled out all of the time attributable only to the factually and legally distinct claims that were unsuccessful. First, the defendants' Motion to Dismiss only concerned claims that were later dismissed, including the Tip Pool Claims and the claims against CUEI. Therefore, Stewart's counsel's work on the motion, which did not implicate any issues concerning the successful Off-the-Clock Claims, "cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Hensley*, 461 U.S. at 425 The court accordingly will disallow entries related to the Motion to Dismiss billed between May 24, 2011 and June 29, 2011, which total 21.4 hours.[14]

Second, Stewart's Motion for Leave to Amend and the related Motion for Reconsideration concerned Stewart's attempt to add individual retaliation claims by Stewart and two of the opt-in plaintiffs. In her Response, Stewart does not address the defendants' argument that time spent on these two motions should not be reimbursed. The court has identified 9.0 hours of time attributable specifically to the two motions.[15] Because that time was spent only with respect to claims that were dismissed on the merits, the court finds that the time was not

---

[14]These include the following entries: (1) 2.8 hours on 5/24/11; (2) 1.4 hours on 6/7/11, (3) 4.8 hours on 6/13/11; (4) 3.6 hours on 6/14/11; (5) 8.2 hours by Burton and Grace combined on 6/17/11 (excluding 0.2 hours by Grace on an unrelated task); and (6) 0.6 hours on 6/29/11. Also, the court notes that the defendants have also argued that the time spent by Burton addressing the Motion to Dismiss, even if otherwise compensable, was "excessive." Although that argument is rendered moot by the court's ruling that no time spent addressing that motion is compensable, the court would not have found it excessive for Burton to spend approximately 2.5 to 3 business days addressing the complex procedural and legal issues implicated by the Motion to Dismiss.

[15]The defendants identified 7.5 hours of time related to the motions. The court has identified an additional 1.5 hours of time (1.2 hours on 9/24/12 and 0.3 hours on 10/2/12).

19

expended "in pursuit of the ultimate result achieved" with respect to the successful Off-the-Clock Claims. Therefore, the court will disallow those entries from the fee award.

Third, Stewart's Motion for Summary Judgment concerned only the Tip Pool Claims and the retaliation claim by Stone, both of which the court dismissed on the merits following the bench trial. The billing statements reflect at least 27.6 hours spent on that motion, which cannot be regarded as made in pursuit of the ultimately successful Off-the-Clock Claims.[16]

Fourth, the defendants have identified several entries that they contend reflect work performed on dismissed claims, including (1) 4.1 hours meeting with Stewart, Rivera, and Ranger, where Rivera never opted into the case and Ranger was later voluntarily dismissed; (2) 1.2 hours meeting with Craft, where Craft was later voluntarily dismissed, (3) 0.2 hours filing consent forms for Ranger and Craft, and (4) 0.4 hours preparing information concerning Ranger. Stewart's Reply only obliquely addresses this argument, stating that Grace and Burton justifiably met with "witnesses such as Megan Rivera, Samantha Ranger, and Anna Craft to gather information to support plaintiffs' successful motion for notice." (Docket No. 182 at p. 3.) However, Stewart's position is insufficient: the motion for expedited notice related both to the Tip Pool Claims and to the distinct Off-the-Clock Claims. Therefore, to the extent the attorneys spent time with Ranger, Craft, and Rivera addressing the factually and legally distinct Tip Pool Claims and/or any claims by Ranger, Craft, and Rivera specifically, that time should not be reimbursed. On the other hand, in determining that conditional certification of the Nashville Off-the-Clock Claims was appropriate, the court relied on affidavits from Ranger, Craft, and Rivera,

_____

[16]These include: 6.9 hours on 12/4/12, 8.4 hours in 12/5/12, 7.8 hours on 12/6/12, 1.6 hours on 1/4/13, 2.4 hours on 1/11/13, and 0.5 hours on 1/16/13.

which in part addressed those claims. Therefore, at least some work referenced in the entries relating to Ranger, Craft, and Rivera concerned the successful Off-the-Clock Claims, notwithstanding the fact that their particular claims did not proceed to trial. Under the circumstances, the court will award fees for only half of the 5.3 hours spent meeting with these individuals in November 2012 and no fees for the 0.6 hours spent preparing consents or other information for Ranger and Craft.

In summary, the court will reduce the potentially compensable hours as follows: (1) 21.4 hours related to the Motion to Dismiss; (2) 9.0 hours related to the Motion for Leave to Amend and Motion for Reconsideration; (3) 27.6 hours related to Stewart's Motion for Summary Judgment; and (4) 3.25 hours (2.65 hours + 0.6 hours) related to claims by Ranger, Craft, and Rivera. The court will also reduce the rate to $75 for 1.8 hours that should have been performed by a paralegal at a lower billing rate. The court will therefore disallow $24,769.75 of the requested fees (61.25 hours X $395/hr + 1.8 hours X $(395-75)/hr).

### D. Relative Success on the Claims

At each stage in this litigation, the plaintiffs (and the defendants) spent significant time and effort litigating the nationwide Tip Pool Claims, which involved more plaintiffs (or potential plaintiffs) and implicated more extensive briefing and attorney effort than the individualized Nashville Off-the-Clock Claims. As described in the court's discussion of the procedural history of this case, even as to tasks that in part concerned the Off-the-Clock Claims, such as preparing Stewart's Response to the defendants' Motion to Summary Judgment, the bulk of the work related to the unsuccessful claims.

For example, in connection with the Motion for Expedited Court-Supervised Notice, the

parties filed extensive submissions relating to the Tip Pool Claims, including affidavits that in whole or in part introduced facts specific to those claims, as well as substantial briefing specific to those claims. The parties' submissions concerning the defendants' Motion for Summary Judgment largely related to the unsuccessful Tip Pool Claims and individual retaliation claims. The plaintiffs' motion to expand the Nashville class shortly before trial was denied. Substantially more than a majority of the bench trial was devoted to the Tip Pool Claims and retaliation claims, including numerous witnesses who testified exclusively about either or both of those claims. Had those distinct claims not been part of the bench trial, the trial would have been considerably shorter, perhaps involving only a handful of witnesses and documents. The post-trial submissions also included extensive sections relating specifically to the Tip Pool Claims and retaliation claims. In sum, if this case concerned only the legal and factually distinct Nashville-specific Off-the-Clock Claims on which a subset of plaintiffs ultimately prevailed, substantially more than a majority of the work performed on the case would have been unnecessary.

Furthermore, the results achieved by Stewart were meager. First, numerous opt-in plaintiffs were dismissed before trial. Second, the class of 37 claimants on the nationwide Tip Pool Claims collectively sought $16,132 in restitution (and equivalent liquidated damages), but recovered zero. Thus, over two-thirds of the opt-in plaintiffs whose claims proceeded to trial – including all of the non-Nashville plaintiffs – recovered nothing for their participation in this lawsuit. The three individual retaliation plaintiffs (including Stewart and two out-of-state opt-in plaintiffs) sought unspecified damages for embarrassment and humiliation, and Stone also claimed approximately $20,800 in back wages. Despite the presentation of proof and argument specific to the retaliation claims, the court dismissed them. Third, and finally, even with respect

to the successful claims, Stewart recovered only a fraction of the damages she demanded on behalf of the 11-person Nashville class: the plaintiffs in that class sought about $4,400 in restitution for the Off-the-Clock Claims (plus an equivalent amount of liquidated damages), but recovered less than $400 in restitution plus an equivalent amount of liquidated damages. Thus, even though the court found a willful violation, Stewart recovered less than 10% of the damages she sought for the Off-the-Clock Claims. In sum, Stewart failed to prove the claims implicated by the vast majority of plaintiffs (*i.e.* the Tip Pool Claims), the retaliation claims were dismissed on the merits following the bench trial, and Stewart and her Nashville co-plaintiffs only recovered a small fraction of the damages sought on the Off-the-Clock Claims.

In light of these considerations, the court finds that (1) even after accounting for work plainly spent only on the dismissed claims as detailed in the previous section, the remaining total time entries still include a substantial amount of time devoted to the unsuccessful claims, which time is not compensable; and (2) awarding the lodestar amount would be excessive and unjust in light of the meager results achieved. Taken in combination, these considerations justify a substantial reduction of the requested fee award.

At the same time, the court finds that this reduction must be limited, because the court is cognizant of the fact that Congress specifically provided for a reasonable fee award for successful FLSA plaintiffs, regardless of the monetary amount of the judgment. Following the bench trial, the court found that the defendants had committed serious and willful violations of the FLSA's wage-and-hour provisions by shaving time off the Nashville bartenders' time clock entries. Although the monetary amounts at issue were small, the court appreciates that every dollar counts for individuals working at the bottom of the wage scale and that Congress chose to provide a

Case 3:11-cv-00342   Document 183   Filed 01/10/14   Page 23 of 26 PageID #: 4561

financial incentive to attorneys to protect workers against employers who flout (in this case willingly) an employee's right to his or her wages, even where the value of that employee's claims is very low. *See United Slate*, 732 F.2d at 503("[T]ransfixion on the damages amount in establishing fees would penalize those litigants whose cases carry slight pecuniary damages, but which present instances of significant statutory violations."); *Fegley*, 19 F.3d at 1134-35 ("The purpose of the FLSA attorney fees provision is to insure effective access to the judicial process by providing attorney fees for prevailing plaintiffs with wage and hour grievances. Courts should not place undue emphasis on the amount of the plaintiff's recovery because an award of attorney fee here encourages the vindication of congressionally identified policies and rights.") (internal quotation marks and citations omitted). Be that as it may, the court also appreciates that plaintiffs' attorneys are not entitled to a windfall by recovering litigation expenses attributable to failed claims that had little or no factual and legal overlap with successful claims joined in the same proceeding.

Taking into account these competing considerations, the court finds that a reduction of the remaining fees by two-thirds is warranted. Of the remaining 351.70 hours of potentially compensable time at the $395 rate (*i.e.*, $138,921.50), a 66.7% reduction results in $46,307.17 in fees, or an equivalent of approximately 117.2 hours of work.[17]

As to the 11.6 hours spent by Grace and Burton on the fee application itself, the Sixth Circuit has held that, subject to appropriate limitations, attorneys are entitled to reasonable time spent on a fee application, not to exceed 5% of the time spent on the main case. *Coulter v. State*

---

[17]Accounting for the previous reductions leaves 363.3 hours of compensable time. 11.6 hours of that remaining time was spent on the fee application itself, which the court will address separately.

24

*of Tenn.*, 805 F.2d 146, 151 (6th Cir. 1986). Pursuant to *Coulter*, the court will therefore limit compensation for the fee application to 5% of the post-adjustment compensable hours (*i.e.*, 5% of 117.2 hours), or approximately 5.9 hours of attorney time ($2,315.36).[18]

The defendants have not specifically challenged Stewart's cost demand of $5,537.55, which is supported by appropriate documentation.. In the absence of any meaningful challenge, the court finds that demand to be reasonable and substantiated.

Therefore, the court will award total fees and costs of $54,295.08 ($46,307.17 + $135 + $2,315.36 + $5,537.55). The court finds that this amount best approximates the amount of compensable time that Stewart's counsel reasonably spent pursuing the Off-the-Clock Claims. The court notes that, notwithstanding substantial reductions to the amount demanded by Stewart, this award is approximately 69 times the value of the underlying judgment against the defendants for $789.50 in favor of the 11 plaintiffs who prevailed on their Off-the-Clock Claims. The court's award – which best approximates the work performed relative to the successful claims here – provides sufficient incentive for counsel to represent future plaintiffs seeking payment for "off-the-clock" time and/or uncompensated overtime, even where those plaintiffs' claims have a monetary value as low as the successful claims at issue here. Thus, the court does not construe its award as somehow frustrating the FLSA's intent to vindicate the rights of all aggrieved

---

[18]The defendants have also argued that it was excessive for Stewart's attorneys to spend 5.2 hours drafting discovery requests and 50.3 hours preparing Stewart's Proposed Findings of Fact and Conclusions of Law. The court's across-the-board reduction renders these arguments moot. Nevertheless, the court notes that it would not have found any inherent reason to conclude that the time spent on these tasks was excessive or unnecessary for Burton to undertake, particularly where the defendants did not identify why the court should treat the time as excessive, did not articulate what amount of time would have been reasonable, and did not provide the time that their own attorneys spent working on equivalent tasks.

employees, whatever the pecuniary value of their underlying (and valid) claims.

In sum, this is an extraordinary case, in which Stewart's attorneys devoted substantial resources to claims that did not prove successful for a supermajority of the plaintiffs and that resulted in only a fractional recovery on a distinct set of successful claims by a subset of plaintiffs. Therefore, although the ultimate fee and costs award is approximately 70% less than what Stewart has requested, the court finds that a substantially reduced award is justified under the exceptional circumstances presented in this case.

## CONCLUSION

For the reasons stated herein, the court will award fees and costs of $54,295.08.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge